UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DR. ASHU GARG,<br>      Plaintiff<br><br>      v.<br><br>VHS ACQUISITION SUBSIDIARY, NO. 7<br>d/b/a SAINT VINCENT HOSPITAL,<br>DAVID BADER, JOHN MUKAI, and,<br>DOUGLAS BURD<br>      Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    Civil Action No. |

## **VERIFIED COMPLAINT**

This is a complaint brought by a hardworking and dedicated physician who was denied an equal opportunity to complete his radiology residency because of his age. Defendants then terminated his employment after he complained of the disparate treatment. Defendants' actions are in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621, et seq. ("ADEA") and Chapter 151B. Defendants also breached their written employment agreement with plaintiff, the implied covenant of good faith and fair dealing, and tortuously interfered with plaintiff's contractual relations.

Parties

1. Plaintiff, Dr. Ashu Garg ("Dr. Garg"), is an individual residing at 159 Macadamia Lane, Simi Valley, Ventura County, California 93065.

2. Defendant, VHS Acquisition Subsidiary No.7, doing business as Saint Vincent Hospital ("SVH"), is a community hospital in Worcester founded by the Sisters of Providence in 1893, with a principal place of business at 123 Summer Street, Worcester, Worcester County, MA 01608.

1

3. Defendant, Dr. David Bader is the Director of SVH's Radiology Residency Program and has a usual place of business at 123 Summer Street, Worcester, MA 01608.

4. Defendant, Dr. John Mukai, is a faculty member of SVH's Radiology Residency Program and has a usual place of business at 123 Summer Street, Worcester, MA 01608.

5. Defendant, Dr. Douglas Burd, is a faculty member of SVH's Radiology Residency Program and has a usual place of business at 123 Summer Street, Worcester, MA 01608.

## Background

6. In 1998, Dr. Garg graduated with a medical degree from Sarojini Naida Medical College, Agra, India, where he successfully completed a formal radiology training rotation.

7. For eight years, Dr. Garg performed many surgeries including cancer surgeries, where he determined the pre-operative plan based on the radiology imaging studies, both routinely and on an emergency basis. In surgical oncology, he regularly evaluated USG, CT/ MRI and PET CT scans to make life saving surgical decisions.

8. In or around October 2008, Dr. Garg moved to the United States. During the process of applying for ECFMG, he received 90% and 97% scores in USMLE Step 1 and Step 2 CK respectively.

9. Subsequently, he applied for a residency with the expectation that he would become a radiologist and interventional radiologist.

10. Dr. Garg completed his first post-graduate year ("PGY") training at UIC/ Metropolitan Group of Hospitals in Chicago which required only one-year training (temporary) license.

11. Following his PGY1, Dr. Garg completed his PGY2 and PGY3 at the University of Oklahoma ("OUHSC").

12. Dr. Garg was awarded full unrestricted state medical licenses in the state of Oklahoma and California, based on his credentials and following successful fulfillment of other essential licensing requirements, in year 2014 and 2016 respectively.

SVH Residency

13. In June of 2016, Dr. Garg applied to an open PGY4 residency position with SVH. He interviewed twice with Program Director, Dr. David Bader.

14. Despite a Confidentiality Agreement, upon information and belief, Dr. Bader learned additional information about Dr. Garg from OUHSC, evident from comments made by SVH later on, that demonstrated an undue bias toward the evaluation of Dr. Garg's performance.

15. SVH offered him the PGY4 position in August, which Dr. Garg accepted.  *See* August 2, 2016 Offer Letter, attached as Exhibit A.

16. Per Accreditation Council for Graduate Medical Education ("ACGME") requirements, each residency program is required to provide all incoming residents with written expectations of the program.

17. The parties signed a Resident Agreement on or about September 12, 2016 ("Resident Agreement"), which stated that SVH would provide a Graduate Medical Education ("GME") Policy Manual to Dr. Garg.  The program also is required to provide a Radiology Residency Manual to Dr. Garg.  *See* Resident Agreement, attached as Exhibit B.

18. However, Dr. Garg did not receive a GME Policy Manual nor any written (or electronic form) expectations of the radiology residency program until he requested it in July of 2017 – after SVH terminated his employment.

19. Paragraph 3(b) of the Resident Agreement reads as follows:

    b) RENEWAL TERM. (i) Notice of Renewal/Non-Renewal.  If Hospital, in its sole discretion, offers the Resident Physician the opportunity to renew this Agreement for an additional term of twelve (12) months, Hospital will provide Resident Physician with notice of not less than four (4) months prior to the expiration of the Initial Term, unless the primary reason(s) for the non-renewal occurs within the four months prior to the end of this Agreement.  In that event, Hospital shall provide Resident Physician with at least five (5) days' notice of the nonrenewal before the end of the Initial Term or applicable renewal term.

20. After completing credentialing and licensing requirement for the Massachusetts Board of Registration in Medicine, Dr. Garg began the PGY4 on September 12, 2016. He was expected to complete his residency in radiology at SVH in two years by September 2018.

21. Dr. Garg was 46 years old when he began the program.

22. Upon information and belief, he was the oldest resident in the program, as the age range for the other residents was 26 to 36 years old.

Night Float Coverage

23. SVH determined Dr. Garg was competent and prepared to take night float in October 2016, one month into his residency at SVH, even though SVH knew that he had not taken night float in his previous residency.

24. In this role, Dr. Garg served as a senior radiologist at SVH at night covering the entire service with indirect supervision and support. Per SVH, Dr. Garg had to be a fully formed, fully functional radiologist performing life-saving critical diagnostic interpretations in real time in this role.

25. In or around November 2016, Dr. Bader met with Dr. Garg to discuss Dr. Garg's performance and concerns around the night float coverage.

26. On or about December 21, 2016, Dr. Bader met with Dr. Garg again and reported that Dr. Garg made "significant improvements over the past month". *See* ER Rotation Evaluation, attached as Exhibit C.

### SVH writes letters of recommendation for Dr. Garg

27. On January 20, 2017, Dr. Bader wrote a letter of recommendation in support of Dr. Garg's application for a fellowship with vascular interventional radiology fellowship. *See* January 20, 2017 Letter from Dr. Bader, attached as Exhibit D.

28. Associate Chief of Radiology, Dr. Brian Midkiff and Acting Director, Vascular and interventional Radiology, Dr. Gregory Berberian, also wrote letters of recommendation for Dr. Garg for the fellowship. *See* Recommendation Letters, attached as Exhibit E.

29. On February 14, 2017, Dr. Bader wrote a letter to the American Board of Radiology that he expected Dr. Garg to complete his residency by June of 2018 – less than the required typical two years. *See* February 14, 2017 Letter from Dr. Bader, attached as Exhibit F. Dr. Garg made this request to Dr. Bader, who stated that he would only agree after he considered Dr. Garg's performance and spoke with other staff at the residency.

30. On February 22, 2017, Dr. Bader wrote a second letter to the American Board of Radiology, which confirmed Dr. Garg's understanding that he was performing well. *See* February 22, 2017 Letter from Dr. Bader, attached as Exhibit G.

### Dr. Garg needs improvement in patient care and medical knowledge

31. The next day, Dr. Garg received a written warning that stated he did not meet performance expectations in the core competencies of patient care and medical knowledge. Though Dr.

Garg disagreed, he acknowledged that SVH believed that there were two practice areas upon which he could improve. In all other core competencies, Dr. Garg met expectations.

32. He responded to the written warning by email on March 2, 2017, in which he explained that Dr. Burd's evaluation of Dr. Garg's readings was not accurate, as Dr. Garg spoke to others who confirmed that Dr. Garg's readings were correct. In response, Dr. Bader told Dr. Garg that this was not related to Dr. Burd and reiterated SVH's concerns about patient care and medical knowledge.

33. This is around the time that Dr. Garg noticed that he was treated less favorably than the younger residents. Dr. Burd's unreasonable criticism of Dr. Garg's radiology readings, while being lax with the younger residents, was evidence of this.

34. Nonetheless, Dr. Bader agreed to recommend that Dr. Garg can complete the program in less than two years. Dr. Bader and others also wrote letters of recommendation for the fellowship – to which he was subsequently matched.

35. In fact, between March and June of 2017, Associate Program Director, Dr. Kanzaria, instructed and assigned Dr. Garg to actively participate in the department's American Board of Radiology Core examination preparation sessions, which was typically reserved for PGY4 and sometimes, for repeat/ failed PGY5 residents.

36. Based on the above, Dr. Garg reasonably believed that his overall performance was satisfactory and convinced himself that SVH staff was not inappropriately considering his age in their evaluation of his performance.

<u>The disparate treatment continues</u>

37. However, soon thereafter, Dr. Bader and Dr. Kanzaria also singled Dr. Garg out without reason.

38. Specifically, on or about April 18, 2017, both Dr. Bader and Dr, Kanzaria unreasonably criticized Dr. Garg for inadvertently failing to sign one "sign out form". *See* April 18, 2017 Email from Drs. Bader and Kanzaria, attached as Exhibit H.

39. In contrast, Dr. Garg is aware of at least one resident significantly younger than Dr. Garg, who failed to do so for five consecutive days, without criticism.

40. Not only had Drs. Bader and Kanzaria treated him less favorably than the younger residents, but also Dr. Mukai made an age-related comment toward Dr. Garg.

41. Around that same time, during a conversation about images, Dr. Mukai repeatedly asked Dr. Garg's age. When Dr. Garg responded that he was over 40, Dr. Mukai rudely said, "You are fucking forty years old and trying to learn radiology now?". Later SVH admitted that Dr. Mukai made this statement, however, tried to dilute its harshness by stating that Dr. Mukai referenced this to Dr. Garg's "wisdom" and "experience".

42. Dr. Garg hesitated to raise these concerns as he did not want to take any action that could jeopardize his residency.

### SVH offers Dr. Garg a position for his final year of residency

43. Per the Resident Agreement, SVH was supposed to provide notice of renewal at least four months in advance of the expiration of the initial term (June 30, 2017).

44. However, on April 26, 2017, Dr. Bader signed an offer letter for Dr. Garg to complete his final year of residency through June 2018 ("Renewal"), which confirmed that Dr. Garg's overall performance was satisfactory. The Renewal did not reference any concerns about Dr. Garg's performance or that the offer may be revoked if he does not perform satisfactorily. *See* April 26, 2017 Renewal, attached as Exhibit I.

45. After Dr. Bader signed the Renewal, he issued Dr. Garg a written warning on May 3, 2017 for his alleged unsatisfactory performance in March and April. *See* May 3, 2017 Written Warning, attached as Exhibit J.

46. At this stage, Dr. Garg was confused by SVH's evaluation of his performance, as the second written warning referenced details that were false.

47. Specifically, it referenced that SVH reviewed expectations with Dr. Garg, that his readings had to be re-read and the timeliness of his reporting, none of which were true.

48. Dr. Garg was suspect of the SVH and the decision makers' true motives and now, he felt compelled to report the disparate treatment he was experiencing.

Dr. Garg's complaint

49. On May 12, 2017, Dr. Garg complained to Dr. Bader about Dr. Burd's disparate treatment. Dr. Garg offered to meet with Dr. Bader to review the readings to see Dr. Burd's unreasonable criticism, and because there were discrepancies by the attendings. *See* May 12, 2017 Email from Dr. Garg, attached as Exhibit J.

50. In response, Dr. Bader said that the two of them would have to meet with Human Resources as a result of Dr. Garg's "accusation of discrimination." *See* May 12, 2017 Email from Dr. Bader, attached as Exhibit K.

51. Concerned that doing so could jeopardize his final year of residency, Dr. Garg said there was no need to meet with Human Resources.

52. Neither Dr. Bader nor Human Resources followed up with Dr. Garg on his complaint.

53. Dr. Garg pointed out to Dr. Bader that he was singled out for not completing one sign out sheet, while another younger resident failed to complete six.

54. In mid-May, Dr. Garg started his fluoroscopy rotation. During this time, Dr. Garg had to work with broken fluoroscopy machines and when he complained about this to Dr. Mukai, Dr. Mukai suggested that working on broken machines better prepared the residents.

55. Dr. Garg signed the Renewal on May 15, 2017, which bound both parties to Dr. Garg completing his PGY-5 at SVH from July 1, 2017 to June 30, 2018.

56. Around that same time, Dr. Garg also agreed to make up some days in November 2017, confirming that he would complete his final year of residency at SVH. *See* Absence Make-Up Time Form, attached as Exhibit L.

SVH continues to assign Dr. Garg significant responsibilities

57. SVH assigned Dr. Garg to take his third night float from June 10-15, fully trusting him to read and review images effectively and independently. Dr. Garg served as a senior radiologist at SVH at night covering the entire service with indirect supervision and support. Per SVH, Dr. Garg had to be a fully formed, fully functional radiologist performing life-saving critical diagnostic interpretations in real time in this role.

58. Upon completing the night float, Dr. Garg did not receive any negative feedback from SVH staff.

59. On June 14, 2017, Dr. Garg was matched for his Interventional Radiology fellowship at NYU Medical Center, through the National Resident Matching Program. *See* Print out of Match Results, attached as Exhibit M.

SVH abruptly terminates Dr. Garg's residency, despite improvements

60. On June 21, 2017, Dr. Bader and Dr. Kanzaria met with Dr. Garg and presented him a termination letter that stated Dr. Garg failed to meet performance expectations of a PGY4

      level during assessment for academic year 2016-2017.  *See* June 21, 2017 Termination Letter, attached as <u>Exhibit N</u>.  Dr. Garg was shocked.

61. During this same meeting, they also provided Dr. Garg with his Year End Milestone Evaluation, which stated that Dr. Garg improved in the two core competencies in which he was previously criticized - patient care and medical knowledge.  It was clearly evident that he did better in these two core competencies, and still performed satisfactorily in the remaining core competencies. *See* Year End Milestone Evaluation, attached as <u>Exhibit O</u>.

62. He had not made any material mistakes between the time he signed SVH's Renewal and the termination letter.  Moreover, he improved in the two areas that SVH expressed concerns in the past.

63. Dr. Garg was gravely concerned that SVH not only discriminated against him because of his age, but also penalized him for his complaint of discrimination.

64. Shortly thereafter, Dr. Garg met with Dr. Midkiff, who did not believe that SVH would overturn the termination or allow Dr. Garg an opportunity to resign.

65. In late July 2017, Dr. Mukai provided an overall general evaluation of Dr. Garg's performance in which he mostly received rankings of "Very Good".  *See* Overall General Evaluation, attached as <u>Exhibit P</u>.

66. Dr. Garg also was confident that his 360 evaluations by other radiology residents were more than satisfactory.

67. Dr. Bader's inconsistent evaluation of Dr. Garg's performance suggested that he harbored retaliatory animus toward Dr. Garg after he complained about discrimination.

<u>Dr. Garg's appeal efforts</u>

68. Dr. Garg requested that he be allowed to complete the ARIP course already scheduled/enrolled for the month of August, so that he could be eligible for the core Board exams, but SVH denied his request.

69. Dr. Garg appealed the termination decision, in which he also made a formal complaint through counsel regarding the discrimination on or about July 12, 2017.

70. On or about July 19, 2017, Director of Medical Education, Dr. Yuka-Marie Vinagre, determined that in lieu of termination, SVH could offer Dr. Garg the opportunity to repeat his PGY4 with zero credits for the past ten months.  SVH also asked Dr. Garg to rescind his acceptance of the current PGY-5 position. However, SVH also told Dr. Garg that even if he successfully completed his repeated PGY4, he could not finish his residency at SVH. Instead he had to find a new program to complete his final PGY5 year of residency.

71. Dr. Garg knew that this was not a fair resolution given that it would be impossible for him to find a program that will accept him as a PGY5 resident. SVH is well aware of the rarity of an open PGY-5 position.

72. Dr. Vinagre's decision was also inconsistent with SVH's announcement that Dr. Garg was listed as a member of its House Staff for 2017-2018 year as a PGY5 resident.  *See* Printout from Hospital dated July 22, 2017, attached as Exhibit Q.

73. Thus, Dr. Garg appealed Dr. Vinagre's decision.

74. SVH's Chief Executive Officer, Jeffrey M. Welsh, and Dr. Bader held a meeting with Dr. Garg on August 7, 2017.

75. At the meeting, SVH had its outside counsel in attendance, Attorney Barbara Hayes Buell. Despite his request, Dr. Garg was denied an opportunity to have his counsel attend. *See* August 1, 2017 Email from Attorney Buell, attached as Exhibit R.

76. The next day, Welsh reaffirmed the decision to terminate Dr. Garg's residency, without any opportunity for Dr. Garg to repeat his PGY4 or provide any credits for the eleven months he worked at SVH.

77. Dr. Garg tried applying to programs in other states. However, because his termination was finalized in August 2017, it was already too late to apply.

78. In October 2017, for purpose of residency transfer and also for ABR academic credits, Dr. Garg requested Dr. Bader to provide a summary evaluation, per the required standards set forth by the ACGME.

79. Dr. Bader misrepresented in the Summative Evaluation that Dr. Garg had not met performance expectations in core competencies of Patient Care and Medical Knowledge, despite his year-end review where Dr. Garg was told he did.

80. Because of this misrepresentation, Dr. Garg has been unable to secure a residency in any other program.

81. In October 2017, SVH notified ABR that Dr. Garg is no longer working in its residency program. See October 11, 2017 Letter from ABR to Dr. Garg, attached as Exhibit S. This demonstrates the program's interference with Dr. Garg's ability to complete the ABR Core exam (Part 1 of American Board of Radiology examination).

82. Through counsel, Dr. Garg repeatedly requested copies of all documents from his residency folder during the appeal process and after his termination was finalized in August 2017.

83. However, SVH did not provide many of the documents until June 2018.

84. This delay caused further harm to Dr. Garg because without a complete copy of his documents as a PGY4 resident, it hindered his ability to fully enforce his rights.

85. Dr. Garg satisfied the administrative filing requirement under M.G.L. c. 151B, §9 by filing a complaint against defendants with the Massachusetts Commission Against Discrimination, subsequently withdrawn on or about August 8, 2019.

## COUNT I

### The Age Discrimination in Employment Act, 29 U.S.C. § 621, et seq.

86. Dr. Garg alleges and incorporates by reference all of the above allegations.

87. Dr. Garg was entitled to an equal opportunity to complete his residency. He also was entitled to full credit for his PGY4 residency at SVH.

88. In accordance with the ADEA, Dr. Garg also had the right to complain to be free from disparate treatment.

89. Defendants interfered with and denied Dr. Garg's rights under the ADEA when it treated him differently than younger residents, in violation of 29 U.S.C. § 623(a).

90. Defendants interfered with and denied Dr. Garg's rights under the ADEA when it terminated his employment, in violation of 29 U.S.C. § 623(a).

91. Defendants retaliated against Dr. Garg for having exercised his right under the ADEA to continue working at SVH, despite his complaint of discrimination, in violation of 29 U.S.C. 623(d).

92. As a result of the above actions, Defendants violated the ADEA.

93. Defendants' unlawful mistreatment of Dr. Garg has caused him to suffer financial losses in excess of $75,000.00, including lost wages, and to endure significant emotional distress.

## COUNT II

### Massachusetts General Laws, Chapter 151B

94. Dr. Garg alleges and incorporates by reference all of the above allegations.

95. Dr. Garg was entitled to an equal opportunity to complete his residency. He also was entitled to full credit for his PGY4 residency at SVH.

96. In accordance with Chapter 151B, Dr. Garg also had the right to complain to be free from disparate treatment.

97. Defendants interfered with and denied Dr. Garg's rights under Chapter 151B when it treated him differently than younger residents.

98. Defendants interfered with and denied Dr. Garg's rights under Chapter 151B when it terminated his employment.

99. Defendants retaliated against Dr. Garg for having exercised his right under Chapter 151B to continue working at SVH, despite his complaint of discrimination.

100. As a result of the above actions, Defendants violated Chapter 151B.

101. Defendants' unlawful mistreatment of Dr. Garg has caused him to suffer financial losses in excess of $75,000.00, including lost wages, and to endure significant emotional distress.

## COUNT III

### Breach of Contract

102. Dr. Garg hereby restates and realleges all above paragraphs.

103. Dr. Garg and SVH had a valid Resident Agreement, which was renewed on or about May 15, 2017, for a renewal term from July 1, 2017 to June 30, 2018.

104. SVH breached the Resident Agreement when it terminated Dr. Garg's employment without a reason that occurred between May 15, 2017 and June 21, 2017.

105. SVH also breached the Agreement when it failed to give him full credit for his PGY4 residency at SVH and did not allow him to complete his residency at SVH.

106. SVH's breach caused and continues to cause Dr. Garg to suffer damages in excess of $75,000.00.

## COUNT IV

### Breach of the Implied Covenant of Good Faith and Fair Dealing

107. Dr. Garg hereby restates and realleges all above paragraphs.

108. Dr. Garg and SVH had a valid Resident Agreement, which was renewed on or about May 15, 2017, for a renewal term from July 1, 2017 to June 30, 2018.

109. SVH breached the implied covenant of good faith and fair dealing when it when it terminated Dr. Garg's employment without any good faith reason that occurred between May 15, 2017 and June 21, 2017.

110. SVH also breached the implied covenant of good faith and fair dealing when it failed to give him full credit for his PGY4 residency at SVH and did not allow him to complete his residency at SVH.

111. SVH's breach caused and continues to cause Dr. Garg to suffer damages in excess of $75,000.00.

## COUNT V

### Tortious interference with Dr. Garg's contractual relations with the ABR

112. Dr. Garg hereby restates and realleges all above paragraphs.

113. Dr. Garg had a contract with the ABR to take the Core exam (Part 1 of the ABR exam).

114. Dr. Garg also had a contract with NYU Medical Center for the Interventional Radiology fellowship.

115. Defendants knowingly interfered with Dr. Garg's contract with the ABR by wrongfully terminating his residency, which then caused the ABR to terminate Dr. Garg' eligibility to take the exam.

116. Defendants interference with the contract was improper because the termination was based on discrimination and retaliation.

117. Dr. Garg was unable to take the ABR exam, which then prohibited him from completing his PGY5 and become a radiologist.

118. Defendants' improper interference caused Dr. Garg to suffer harm in the form of future lost wages, distress, and he incurred attorney's fees.

## COUNT VI

### Tortious interference with Dr. Garg's contractual relations with NYU Medical Center

119. Dr. Garg hereby restates and realleges all above paragraphs.

120. Dr. Garg had a binding NRMP contract with NYU Langone Medical Center, Manhattan for the Interventional Radiology fellowship starting July 2018.

121. Defendants knowingly interfered with Dr. Garg's contract with NYU Langone Medical Center, Manhattan by wrongfully terminating his residency, which then ultimately resulted in a rescission of the fellowship offer.

122. Defendants interference with the contract was improper because the termination was based on discrimination and retaliation.

123. Dr. Garg was unable to participate in the fellowship, which prevented him from future career opportunities to become an interventional radiologist and ultimately prohibited him from becoming a practicing Vascular and Interventional radiologist.

124. Defendants' improper interference caused Dr. Garg to suffer harm in the form of future lost wages, distress, and he incurred attorney's fees.

## REQUESTS FOR RELIEF

WHEREFORE, Dr. Garg respectfully requests that this Court grant the following relief:

1. Reinstate Dr. Garg to complete his PGY5 and issue him full one-year credit for his PGY4 at SVH.

2. Lost wages, punitive damages and emotional distress damages due under both state and federal claims, as well as the breach of contract and breach of the implied covenant of good faith and fair dealing.

3. Lost wages, including interest and liquidated damages, under the ADEA and Chapter 151B.

4. Reasonable attorneys' fees as well as the costs of this action; and

5. Such other and further relief as a court may deem necessary and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted,
DR. ASHU GARG
By his attorneys,

/s/ Kavita M. Goyal
Kavita M. Goyal (BBO # 654013)
Matthew Perry (BBO # 703809)
Rosen & Goyal, P.C.
204 Andover Street, Ste. 402
Andover, MA 01810
(978)474-0100
kgoyal@rosenlawoffice.com
mperry@rosenlawoffice.com

Date: May 28, 2020

2. Lost wages, punitive damages and emotional distress damages due under both state and federal claims, as well as the breach of contract and breach of the implied covenant of good faith and fair dealing.

3. Lost wages, including interest and liquidated damages, under the ADEA and Chapter 151B.

4. Reasonable attorneys' fees as well as the costs of this action; and

5. Such other and further relief as a court may deem necessary and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted,
DR. ASHU GARG
By his attorneys,

Kavita M. Goyal (BBO # 654013)
Matthew Perry (BBO # 703809)
Rosen & Goyal, P.C.
204 Andover Street, Ste. 402
Andover, MA 01810
(978) 474-0100
kgoyal@rosenlawoffice.com
mperry@rosenlawoffice.com

Date: May ___, 2020

## VERIFICATION

I, Dr. Ashu Garg, on oath, state that I have read the above Complaint, including its corresponding exhibits, and that the facts averred therein are true and, as to statements made upon on information and belief, I believe those to be true.

May 26 2020

_____
Dr. Ashu Garg

17

Scanned with CamScanner