# PLAINTIFF EXHIBIT 1

1              UNITED STATES DISTRICT COURT
2            FOR THE DISTRICT OF MASSACHUSETTS
3      Civil Action No. 4:20-cv-40060-DHH
4      - - - - - - - - - - - - - - - - - - -x
5      DR. ASHU GARG,
6                      Plaintiff,
7           v.
8      VHS ACQUISITION SUBSIDIARY NO. 7
9      d/b/a SAINT VINCENT HOSPITAL, DAVID
10     BADER, JOHN MUKAI, and DOUGLAS BURD,
11                      Defendants.
12     - - - - - - - - - - - - - - - - - - -x
13
14            DEPOSITION OF DR. ASHU GARG
15     OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
16                  One Boston Place
17                Boston, Massachusetts
18                 February 14, 2022
19               9:07 a.m. to 6:26 p.m.
20
21     Daria L. Romano, RPR, CRR, and Notary Public
22
23
24

2

```
1   APPEARANCES:

2

3   ROSEN & GOYAL

4   (by Kavita Goyal, Esq.)

5   204 Andover Street

6   Andover, Massachusetts 01810

7   (978) 474-0100

8   kgoyal@rosengoyal.com

9   Counsel for the Plaintiff.

10

11  OGLETREE DEAKINS NASH SMOAK & STEWART, P.C.

12  (by Diane M. Saunders, Esq.

13  Olivia L. Vehslage, Esq.)

14  One Boston Place

15  Boston, Massachusetts 02108

16  (617) 994-5700

17  diane.saunders@ogletreedeakins.com

18  olivia.vehslage@ogletreedeakins.com

19  Counsel for the Defendants.

20

21

22  ALSO PRESENT:

23  David Bader

24
```

Dr. Ashu Garg vs                                                    Dr. Ashu Garg
VHS Acquisition Subsidiary No. 7, et al.

3

1               I N D E X

2  Deposition of:                    Page

3  ASHU GARG, M.D.

4  By Ms. Saunders                   5

5

6

7  CONFIDENTIAL QUESTION AND ANSWER CONTAINED ON

8  PAGE 154

9

10

11               E X H I B I T S

12  No.                                    Pg.

13  Exhibit 1   MCAD charge, filing date,    14

14              1/8/2018

15  Exhibit 2   Letter, February 12, 2018    14

16  Exhibit 3   Dismissal letter             14

17  Exhibit 4   Dismissal and notice of rights  14

18  Exhibit 5   Ashu Garg's Rebuttal Statement  14

19              to Saint Vincent Hospital,

20              David Bader, John Mukai, and

21              Douglas Burd's Responsive

22              Position Statement

23  Exhibit 6   Ashu Garg's Supplemental      14

24              Statement to Saint Vincent

Dr. Ashu Garg vs                                                    Dr. Ashu Garg
VHS Acquisition Subsidary No. 7, et al.

4

| 1  |              | Hospital, David Bader, John      |     |
| 2  |              | Mukai, and Douglas Burd's        |     |
| 3  |              | Responsive Position Statement    |     |
| 4  | Exhibit 7    | Petition                         | 23  |
| 5  | Exhibit 8    | Complaint and Jury Demand        | 23  |
| 6  | Exhibit 9    | Voluntary dismissal without      | 23  |
| 7  |              | prejudice letter                 |     |
| 8  | Exhibit 10   | Statement of claim               | 23  |
| 9  | Exhibit 11   | Verified complaint               | 31  |
| 10 | Exhibit 12   | Plaintiff's Answers and          | 101 |
| 11 |              | Objections to Defendants'        |     |
| 12 |              | Second Set of Interrogatories    |     |
| 13 | Exhibit 13   | E-mail, May 13, 2017             | 191 |
| 14 | Exhibit 14   | E-mail, August 3, 2017           | 230 |
| 15 | Exhibit 15   | E-mail                           | 236 |
| 16 | Exhibit 16   | Department of Radiology          | 259 |
| 17 |              | resident educational             |     |
| 18 |              | portfolio review                 |     |
| 19 | Exhibit 17   | Department of Radiology          | 259 |
| 20 |              | resident educational             |     |
| 21 |              | portfolio review                 |     |
| 22 | Exhibit 18   | Letter, February 23, 2017        | 262 |
| 23 | Exhibit 19   | Letter, May 3, 2017              | 263 |
| 24 | Exhibit 20   | O.U. Summative Competency-        | 308 |

Dr. Ashu Garg vs                                                      Dr. Ashu Garg
VHS Acquisition Subsidiary No. 7, et al.

5

1            Based Performance Evaluation

2   Exhibit 21  General release and        316

3            settlement agreement

4

5   *Original exhibits retained by Ms. Saunders

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

12

1   a significant error when those were reviewed
2   by other people.
3        Q.   Okay.  And why are you suing
4   Dr. Mukai?
5        A.   Because he made -- he shouted at me,
6   "You're fucking 40 years old and you are
7   trying to learn radiology now?"  First he
8   asked my age before starting -- before
9   shouting and then he say that, "You're fucking
10  40 years old and you are trying to learn
11  radiology now?"
12       Q.   So you're suing him for that comment?
13       A.   That comment as well as I -- during
14  my first night float, I read a study.  That
15  study was hard because that was without
16  contrast, the study, and I called Dr. Milliam
17  Kataoka.  That study was -- I consulted
18  Milliam Kataoka and I -- exactly what she told
19  me, I wrote in that study, and I got
20  significant mistake by Mukai for that study.
21       Q.   And what are you hoping to gain
22  through this lawsuit?
23       A.   Justice.
24       Q.   And what would justice look like to

30

1    program" --

2        A.    Correct.

3        Q.    -- "at SVH was wrongful"?

4        A.    Yes.

5        Q.    Okay.  And did you review this before

6    this was submitted on your behalf?

7        A.    Yes.

8        Q.    Okay.

9        A.    I reviewed, but somehow this thing,

10   PGY4, maybe -- I don't remember how it

11   happened, this mistake.

12       Q.    Because you believed that at this

13   time, you were in the PGY5 program?

14       A.    I was in the PGY5 program.

15       Q.    I'm sorry.  You believed you were a

16   PGY5?

17       A.    Yes.

18       Q.    Okay.  And when did you start

19   becoming a PGY5?

20       A.    July 1, 2017.  It was posted by

21   hospital roster, by the program, at SVH.

22       Q.    Okay.

23              MS. SAUNDERS:  And then -- so I

24   was going to mark the very first tab, tab 1,

43

1        Q.    You can answer.

2        A.    Retaliation is a continuation of

3    something when -- when somebody's -- retaliate

4    means, like, retaliate, right?

5        Q.    You have a retaliation claim in this

6    case.

7        A.    Yes.

8        Q.    What does it mean to you?

9        A.    Because I made the complaint of age

10   discrimination in -- to Dr. Bader, so that's

11   why he -- he retaliate.

12       Q.    Okay.  So that's one.

13       A.    Mm-hmm.  Yes.

14       Q.    So how do you explain the -- how does

15   the University of Oklahoma breaching the

16   confidentiality clause in the settlement

17   agreement -- how did that play any part in

18   Saint Vincent Hospital's decision to terminate

19   you from the radiology residency program?

20            MS. GOYAL:  Objection.  Asked and

21   answered.

22        You can answer.

23            THE WITNESS:  I can --

24            MS. GOYAL:  You can answer again.

49

1   mean Dr. Bader?

2       A.   Yes.

3       Q.   So do you think Dr. Bader --

4       A.   You have to ask this question to

5   Bader, not me, which carries most -- why you

6   terminated him wrongfully.

7       Q.   Do you believe that Dr. Bader is the

8   only person that was involved in the decision

9   to terminate you from the Saint Vincent

10  radiology residency program?

11      A.   Only person?  Yeah.  Based on

12  document, yes.

13      Q.   So it was his decision alone?

14      A.   Yes.

15      Q.   So what about the review process that

16  you went through at the hospital?  You had it

17  reviewed by Yuka Marie Vinagre, by Jeff Welch,

18  and also by a faculty review committee.

19           Do you remember that?

20      A.   That was all influenced by Bader.

21      Q.   So he controlled all of them?

22      A.   Yes.

23      Q.   Okay.

24      A.   Because he -- initially he said that,

55

1    settlement agreement.  Why I'm going to reveal

2    that thing?  I'm still bound to that

3    confidentiality.  I'm not going to tell you

4    anything about that --

5         Q.   Okay.  So you also --

6         A.   -- from my end.

7         Q.   You also didn't reveal that you had

8    complained to Dr. Bader about discrimination.

9    The only thing you talked about was the fact

10   that Dr. Mukai had made a comment to you on

11   one occasion about your age.

12        A.   Yes.  So the reason for that is, I

13   want to prove it objectively.  So when Burd

14   gave me the R4 rating for a study where he

15   was -- himself was not sure whether there will

16   be a true finding that -- that should be

17   attended.

18             And on -- at number 7, in terms of

19   the priority when you are to inform a

20   physician on floor or hospitalist on floor

21   that something is critical, then it should be

22   your number one finding, then comes less

23   important thing, less critical thing.

24             And he put everything on number 7.

65

1   them, why didn't you sue them?

2           MS. GOYAL:  Objection.

3       A.   Because they were influenced by

4   Dr. Bader.

5       Q.   Each and every one of them?

6       A.   Correct, because they -- they are

7   subordinates to Dr. Bader.  They were under

8   him.

9       Q.   And is that your belief with regard

10  to Mr. Welch?  You think he was subordinate to

11  Dr. Bader?

12      A.   No.

13      Q.   Well, how did Dr. Bader influence

14  Mr. Welch?

15      A.   Ask Bader.

16      Q.   You have no information?

17      A.   I -- I saw him staying after that

18  meeting with him.  I saw him staying after

19  meeting with Vinagre, him.  So I don't know.

20  You have to ask Bader.

21      Q.   So you have no -- you don't know what

22  was discussed at either one of those meetings

23  that you just testified about?

24              MS. GOYAL:  I'm a little confused

66

1    in terms of which meetings with whom.  So if
2    we could try and use the proper names, I think
3    it would be helpful for the record.
4                   MS. SAUNDERS:   Okay.
5    BY MS. SAUNDERS:
6        Q.    So your testimony is that -- that the
7    reason that you believe that Dr. Bader
8    influenced Dr. Vinagre and Jeff Welch was
9    because you saw Dr. Bader having private
10   meetings with each one of those individuals
11   after the appeal meetings that you had with
12   them; is that right?
13       A.    Correct.
14       Q.    Okay.  So you're talking about two
15   separate meetings.  So it's starting first
16   with Dr. Vinagre.
17             You had a meeting with Dr. Vinagre
18   about your appeal, correct?
19       A.    Yes.
20       Q.    And then after that meeting, you saw
21   Dr. Bader talking to Dr. Vinagre, correct?
22       A.    Yes.
23       Q.    And what did they discuss?
24       A.    I don't know.

Dr. Ashu Garg vs                                            Dr. Ashu Garg
VHS Acquisition Subsidiary No. 7, et al.

67

1        Q.    And --
2        A.    They were not discussing it in front
3    of me but far, a little bit far from me.
4        Q.    Okay.   And then you had a meeting
5    with Mr. Welch, correct?
6        A.    Correct.
7        Q.    And then after that meeting, you saw
8    Mr. Welch talking to Dr. Bader, correct?
9        A.    Yes.
10       Q.    And what did they discuss?
11       A.    I don't know.
12       Q.    Besides the fact that you saw
13   Dr. Bader speaking privately with each one of
14   those individuals, Dr. Vinagre and Mr. Welch,
15   do you have any other reason to believe that
16   Dr. Bader improperly influenced either one of
17   them?
18       A.    Yes.
19       Q.    And what is it --
20       A.    I met Dr. Vinagre earlier, before the
21   Stage Three appeal meeting, and she told me
22   that once the decision by the program director
23   is made, then usually the program has to
24   decide whatever the end result will be,

Dr. Ashu Garg vs                                           Dr. Ashu Garg
VHS Acquisition Subsidiary No. 7, et al.

68

1   whether it's going to be terminated or whether
2   it will be.  So she said that.  And I think
3   this is documented as well.
4       Q.   So she said that -- so what did you
5   interpret that to mean in terms of her
6   authority with regard to the --
7       A.   So she --
8       Q.   -- Step Three appeal?
9       A.   Say it again?
10          MS. SAUNDERS:  Can you repeat it.
11          (Record read)
12      A.   She was relying on Bader for making
13  the decision.
14      Q.   So you understood her to be saying to
15  you that she was relying on Dr. Bader to make
16  her decision?
17      A.   Correct.
18      Q.   And how about with -- anything else
19  with regard to why you think that Dr. Vinagre
20  was improperly influenced by Dr. Bader?
21      A.    Improperly influenced?  You use the
22  word improperly influenced?
23      Q.   I did use the word improperly
24  influenced.  Can you answer the question with

69

1    that word in it?

2         A.   Can you repeat the whole question

3    again?

4         Q.   Oh, sure, yes.  I can keep asking

5    questions all day.  So --

6              MS. GOYAL:  Excuse me, Diane.

7    He's answering the questions to the best of

8    his ability.  Let the record reflect that I

9    sense a little bit of hostility based on

10   nothing.  He's answering every single question

11   you're asking, even when you're asking repeat

12   questions.  So I would ask you to be more

13   professional about your approach to the

14   witness.

15   BY MS. SAUNDERS:

16        Q.   Dr. Garg, do you believe that

17   Dr. Bader influenced Dr. Vinagre?

18        A.   Yes.

19        Q.   And you testified that the basis for

20   that belief is, number one, you saw him having

21   a private meeting with Dr. Vinagre and, number

22   two, Dr. Vinagre made a comment to you about

23   Dr. Bader being -- that she needs to rely on

24   his decision; is that right?

1      A.    Yes.

2      Q.    Besides those two things, is there

3  any other reason why you believe Dr. Bader

4  influenced Dr. Vinagre's decision?

5      A.    You have to ask that question to

6  Bader.

7      Q.    I'm asking the question to you, your

8  belief.

9            Is there anything besides those two

10  things that form the basis for your belief

11  that Dr. Bader influenced Dr. Vinagre?

12      A.    She -- I had that small meeting with

13  Vinagre and in front of Dr. Bader.  She didn't

14  know the full details what exactly -- what is

15  going on, like all the details, so she was,

16  like, on Bader, because she -- she was not my

17  attending.  She was, I think, intensivist or

18  critical care doctor there.  So I was not

19  working with her.  She has no idea about my

20  performance or what is going -- what is

21  happening with me.

22            So that -- that meeting was for -- a

23  very brief meeting, that Stage Three appeal

24  meeting.  She didn't have full idea about what

71

```
 1    exactly, so she was relying upon Bader.  And
 2    before that meeting, I met Vinagre in person.
 3    She said that once the program decide the
 4    resident's termination, then the hospital will
 5    go with it.
 6         Q.   And besides what you've already
 7    testified to, are there any other reasons why
 8    you believe that Dr. Bader influenced
 9    Dr. Vinagre's decision on your Step Three
10    appeal?
11         A.   She was not working with me.  She
12    don't know -- I am not internal medicine
13    resident.  I was a radiology resident.  I
14    don't have any encounters with her, any common
15    patients.  She don't have -- she does not have
16    any idea about me.
17         Q.   Anything else?
18         A.   Anything else?  Zero credit, she
19    wrote in her letter, zero credits.
20         Q.   And why does that make you think that
21    Dr. Bader influenced her, that she wrote that?
22         A.   Because when I did my interventional
23    radiology with Dr. Berberian, Gregory
24    Berberian, he told me that I'm passed.  I did
```

77

1  breaks.

2           THE WITNESS:  Okay.

3  BY MS. SAUNDERS:

4      Q.   So I'm going to assume that you

5  understand you're still under oath.  Correct?

6      A.   Mm-hmm.

7      Q.   Okay.  So you're under oath all day

8  until you're done and leave.

9           Do you understand that?

10     A.   Yes.

11     Q.   Okay.

12           MS. SAUNDERS:  So can you repeat

13  back the question, please.

14           (Record read)

15     A.   Okay.  So before Stage Two appeal

16  meeting, I met Bader in his office.  He said

17  that he is going to send an e-mail with all

18  the details, what this appeal meeting is

19  about, how -- what their roles are, everything

20  in detail, to those faculty members.  Then he

21  said that the faculty should be there.

22           And the time which was given to me

23  for the faculty meeting was -- I was there at

24  the time and faculty was there at the time,

78

1   then Bader came.  He asked that was

2   unexpectedly -- he asked unexpectedly to leave

3   the room.

4       Q.   He being Bader?

5       A.   Bader, yes.  Bader asked me

6   unexpectedly.  I was not expecting that I have

7   to leave the room, because that was my start

8   time of -- of my meeting with the faculty

9   members.

10          And then he also -- and also he

11  ask -- then I waited outside for 20 minutes --

12  about 20 minutes, half an hour, approximately,

13  at least 20 minutes.  So then they call me

14  back.  So it is pretty obvious.  All the

15  details he told me that he's going to send

16  when I met him in person -- he also ask me

17  which faculty members I want to choose, if

18  that faculty members are okay or not.  He

19  suggested some names, then I said, "Okay."

20          The meeting was supposed to start

21  exactly at the time when I was there.  It was

22  unexpected that I have to go out.  And it was

23  unexpected that -- spending so much time with

24  the faculty members, though he told faculty

80

1  e-mail?

2      A.   No, to all faculty members who will

3  be hearing my Stage Two appeal meeting.

4      Q.   Okay.  So he's -- so the reason why

5  you think he influenced them was because you

6  believe he sent that e-mail.

7              MS. GOYAL:  Objection.

8      Q.   Is that right?  Is that what you're

9  saying?

10      A.   Yes.

11      Q.   And because he had a meeting with

12  them at the time that you were supposed to

13  start your meeting?

14      A.   They were already -- they are

15  subordinate to Bader.

16      Q.   What do you mean, they're

17  subordinate?

18      A.   They are working under Bader.  Bader

19  can do whatever they can do with the faculty

20  members.

21      Q.   Why do you believe that they were

22  working under Bader?

23      A.   Because he's the chairman, and he is

24  also the program director.

1      Q.    The chairman of what?

2      A.    Radiology program at Saint Vincent

3  Hospital.

4      Q.    The chairman of the medical -- of the

5  department?

6      A.    Yes, radiology department.

7      Q.    Okay.  And as the chairman of the

8  department, is that a medical staff role?

9      A.    Can you say it again?

10     Q.    I asked, was that a medical staff

11  role or is that -- do you believe that that's

12  an employment role?

13     A.    I don't know what kind of contact --

14  he himself with the SVH, what kind of contract

15  the faculty had with the program.  I don't

16  know how susceptible they are.

17     Q.    Okay.  But you believe that they

18  report to him?

19     A.    Yes.

20     Q.    Okay.  So besides the fact that they

21  report to him and that Dr. Bader said he was

22  going to send this e-mail to them and the fact

23  that Dr. Bader had a meeting with them for 20

24  minutes at the time that you were supposed to

125

1      Q.   And what influence do you believe
2   Dr. Mukai had about the decision to dismiss
3   you from the program?  Dr. Bader's decision to
4   dismiss you from the program in June of 2017,
5   what role did Dr. Mukai play?
6      A.   He's a senior radiologist in the
7   program for many years as compared to the
8   newcomer, new, younger faculty members, and he
9   sit next to Bader in the working station, and
10  also their offices are closed in the back.  So
11  I don't know how much work influence he did.
12  Ask -- it will be better asked with Dr. Mukai.
13     Q.   So, again, I'm asking about what your
14  belief is and what evidence you have.  Okay?
15          So do you have any evidence, sitting
16  here today -- other than the fact that you
17  know that he was a senior radiologist and had
18  an office close to Dr. Bader, do you have any
19  evidence that Dr. Mukai had any influence over
20  Dr. Bader's decision to dismiss you from the
21  program in June of 2017?
22     A.   I don't know.
23     Q.   You don't -- you don't know whether
24  you have any evidence or not?

126

1       A.    I don't know.

2       Q.    Do you -- strike that.

3             Do you believe that Dr. Mukai

4  encouraged Dr. Bader to dismiss you from the

5  program?

6       A.    Maybe.

7       Q.    And why do you believe that?

8       A.    Because he -- he made this statement,

9  and also he -- and this is the big thing.  My

10 first night float, I dictated the study

11 according to the instructions from Kataoka.

12 Exactly what she told me, I dictated the same

13 thing, and he gave me -- significant miss to

14 me.  And so that is -- that is he don't like

15 me.

16      Q.    Anything else?

17      A.    Those are enough, I think.

18      Q.    But sitting here today, there isn't

19 anything else that you -- that you believe

20 that you're just not testifying to?

21      A.    He also wrote, "He's not ready for

22 third year."  And I was already working as a

23 third year.

24      Q.    And Dr. Mukai rated you as very good

128

1   evaluation before it will be deleted.

2        Q.    Did Dr. Mukai complete the evaluation

3   after your attorney sent in an appeal letter?

4        A.    Yes.

5        Q.    And when you say, "evaluation," do

6   you mean performance evaluation?

7        A.    Yeah.  For the whole year, yeah.

8        Q.    Performance evaluation?

9        A.    Yes, performance evaluation for the

10  whole year.

11       Q.    Okay.  And you had access to those

12  performance evaluations?

13       A.    I don't have the access to the

14  performance --

15       Q.    Then how could you have looked at it

16  and saw?

17       A.    There were only a few -- few

18  performance evaluations there.  I was not able

19  to see my prior -- that was -- that was not

20  available in that system.

21       Q.    But you said you were able to see the

22  one that Dr. Mukai completed for you in

23  July 2017.

24       A.    Yeah, I -- there was, I think, one

129

1    more also there, but I didn't see the previous
2    ones.
3        Q.   So your testimony is that in -- that
4    in July 2017, later in July, because this
5    would have been after your attorney submitted
6    the appeal letter, you were able to see
7    evaluations on the MyEvaluations system; is
8    that right?
9        A.   Not all.
10       Q.   But you were able to see some,
11   correct?
12       A.   Yeah, those were recently submitted,
13   because they were under still review or
14   something, so the message was coming that they
15   were not uploaded.
16       Q.   So which ones were you able to see
17   besides the one of Dr. Mukai's?
18       A.   Mukai I remember, but I don't
19   remember the other one.  I think there was one
20   other one also, probably.  And it is
21   documented there.
22       Q.   What is documented?
23       A.   His evaluation.
24       Q.   Mukai's evaluation?

130

```
 1        A.   Yeah, Mukai's evaluation, end of

 2   year.

 3        Q.   So when you sent an e-mail to

 4   Dr. Bader in May and complained about

 5   Dr. Burd, why didn't you mention this

 6   conversation that you had with Dr. Mukai where

 7   he --

 8        A.   As I told you earlier, I want to

 9   bring that issue, discrimination thing,

10   objectively.  So that reading and the grading

11   given by Burd was objective.  That's why I

12   bring Burd issue.  And I was expecting that

13   those things will be corrected by Dr. Bader in

14   the department and not to go into this HR

15   route or this termination or even not take a

16   different route from here, but it went in that

17   route.

18             Instead of having -- sitting to

19   discuss with Burd and go over the study, or

20   other attendings, I offered that I want to sit

21   for this reading.  He never did that.  But he

22   asked me, "Let bring the HR."  Why bring the

23   HR?

24        Q.   He being Dr. Bader?
```

Dr. Ashu Garg vs
VHS Acquisition Subsidiary No. 7, et al.

Dr. Ashu Garg

131

1       A.   Yes.  I asked whether to sit on the
2  next -- next week and to go over that study.
3       Q.   So going back to Dr. Mukai, why
4  didn't you complain to human resources about
5  Dr. Mukai --
6       A.   I don't --
7       Q.   -- making the comment to you about
8  you're fucking 40 years old and trying to
9  learn radiology?
10      A.   Because I don't want to get into
11  trouble unnecessarily if -- I want to keep my
12  residency.  I want to continue as a resident.
13  And as I told you earlier also, if I have
14  finished my residency from SVH, then I will
15  not even have told anybody about that.
16      Q.   And you -- and you didn't tell anyone
17  about that conversation with Dr. Mukai, you
18  said earlier?
19      A.   Yes.
20      Q.   Okay.  So the first time that was
21  raised was by your attorney during the appeal
22  process?
23      A.   Correct.
24      Q.   Okay.  And you believe that there

147

1     A.   Yes.

2     Q.   And you're saying that you, then,

3  know that he -- that that was not rated as an

4  R1, R2, R3, R4?

5     A.   No.

6     Q.   How do you know that?

7     A.   Because I looked at the study.

8     Q.   At what point in time did you do

9  that?

10     A.   Because the nurse was saying the

11  patient is having pain and the patient is --

12  the nurse was seeing the fractures, but the --

13  but Resident 4 was not able to see the fractures.

14     Q.   Right, but how do you know that he --

15  that his -- the missed reading that he had,

16  how do you know that that wasn't recorded as

17  an R1 through 4 or 5?

18     A.   Because after -- once the attending

19  sign the history, final read, then the study

20  is logged, I think, and nobody can change it.

21  So I didn't see any R1, R2, R3, and R4

22  grading.

23     Q.   So if the reading's correct, it

24  doesn't get a grading?

148

1     A.   The reading was incorrect.

2     Q.   If the reading's correct, it doesn't

3   get a grading; is that true?

4     A.   Yes, mm-hmm.

5     Q.   Okay.  So -- and if it does get a

6   grading, where is that grading kept?

7     A.   In the computer system.

8     Q.   Okay.  And would you have access to

9   his gradings?

10    A.   I don't have access, but when I

11  reviewed his study because the nurse called me

12  from the floor --

13    Q.   I understand that you thought it was

14  incorrect, but what I'm saying is -- I'm

15  asking you about the grading by the attending

16  where they would list it as R1, R2, R3, R4.

17         How do you know that it wasn't

18  identified as an error by them on -- at one of

19  those levels?

20    A.   For this particular study, it was --

21    Q.   Yes, that's what we're talking about,

22  that one study.

23    A.   Yeah, that one study.  Because there

24  was no -- they put it, this study is R1, this

159

1      Q.   So it's your memory, right?

2      A.   Yeah.

3      Q.   Yeah, I mean, so that -- so if you

4  tell me you don't remember about this, I'm

5  going to ask you, well, what documents would

6  you need to refresh your recollection.

7      A.   Okay.

8      Q.   So -- and then you can tell me if

9  there are and I'll pull them out, because if

10  there are, we have them.  So -- and I'm not

11  asking about your review of his resident file,

12  okay?

13          So how about Resident 1           how --

14  based on your observation, how was Resident 1

15  Resident 1 treated better than you?

16      A.   I mentioned the dates in my appeal

17  Four Stage letter, which dates he worked on

18  the night float, and he give all six sign-out

19  sheets to Dr. Burd.  And he sign all of them

20  together without saying any word -- without

21  disciplining him or without saying anything

22  that this should not be done.  The sign-out

23  sheet is a big responsibility in the

24  transition of patient care.  This is not only

160

1    the program requirement, this is also the
2    ACGME requirement.
3         Q.    So your testimony is that Resident 1
4    handed Dr. Burd six sign-out sheets at the
5    same time --
6         A.    Yes.
7         Q.    -- for six different shifts?
8         A.    Previously done, already done.
9         Q.    And how do you know that there
10   were -- that there were six and that they were
11   sign-out sheets?
12        A.    Because he signed it in front of me.
13        Q.    Resident 1 signed it in front of you?
14        A.    No, Burd signed it.
15        Q.    And how was it -- I mean, that you
16   were, what, looking over his shoulder while he
17   signed six documents?  How did you --
18        A.    No, in the conference room at the
19   end -- towards the end, he present -- he
20   finish the presentation, and after that he
21   give all the six sign-out sheets to him to
22   sign.  It is my personal observation, and
23   other residents were there.
24        Q.    And who were they, the other ones

169

```
 1      A.   No.
 2      Q.   -- about this?
 3      A.   No.
 4      Q.   How do you know that they were for
 5  six different days if he just quickly flipped
 6  them over and signed them?
 7      A.   Because I saw the dates.
 8      Q.   You looked over -- you sat there --
 9      A.   Yes.
10      Q.   So your testimony is that you sat
11  there just staring at what was being done --
12      A.   Yes.
13      Q.   -- and, like, carefully studied these
14  dates?
15      A.   Yeah.
16      Q.   Okay.  And then what did you do next
17  after you saw this happen?
18      A.   It was signed by Burd and it was
19  given back to Resident 1
20      Q.   And then what did you do next?
21      A.   I went to my reading group.
22      Q.   And then what happened?
23      A.   Nothing.  I started my reading work.
24      Q.   And this occurred -- this incident
```

181

1       Q.   You can answer.

2       A.   Can you repeat the question so that

3   we will clarify?

4           MS. SAUNDERS:   Can you repeat the

5   question.

6           (Record read)

7           MS. GOYAL:   Objection.

8   BY MS. SAUNDERS:

9       Q.   You can answer.

10      A.   Feedback, I only met Dr. Bader after

11  first -- for this concern thing that is a

12  problem once or twice; once after immediate

13  night float, and he said that, "Your speed was

14  slightly slow."  And then after that, I met

15  him first warning letter in February.  So that

16  first warning letter, I was surprised that so

17  many dates were there.  Initially I was --

18  initially he gave me a letter which has

19  multiple errors in it.

20      Q.   Okay.  So that's not -- you're just

21  talking.  This is not what I asked you about

22  at all.  I didn't ask you about your

23  conversations with Dr. Bader about --

24      A.   So I'm talking about --

195

1   discrimination.  So -- but I said it subtly,

2   but he immediately -- already he has in back

3   of his mind from Oklahoma information that now

4   this -- he complained about age

5   discrimination, so then he -- his -- now the

6   mind shifted all towards how to kick out this

7   resident rather than --

8       Q.   That's what you think.

9       A.   -- rather than resolving this reread

10  grade and go over with Dr. Burd and have a

11  conference, because I offered him to go over

12  with these rereads in my petition also, "Garg

13  offered to meet with Dr. Bader to review the

14  readings."

15          I didn't go with the age

16  discrimination thing.  I asked for -- offered

17  to meet with Dr. Bader to review the reading,

18  actual reading, so that things can resolve

19  and -- but this was the objective thing, so

20  that's why I brought it.

21      Q.   Well, don't you think that it -- that

22  it could have been possible that Dr. Bader

23  would read this and think that you were

24  complaining about national origin

199

1    May 13th, correct?

2        A.   Yeah, I didn't -- I didn't follow

3    with Dr. Bader for this -- this thing.

4        Q.   Okay.

5        A.   Do I need to inform, because he's the

6    chairman and he's -- the hospital or the

7    program already knew that I made the

8    complaint, then they should act accordingly.

9        Q.   So why did you say that you didn't

10   think a formal meeting was necessary?

11       A.   Because I was scared that I will be

12   in problem when the things will go at HR and

13   things.  I don't want to become the focus of

14   attention.  I want to finish my residency

15   without problem.  But this time, because this

16   was going too much, then I objectively -- and

17   I have the objective evidence.  So that's why

18   I made a complaint.

19       Q.   Did you ever make any complaint to HR

20   during your residency program?

21       A.   No.  Oh, I made the complaint to

22   Vinagre, discrimination complaint, and to CEO.

23   So I don't know if that is -- because I was

24   going through the GME policy.

209

1   want to improve."
2       Q.   Did you --
3       A.   And I -- then you feel, oh, why I
4   waste this half an hour in sleeping; let's do
5   more work; let's do more concentrate on the
6   work.
7       Q.   But did you say in that meeting that
8   you didn't disagree with the evaluations of
9   your performance?
10      A.   No, I never said this.  I said I
11  disagree with the evaluations.
12      Q.   And what did you disagree with about
13  the evaluations of your performance?
14      A.   Because I don't think so those are --
15  those are honest evaluations.
16      Q.   You thought that they were honest
17  evaluations?
18      A.   They were not honest.
19      Q.   Okay.  So you thought that all of the
20  attendings who evaluated you negatively, that
21  none of them were being honest?
22          MS. GOYAL:  Objection.
23      A.   When you will come to this evaluation
24  thing, then I will explain you better, when

213

1      Q.    And at that meeting --

2      A.    Yeah, then they --

3      Q.    -- then they gave you this

4    information?

5      A.    Yes.

6      Q.    Okay.  So at that meeting, when they

7    talked to you about the fact that you had the

8    opportunity to repeat your PGY4 year there,

9    isn't it true that both Dr. Vinagre and

10   Dr. Bader reiterated that doing that would be

11   a way to allow you to continue in an

12   accredited program and, therefore, to continue

13   to have the possibility to transfer into

14   another program during or at the end of that

15   year?

16     A.    So I didn't see fair chance --

17     Q.    This is not why.

18           The question is, do you -- isn't it

19   true that they told you that in the meeting,

20   yes or no?

21     A.    Yes, they told me.

22     Q.    They did tell you that in the

23   meeting?

24     A.    They told me -- they told me, then I

214

1   have to find a PGY5 position somewhere else --

2       Q.    Okay.  Once you completed the PGY4.

3       A.    -- and zero credit for my year, which

4   I already completed that year, zero credit

5   towards that year.

6       Q.    So they did explain to you what the

7   offer was?

8       A.    Yes.

9       Q.    And that this was --

10      A.    And I would resign -- they ask me to

11  resign my PGY5 contract, in that meeting, in

12  writing.

13      Q.    And why was it that you decided not

14  to accept that offer?

15      A.    Because that was not -- I was not

16  getting the fair chance, I was not getting the

17  fair opportunity.

18      Q.    So your reason is that it wasn't

19  fair?

20      A.    It was not fair.

21      Q.    Is it anything else?

22      A.    Because they were giving me zero

23  credit.  If they will -- if they will agree --

24  because Bader already told me that, "You

215

1   passed the intervention."  That is for two

2   weeks.  Even if they say that two weeks, I

3   will give you the credit, then I will consider

4   it being an honest offer.  But they said that

5   zero -- zero credits for the whole year.  I --

6   I work very hard in Saint Vincent Hospital.

7   And also to resign my PGY5 contract.  Why I'm

8   going to resign the PGY5 contract?

9        Q.   But you had already repeated your --

10  your PGY3 year at the University of Oklahoma,

11  correct?

12       A.   Correct, correct.

13       Q.   So why wouldn't you just do it again

14  at -- the PGY4 year again at Saint Vincent?

15       A.   There was difference in honesty.

16       Q.   How so?

17       A.   This was dishonest offer, and that

18  was honest offer.

19       Q.   What do you mean by it was a

20  dishonest offer?

21       A.   Because somebody's giving me zero

22  credit where I worked every day, and also when

23  I pass the rotation.  And if I will get at

24  least two weeks of credits, then that will

220

1      A.    Yes.

2      Q.    So your testimony is that you think

3  that the Saint Vincent radiology residency

4  should have used 360s from other residents?

5      A.    Yes.

6      Q.    Okay.  And you were represented by a

7  lawyer at this point in time, weren't you,

8  July 2017?

9      A.    Correct.

10     Q.    So isn't it true that at the time and

11  in other -- isn't it true that you have

12  previously said that the reason you didn't

13  accept this offer to repeat your PGY4 year was

14  that you thought that there would be no way

15  for you to get a fifth year position?

16     A.    It is a rare find, very rare find, to

17  get the fifth year position because in

18  radiology residency, the residents are already

19  settled in their fifth year.  It's very hard.

20  But I -- I never heard of it before that.  And

21  also, the thing is zero credits towards all my

22  efforts, and also the warning will continue

23  and they can expel me at any time.

24     Q.    So those conditions also led you to

221

1  reject that offer?

2     A.   Condition, yeah, those were looking

3  not fair to me.  Those were not the fair

4  offer.  Those were not the fair opportunity,

5  because he already said before that, "I made

6  up my own determination.  I will not let you

7  complete."

8              (Pause)

9  BY MS. SAUNDERS:

10    Q.   In what way do you believe you were

11 retaliated against?  What actions were

12 retaliatory towards you?

13    A.   Dismissal from the program after

14 making the complaint.

15    Q.   What else?

16    A.   Not providing me documents so I can

17 see what actually is going on.  The documents

18 were not provided to me.  And my evaluation

19 was suspended, and it was not showing the full

20 results.  And I -- that is documented in my

21 e-mails as well.  And also -- so it was for

22 people to assess me, and he already -- he

23 already said that, "I make the determination."

24 If he's really following GME process, then he

222

 1   should not say that.
 2        Q.   Okay.  So going --
 3        A.   He said that, "Let's -- let's do -- I
 4   will try to help you.  Let's see the type of
 5   people help you."  He already said, "I made a
 6   final determination.  I will not let you do
 7   it."
 8        Q.   So going back to my question, which
 9   was -- which was, in what ways do you believe
10   you were retaliated against.  So far you
11   listed two.  You said dismissed from the
12   program, not providing documents.
13             Anything else?
14        A.   Not providing access to my
15   evaluations, because those were all -- like,
16   there was no evaluation there when I was
17   clicking, clicking every day, and then only
18   one or two.  Mukai was -- later came on that.
19   And also, he said to me --
20        Q.   Who's he?
21        A.   Dr. Bader said to me before the Stage
22   Two appeal meeting that, "I will not let you
23   do radiology.  I make the final determination.
24   I am not going to let you finish the

223

 1   radiology.  And I'm not going to do any
 2   settlement here like you had before
 3   previously."
 4        Q.   So I'm asking about ways in which you
 5   were retaliated against, so actions that you
 6   believe were retaliatory.
 7             So so far you've said dismissal from
 8   the program, not providing documents, not
 9   providing access to evaluations.  Anything
10   else?
11        A.   Yeah, my -- and also, he -- through
12   chief resident, he announced that Dr. Garg is
13   not going to be staying in the program.  That
14   is also violation of GME.  And the GME Stage
15   Two, Three, and Four appeal was pending.  Neha
16   Prakash announced all the residents June 21st
17   or June 22 that Ashu Garg will not be in the
18   residency program, so we have to distribute
19   his night float for the remaining year.
20        Q.   And how do you know that that
21   happened?
22        A.   That happened because all the
23   resident -- when I went there to meet
24   Dr. Bader because I was -- on 21st, I got the

224

1    termination letter.  22nd, I was significantly

2    stressed and -- but -- I didn't came for work,

3    but I came to meet Dr. Bader.  I came to meet

4    him, and also then I went inside the resident

5    room.  Then the resident told me that Neha

6    just announced.

7        Q.   So you know that because another

8    resident told you that she said this?

9        A.   Yes, and then I asked Neha.  She

10   said, "Yes."

11       Q.   And who was the resident that told

12   you that she said this?

13       A.   Ahmed Mohammed.  I think, Ahmed

14   Mohammed or Ghasan.  I don't know.

15       Q.   And you asked Neha, and she said that

16   she said that?

17       A.   Yeah, she herself confirmed.  And

18   then I made the -- then I told this thing

19   that, "The GME process is pending, the Stage

20   Two appeal process is still pending, the Stage

21   Three is pending, Stage Four is pending," and,

22   "How you announce that this resident is not

23   going to stay in the program?"  Either you

24   don't believe in the GME or you don't follow

225

1  or you -- whatever you want.  That's -- that's
2  how you want to treat, that is retaliation.
3      Q.   But I thought that you were listed in
4  a book as a fifth year.  It seems totally
5  inconsistent.
6      A.   Inconsistent.  So that is done by
7  program, not by me.  Ask the program.
8      Q.   But you were saying that every -- you
9  know, all indications were that you were
10  advancing to a fifth year, but now you're
11  telling me that in June --
12      A.   Yeah.
13      Q.   -- Neha told everyone you weren't.
14      A.   Yes, the truth -- whatever I am
15  saying, that is true under oath.
16      Q.   But -- so did you -- did those
17  things, the fact that you were listed in a --
18  in a listing as a PGY -- did that actually
19  make you think you were going to be advanced?
20      A.   Then I had, like, a hope that I am
21  going to be probably able to continue my PGY5
22  year.  I was already advanced to PGY5, then I
23  will be able to continue as a PGY5 resident.
24  And the department also, in their internal

238

1  copying your file and providing you with
2  documents.  Is that true?
3      A.   When I went to the office, Salonee
4  and Kanzaria was there, and they deny.
5      Q.   And she gave you documents?
6      A.   Later on, they -- they were providing
7  me with documents.  Yes, I received this
8  document.
9      Q.   Okay.  And according to the e-mail
10  from Salonee on -- trying to see the date.
11  I'm not seeing the date on that e-mail, but
12  it's right -- it's probably the same day,
13  July 7th.  She e-mailed you and said that she
14  had also, the day before, e-mailed you a copy
15  of your evaluations with comments, the
16  milestones, and your user name and password
17  for the MyEvaluations website and the link to
18  the program manual.
19          Do you see that?
20      A.   Correct.
21      Q.   So why isn't it that you weren't able
22  to retrieve everything from MyEvaluations
23  on that day?
24      A.   I was not able to retrieve

239

1   everything, that's what I'm saying.  At the
2   time, many prior records were not coming.
3   They were -- I was only seeing one or two
4   coming there.  I don't know.  That's a
5   question for SVH.
6        Q.   Well, she also says in here that she
7   already e-mailed you the copy of your
8   evaluations with comments.
9        A.   She sent me some copies of the
10  evaluations, but not all.
11       Q.   But you can't say which ones you were
12  missing?
13       A.   I cannot say which one I am missing
14  because I didn't have access to my e-mails,
15  SVH e-mails.  And also, many documents when I
16  received in June 2018 that I saw for the first
17  time were about my performance.  I never saw
18  those documents before about my performance.
19       Q.   Are you sure you didn't --
20       A.   So why those documents were not
21  provided to me, because everything is related
22  to my performance, and the performance was the
23  real claim that SVH wants to bring it, that
24  this was the performance deficiency.

241

1      Q.   But isn't it true that Dr. Bader had
2  already gone over all of your evaluations with
3  you in these portfolio review meetings?
4      A.   No.  No.
5      Q.   Didn't you have access to
6  MyEvaluations during your entire residency
7  program?
8      A.   I had the access, but I never used it
9  before.
10     Q.   How is that the program's fault, that
11 you just chose not to use it?
12     A.   No, I didn't choose.  Basically, I
13 didn't have the password or anything for
14 those -- my evaluations.
15     Q.   Don't all residents have access to
16 their evaluations during the program; at any
17 moment, they have access to that program?  You
18 have a user name and password, and you can go
19 on there and look at your evaluations,
20 correct?
21          MS. GOYAL:  Objection.
22     A.   That's correct.  Yes.
23     Q.   You had that the whole time you were
24 a resident at Saint Vincent Hospital, correct?

257

1              (Pause)

2    BY MS. SAUNDERS:

3        Q.    Do you remember having what are

4    called portfolio review meetings with

5    Dr. Bader?

6        A.    Yes.

7        Q.    And there were two of them, correct?

8        A.    One.  Only one I have portfolio

9    review meeting, in January or February 2017.

10       Q.    Wasn't there one on February 14, 2017

11   and then also on June 21, 2017?

12       A.    No, it was not portfolio -- I have

13   only two letters.  That was not portfolio

14   meeting.  That was termination.  And also,

15   that was giving me those milestone summaries.

16   That's all.

17       Q.    So there is a -- there are -- there's

18   a document that's called Resident Educational

19   Portfolio Review that Dr. Bader fills out.  So

20   when you say, "That was not given to me,"

21   or -- I'm talking about a meeting.

22       A.    That was not discussed -- that was

23   not given to me during -- on June 21, 2017.

24       Q.    Did you have a meeting on June 21,

258

1    2017 with Dr. Bader and with Dr. Kanzaria
2    present?
3        A.    Correct.
4        Q.    Okay.  And you're denying that that
5    was a portfolio review meeting?
6        A.    It was not that.  They have not given
7    me any copy or anything for that.
8        Q.    Weren't you asked to sign the
9    portfolio review meeting form and you refused?
10       A.    No.
11       Q.    You deny that that happened?
12       A.    No, I refused to sign the termination
13   letter.  I -- the portfolio meeting evaluation
14   was not there.
15       Q.    So I'm in the -- it's called
16   Performance Documents.  It's in the small
17   binder.  And I'm going to show you --
18       A.    And only just recently I have seen
19   this portfolio evaluation.
20            MS. GOYAL:  There's no question.
21       Which Bates stamp number?
22            MS. SAUNDERS:  2153 and 2154.
23   Okay.  So that's going to be Exhibit 16.
24

259

```
 1              (Exhibit 16 marked
 2              for identification)
 3              MS. SAUNDERS:  And then Exhibit 17
 4   is going to be the next pages, SVH 623 and
 5   624.
 6              (Exhibit 17 marked
 7              for identification)
 8   BY MS. SAUNDERS:
 9      Q.   So I'm going to hand you the
10   documents that have been marked Exhibits --
11   Exhibit 16, which is Bastes-stamped SVH 2153
12   through 2154, and Exhibit 17, which has been
13   Bastes-stamped SVH 623 through 624.
14              And my question to you is, you said
15   you remember a portfolio review meeting in
16   February, correct?
17      A.   Yeah, February.
18      Q.   February 14th?
19      A.   Yes.
20      Q.   And at the end of that meeting, you
21   were asked to sign the form?
22      A.   Yes, I signed the form.
23      Q.   And there's a signature there,
24   correct?
```

Dr. Ashu Garg vs                                    Dr. Ashu Garg
VHS Acquisition Subsidiary No. 7, et al.

260

1      A.    Correct.

2      Q.    That's your signature?

3      A.    Mm-hmm.

4      Q.    Yes?

5      A.    Yes.

6      Q.    Okay.  And that was after attending a

7   meeting with Dr. Bader and Paulomi Kanzaria,

8   correct?

9      A.    Correct.

10      Q.    And then you also attended a resident

11   portfolio review meeting on June 21, 2017 with

12   Dr. Bader and Dr. Kanzaria, correct?

13      A.    That was not portfolio meeting.  We

14   didn't discuss this portfolio thing.  We --

15   that was only termination letter and milestone

16   summary, as I remember, because I didn't see

17   this portfolio review -- till very recently I

18   have this document submitted by -- as a

19   document production in this case.  I have not

20   seen this document before.

21      Q.    So -- and it says here, in

22   Dr. Bader's handwriting, "Dr. Kanzaria

23   present."  I think this says, "This portfolio

24   review, Dr. Garg refused to sign this form as

261

1   well as the summary letter."

2           Do you see that?

3       A.   I refused to sign the termination

4   letter.

5       Q.   But you don't remember ever seeing

6   this form?

7       A.   No.

8       Q.   And what, in your own words, do you

9   believe was the purpose of these portfolio

10  review meetings?

11      A.   These portfolio reviews to -- every

12  six monthly to evaluate the residents, what's

13  going on with their training.

14      Q.   And your testimony is that at that

15  first meeting that you had in February 2017,

16  that you -- you thought that everything was

17  going well?

18      A.   Correct.

19      Q.   So there was nothing in that meeting

20  that indicated to you that -- that things were

21  not going well?

22      A.   Yes.

23      Q.   And then out of nowhere, you received

24  the dismissal notice in June; is that your

269

1   to improve."
2           Do you acknowledge that all those
3   meetings occurred?
4       A.   So here's the answer:  When he called
5   me on this date --
6       Q.   What date?
7               MS. GOYAL:  Which date?
8       A.   Which date?  Give me a second.
9   February 23, 2017.
10      Q.   Yeah.
11      A.   So I got a warning letter -- he first
12  handed me a warning letter with different
13  details on it.  There are multiple errors,
14  there are multiple different dates, and things
15  were there.  Then he checked and then he
16  looked, "Oh, this is not -- this is not" --
17  then he ask Dr. Kanzaria to go again and fix
18  the template -- to fix using the template to
19  make the -- look like real.  And I followed
20  Dr. Kanzaria, and Dr. Bader also was following
21  inside his room.
22      Q.   Okay.  So my question is, there is a
23  list of meetings here, and I just read them
24  all off to you.

270

1      A.   I don't -- I don't --

2      Q.   Did you attend those meetings or do

3   you dispute that those meetings occurred?

4      A.   I dispute some of those meetings.

5      Q.   Which ones?  I'm not asking -- and

6   I'm asking you, do you acknowledge that they

7   occurred?

8      A.   No.

9      Q.   So which ones did not occur?

10      A.   12/8 was -- December 8th was not

11   done.

12      Q.   December 8th is not -- so December 8,

13   2016, you deny that you met with Bader?

14      A.   Yes, or I don't remember.

15      Q.   So you deny that, "As part of this

16   meeting we made a decision together," you and

17   Dr. Bader, "to provide you with an additional

18   educational tool...The goal was to have more

19   one-on-one contact with the staff," and you

20   were to seek out and spend an hour with each

21   faculty member?  You deny having a

22   conversation with Dr. Bader about that --

23      A.   Yes.

24      Q.   -- on December 8, 2016?

271

```
 1        A.   Yes.  And we never discussed about
 2   Dr. Kataoka.
 3        Q.   Did you talk about that you were
 4   expected to spend an hour with each faculty
 5   member to address their specific performance
 6   concerns with you?
 7        A.   No.
 8        Q.   And did you do that?  Did you try
 9   to --
10        A.   No --
11        Q.   -- talk with them?
12        A.   -- it was not -- it was not told to
13   me on this meeting.  I'm not sure this meeting
14   from where this note came.
15        Q.   So you deny that that happened?
16        A.   Mm-hmm.
17        Q.   What else do you deny?
18        A.   1/6/17.
19        Q.   What do you deny, that you met with
20   Dr. Mukai or that you met with Dr. Bader?
21        A.   I met with Dr. Mukai for particular
22   concerns.
23        Q.   But you didn't meet with Dr. Bader?
24             In the next paragraph, it says, on
```

272

1   the same date, "I met with you again to

2   explore additional educational tools."

3          Do you deny that that meeting took

4   place?

5      A.    Hold on.

6          I don't remember this meeting.

7          And this buddy call thing which is

8   mentioned, the last line, was discussed on

9   e-mail.

10      Q.   What else do you deny?  What other

11  meetings do you deny took place?

12      A.   I don't remember 2/17.

13      Q.   The meeting with Dr. Bader on 2/17?

14      A.   Yeah.

15      Q.   How about meeting with Dr. Bader,

16  Dr. Midkiff, and Dr. Kanzaria to review in

17  detail a list of cases from Dr. Burd?

18      A.    I don't remember this either.  I

19  remember only some reading cases where I was

20  asked to review with attendings, so I did

21  that.  But on this date, I don't specifically

22  remember Dr. Midkiff or Kanzaria.

23      Q.   You don't remember this?

24      A.   No.

273

```
1        Q.   Well, are you denying that the
2   meetings took place or you just don't remember
3   them happening?
4        A.   Probably it didn't happen.
5        Q.   Anything else?  Any other meetings
6   that you say didn't happen?
7        A.   No, that's -- that's pretty much.
8        Q.   So if that's true, that these
9   meetings didn't happen, why did you just sign
10  this letter that recited all these meetings
11  that --
12       A.   Because I was not given a chance to
13  read those details.  I was just asked to sign
14  the letter at that time.
15       Q.   But I thought your earlier testimony
16  was that not only did you read the letter, but
17  you noticed that there were -- the dates were
18  wrong, so you had -- Dr. Bader had
19  Dr. Kanzaria go back and fix some of the
20  dates.
21       A.   Yeah, so they have different dates.
22  When Dr. Kanzaria prepare the same letter with
23  different dates or something, then the dates
24  were different, and other -- the details were
```

274

1    different.  So then he said, no, no, no, go

2    and fix those and bring the new one.  Then I

3    followed Dr. Kanzaria up to her room, and she

4    pulled up the template, then she put the dates

5    from there.

6         Q.   So is your testimony that you think

7    that these meetings took place on other dates,

8    possibly, and maybe not the exact date that's

9    listed in this letter, or are you actually

10   testifying that you -- that these meetings did

11   not take place?

12        A.   These meetings did not take place.

13        Q.   And how do you know that -- sitting

14   here today, five years later, that these

15   meetings did not take place?

16        A.   Because at the time I interviewed

17   after that -- this -- so that particularly

18   concerned me.  I -- I didn't met on those

19   days.  They maybe e-mailed that Bader had

20   asked me to come to his office, but I never --

21   the actual meeting never happened.

22        Q.   And why haven't you raised this

23   earlier in any of your various lawsuits,

24   that -- that the warning summarized meetings

280

1   from the patient, do you admit --

2       A.   Yeah, so that is unprofessional.

3   So -- but I was applauded for professional.

4   Maybe that -- I don't know, that -- I am

5   professional or not professional.

6       Q.   Did you slap the hand away from a

7   patient?

8       A.   No.

9       Q.   You deny that you did that?

10      A.   No.

11      Q.   You don't deny it?

12      A.   No, I didn't -- I didn't did that.

13      Q.   Did you yell at a patient?

14      A.   No.

15      Q.   So when Gail Scott makes a report to

16  Dr. Bader and Dr. Midkiff about an incident

17  occurring in May 2017 about you slapping a

18  patient's hand away and yelling at him, you

19  deny that?

20      A.   After that, I met the same

21  technician, and the technician told me, "We

22  don't want to go into politics."  I asked,

23  "Why you make the comment?"  The technician

24  said that, "I don't want to go into politics."

281

1    Q.   And is that technician Gail Scott?

2    A.   Yes.

3    Q.   Okay.  How about Pavel Yaginov?  Did

4  you have --

5    A.   No, I don't remember who -- by face,

6  I don't know who was it.

7    Q.   Did you have an incident with that

8  person and also another technologist about

9  having interactions with the technologists,

10  asking them about why -- why they were

11  shielding patients?

12    A.   Shielding patient?

13    Q.   Yes.

14    A.   No, I don't.

15    Q.   Putting shields to protect them from

16  radiation or whatever it is?

17    A.   Well, that is a requirement.  Every

18  patient must be treated with appropriate

19  standards, which are --

20    Q.   But you don't remember having a

21  conversation about --

22    A.   No.

23    Q.   -- having a conversation about why --

24    A.   No.

282

1      Q.   -- you were -- why they were
2   shielding patients and whether that was
3   required?
4      A.   No.  Maybe this is -- maybe, I don't
5   know, these comments come from some other
6   residents.  I don't know.
7      Q.   And do you deny on another occasion
8   swatting a patient's hand and instructing the
9   patient to use the other hand?
10      A.   I don't remember.
11      Q.   Are you denying that it happened or
12   you just don't remember, so you might have
13   done it?
14      A.   I don't remember, and -- because I
15   cannot do any unprofessional activity.
16      Q.   Because what?
17      A.   I cannot do any unprofessional
18   activity to the patient that makes the patient
19   uncomfortable.
20      Q.   So you agree that slapping a
21   patient's hand would be unprofessional?
22      A.   Yeah.
23      Q.   But you don't know whether you did
24   that?

283

```
 1      A.   Yeah.  And I am applauded for
 2   professional, and I am again repeating it.
 3      Q.   So did you scold the patient and say
 4   "What are you doing?"
 5      A.   I don't remember.  I don't know,
 6   maybe the same thing you will find in another
 7   resident's file, maybe, copied and paste from
 8   there.
 9      Q.   Do you remember having issues in --
10   on your -- I think it's fluoroscopy, is how
11   you say it.
12      A.   Correct.
13      Q.   -- fluoroscopy rotation --
14      A.   Correct.
15      Q.   -- where -- where you got really
16   backed up in fluoroscopy and there were lots
17   of patients --
18      A.   Yes.
19      Q.   -- waiting?
20           MS. GOYAL:  Wait for her to finish
21   her question.  You're interrupting.  Let her
22   finish.
23   BY MS. SAUNDERS:
24      Q.   And do you deny that you became
```

Dr. Ashu Garg vs                                                    Dr. Ashu Garg
VHS Acquisition Subsidiary No. 7, et al.

284

1    short-tempered with the patients?

2         A.   I never become short-tempered with

3    the patients, but I have a really hard time in

4    working on the -- it was challenging to work

5    on the broken machines.

6         Q.   So if Rachel Markland -- she was a

7    technologist, correct?

8         A.   I don't know.

9         Q.   Do you remember the names of any of

10   the technologists?

11        A.   Maybe I will -- I will recognize by

12   face.

13        Q.   Do you remember the names of any of

14   the technologists?

15        A.   No.

16        Q.   None of them?

17        A.   No, because I -- I didn't work that

18   much for a long period of time.

19        Q.   How about Deb Palan?

20        A.   I can recognize by picture.

21        Q.   Okay.  Well, if the technologist

22   testified that you were short-tempered and

23   annoyed with the patients, would you dispute

24   that, in fluoroscopy?

285

1      A.   I was never being short-tempered with

2   the patient.  Maybe I was struggling with the

3   machine so that the technologist perceive it

4   as, like, short-tempered with the patient, but

5   it was not -- I didn't say anything to the

6   patient or disrespect the patient, anything

7   happen then.  But I may be frustrating and

8   short-tempered with the machines, fluoroscopy

9   machines.  Those are broken machines.

10      Q.   Do you remember a time when you

11   were -- and this is what it says in the

12   document -- where you were scouting the

13   stomach and that you were advancing an NG tube

14   in a patient and that you asked for help to

15   lubricate -- to help lubricate the tube and

16   that the patient told you that it hurt and

17   asked you to stop and you -- and pushed your

18   hand away?  Do you remember that?

19      A.   Nasogastric tube is always

20   discomforting to the patient no matter how

21   much you are skilled, because I worked as a

22   surgeon in India for eight to ten years.  I

23   did plenty of nasogastric tube that probably

24   nobody can think of.  So I know each and every

286

1    time, it's very discomforting.  Some patients

2    have discomfort, they say it's a pain.  Some

3    patients say this is like discomfort.

4            But irrespective, you cannot leave

5    the nasogastric tube near the trachea when the

6    patient is hovering.  You have to either

7    advance or you have to completely take out.

8    Now you have to decide what you have to do.  I

9    use my clinical sense and my experience in

10   putting the NG tubes.  So I just advanced it.

11       Q.   And do you remember that

12   Dr. Berberian had to take over --

13       A.   Yes.

14       Q.   -- with that patient and he --

15       A.   Not take over, but he came.  He came.

16   It was not take over.  That is written here.

17   It was not take over.

18       Q.   Okay.  Well, if he testifies that it

19   was a takeover, you would dispute that?

20       A.   He was there to help because he was

21   attending, so...

22       Q.   So your milestone evaluation, your

23   resident milestone evaluation, do you remember

24   getting those?

295

1    received a lot of 1s and 2s, some 3s.

2            And you were aware of that at the

3    time, correct?

4        A.   No.  I didn't see those charts during

5    my residency.  I only got it after my

6    termination.

7        Q.   Well, some of them say that they

8    actually spoke with you about your performance

9    difficulties.

10       A.   No.

11       Q.   So you deny all of that?

12       A.   Yes.

13       Q.   So that's -- so that's my question.

14           So when each one of these residents

15   testifies that -- that your performance was

16   poor and they talked to you about it, you deny

17   that?

18       A.   Yes.

19       Q.   For every single one of them?

20       A.   I have to review again.

21       Q.   Well, which ones do you remember

22   talking about your performance with?

23       A.   I talked to Susana Candia.  She gave

24   me idea about templates and how to --

296

1  basically some change in search pattern.  I
2  also talked to Dr. Messersmith, and she gave
3  me idea about how to -- not to leave the
4  studies on -- in the row.  But I was doing the
5  thing which I was used to doing in Oklahoma,
6  so then I learned that the system in
7  Saint Vincent is different.
8      Q.   And who else did you speak with that
9  you remember about your performance?
10      A.   No one.
11      Q.   So your testimony is that none of
12  them told you that you were having performance
13  difficulties, and none of them offered
14  suggestions for you on how to improve?
15      A.   Correct.  I asked for help from
16  Dr. Mukai to clarify some things, but he send
17  me -- instead, he send me to YouTube video
18  links.
19      Q.   Okay.  And so you acknowledge that he
20  did send you YouTube video links?
21      A.   To help to learn more.  It is not
22  about deficiency.  It is about to learn more.
23      Q.   And it looks -- he did that,
24  actually, after -- he did that in May of 2017,

298

1   including you, and that they went over all the
2   evaluation comments from the attendings during
3   the portfolio review meetings, do you deny
4   that that happened?
5              MS. GOYAL:  Objection.  Is there
6   some testimony that you're referencing that
7   Dr. Kanzaria testified to this?
8   BY MS. SAUNDERS:
9      Q.   Can you answer my question?
10     A.   What Dr. Kanzaria is testifying and
11  what he testified already.
12     Q.   He?  What?
13     A.   What she already testified.
14     Q.   So let's do it this way:  If
15  Dr. Kanzaria and Dr. Bader testified that
16  their practice is that during portfolio review
17  meetings, they go over all of the comments of
18  all the attendings for that period, do you
19  deny that that happened in your portfolio
20  review meeting?
21     A.   Correct.
22              MS. GOYAL:  Objection.
23  BY MS. SAUNDERS:
24     Q.   You deny that?

300
1    read it.
2         Q.    They read that out loud to you?
3         A.    Yes.
4         Q.    That, you remember?
5         A.    Yeah, I think they read most of the
6    things off the termination letter on June 21,
7    2017.
8         Q.    So do you deny that Dr. Bader asked
9    other faculty members to try to help you more
10   and teach you more?
11        A.    I have no firsthand knowledge of
12   this.
13        Q.    Do you deny that different faculty
14   members met with you and reviewed your
15   readings with you to try to help you with your
16   readings?
17        A.    I deny it.  I deny it.  Only the
18   night float reads were cases where I'd go over
19   with the attendings.  Other than those, I have
20   no other sitting or concern, performance issue
21   meeting.
22        Q.    Do you deny that they adjusted your
23   work flow and your schedule to try to help
24   you?

301

1      A.   It was only -- my work flow was only
2   adjusted before first night float, because I
3   was supposed to do the nuclear medicine
4   rotation and Dr. Bader felt that I need to do
5   ER to get accustomed with the Saint Vincent
6   Hospital, like, working environment.  So
7   that's why I did -- there was a modification.
8   Nuclear medicine was changed to ER at that
9   time.
10      Q.   And do you deny that Dr. Bader, you
11   know, took different steps trying to help you
12   succeed in the program?
13      A.   Every program director should try
14   that.
15      Q.   And do you deny that he did that?
16      A.   So he wrote the recommendation
17   letters and he wrote the American Board of
18   Radiology that I am going to finish my
19   radiology earlier than schedule time, and my
20   schedule date was -- finishing was on
21   September 11, 2018.
22      Q.   And what else, if anything, did
23   Dr. Bader do to try to help you succeed in the
24   program?

304

1    and the settlement agreement despite the fact
2    that there might have been documents produced
3    to you.
4              MS. SAUNDERS:  So what kinds of
5    limited questions are you going to allow him
6    to answer?
7              MS. GOYAL:  I don't know.  I don't
8    even know why you need to go down that road.
9              THE WITNESS:  Because I know --
10             MS. GOYAL:  There's no question.
11             THE WITNESS:  Okay.
12   BY MS. SAUNDERS:
13        Q.   Well, you attended the University of
14   Oklahoma program for three years, correct?
15        A.   Correct.
16        Q.   And you received academic credit for
17   two years?
18        A.   Yes.
19        Q.   And you hired a lawyer in your -- the
20   second year of the program there and
21   negotiated a settlement agreement with them?
22        A.   Correct.
23        Q.   And you made accusations of age
24   discrimination against the University of

305

1    Oklahoma?

2        A.    Correct.

3        Q.    And --

4        A.    That's why they created the

5    settlement agreement.

6        Q.    And in the University of Oklahoma

7    program, you also received negative

8    evaluations, didn't you?

9              MS. GOYAL:  Objection.  We're not

10    going to get into his performance at Oklahoma

11    because that is outside the bounds of what

12    he's allowed to disclose per the

13    confidentiality and settlement agreement.

14              MS. SAUNDERS:  So you're not going

15    to allow me to ask any questions about his

16    performance?

17              MS. GOYAL:  No, unless you want to

18    articulate a reason why you need to ask about

19    it.

20    BY MS. SAUNDERS:

21        Q.    Did you receive a resident milestone

22    evaluation at the University of Oklahoma?

23              MS. GOYAL:  Objection.

24              MS. SAUNDERS:  Are you instructing

404

1  COMMONWEALTH OF MASSACHUSETTS)

2  SUFFOLK, SS.                  )

3

4      I, Daria L. Romano, RPR, CRR and Notary

5  Public in and for the Commonwealth of

6  Massachusetts, do hereby certify that there

7  came before me on the 14th day of February,

8  2022, at 9:07 a.m., the person hereinbefore

9  named, who was duly sworn by me, and that such

10  deposition is a true record of the testimony

11  given by the witness.

12      I further certify that I am neither

13  related to nor employed by any of the parties

14  or counsel to this action, nor am I

15  financially interested in the outcome of this

16  action.

17      In witness whereof, I have hereunto set my

18  hand and seal this 23rd day of February, 2022.

19                  _Daria Romano_

20                  _____

21                  Notary Public

22                  My Commission Expires

23                  February 5, 2027

24

# PLAINTIFF EXHIBIT 2

VOL I - Page 1 of 298

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

C.A. No. 4:20-cv-40060-DHH


DR. ASHU GARG,

Plaintiff,

v.

VHS ACQUISITION SUBSIDIARY NO. 7 d/b/a

SAINT VINCENT HOSPITAL, DAVID BADER

JOHN MUKAI, and DOUGLAS BURD,

Defendants


DEPOSITION OF DR. DAVID A. BADER, a witness
called on behalf of the Plaintiff, taken pursuant to
Notice under the applicable provisions under the
Federal Rules of Civil Procedure, before Karen
Cassola Norman, a CER and Notary Public in and for
the Commonwealth of Massachusetts, at the Rosen Law
Offices, P.C., 204 Andover Street, Suite 402,
Andover, Massachusetts, on Tuesday, February 15,
2022, commencing at 9:58 a.m.

J&K COURT REPORTING, 12 BUENA VISTA AVE, SALEM, MA 01970

KC    (978) 825-9171         FAX (978) 744-6476    KC

****************COMPUTER AIDED TRANSCRIPTION**************

1    APPEARANCES:

2

3         Kavita Goyal, Esq.

4         Matthew Perry, Esq.

5         ROSEN LAW OFFICE

6         204 Andover Street, Suite 204

7         Andover, Massachusetts 01810

8             Counsel on behalf of the Plaintiff.

9

10        Dianne M. Saunders, Esq.

11        Olivia L. Vehslage, Esq.

12        OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.

13        One Boston Place, Suite 3500

14        Boston, Massachusetts 02108

15            Counsel on behalf of the Defendants.

16

17   Also Present:

18        Dr. Ashu Garg

19

20

21

22

23

24

VOL I - Page 3 of 298

1                          I-N-D-E-X

2       WITNESS                DIRECT  CROSS  REDIRECT  RECROSS

3       Dr. David A. Bader

4       (By Ms. Goyal)            5     ***      ***      ***

5       (By Ms. Saunders)        **     ***      ***      ***

6                          EXHIBITS

7       NUMBER                                              PAGE

8       1    Letter dated October 23, 2017 - Bates Stamp    104

9            SVH 000806

10      2    Summary Performance Evaluations Report Date:    107

11           4/20/2021 - Bates Stamp SVH 000760-SVH 000767

12      3    Summary Performance Evaluations Report Date:    119

13           7/17/2018 - Bates Stamp SVH 002155-SNH002161

14      4    Summary Performance Evaluations Report Date:    133

15           6/28/2017 - Bates Stamp SVH 001908

16      5    Letter to File - Bates Stamp SVH 000636 and     147

17           with attached Letter dated June 21, 2017 -

18           Bates Stamp SVH 000880-000883

19      6    Resident Educational Portfolio Review - Bates   158

20           Stamp SVH 000623-SVH 000624

21      7    Summary Performance Evaluations Report Date:    172

22           6/28/2017 - Bates Stamp - SVH 001727-SVH 0001732

23      8    Resident Milestone Evaluation: Year-End 2016-   184

24           2017 - Bates Stamp SVH 000443-SVH 000446

VOL I - Page 4 of 298

1                          <u>EXHIBITS</u>

2      NUMBER                                              PAGE

3      9    Letter dated April 26, 2017 - Bates Stamp      194

4           SVH 000001

5      10   Email Exchange - Bates Stamp SVH 000584-       225

6           SVH 000585

7      11   Letter dated August 30, 2017 - Bates Stamp     253

8           SVH 000931-SVH 000933

9      12   CONFIDENTIAL Letter dated March 22, 2017 -     264

10          Bates Stamp SVH 002185-SVH 002186

11     13   CONFIDENTIAL Letter dated April 12, 2017 -     265

12          Bates Stamp SVH 002187-SVH 002188

13

14

15

16

17

18

19

20

21

22

23

24

1          requirements?

2     A    Correct.

3     Q    But your recollection is that once you provided

4          that additional information they came onsite

5          again, and the probation was removed?

6     A    Correct.

7     Q    And you believe that was over the six month

8          period?

9     A    It was all within a six month period.

10    Q    Okay.  Let's go back to your responsibilities as

11         the program director for the Radiology Residency

12         Program at Saint Vincent's Hospital.

13    A    Okay.  That's a rather broad question, what would

14         you like me to --

15    Q    What are your --

16    A    -- focus us?

17    Q    -- what are your day-to-day responsibilities as

18         the program director of the program?

19    A    So it -- a program director is required for

20         oversight of the program as defined by the ACGME

21         to assure that the program is meeting ACGME

22         requirements.  The requirements are -- there are

23         RRC specific, they're called, Radiology Residency

24         Review Committee requirements.

1    Q    Okay.  And other than the oversight of the
2         program, what other responsibilities do you have
3         as a program director?
4    A    The oversight of the -- of the program
5         requirements is all inclusive of all elements of
6         the program.
7    Q    So what does the oversight entail?
8    A    Again, it's a -- it's a very broad question.  The
9         program requirements are a 50-page document, but
10        it's making sure that all components of the
11        training program are maintained.  And there is a
12        wide range and long list of program requirements
13        to attend to.
14   Q    So how do you ensure that all components of the
15        training program are maintained?
16   A    That's my job.
17   Q    Right, so how do you do your job on a day-to-day
18        basis?
19   A    Again, I would -- I would like to say that it's
20        such a broad -- it's such a broad question.  So
21        the --
22   Q    Okay.
23   A    -- I can give -- I can give you an overview and
24        if there's anything you'd like to ask me

1      specifically about it, so --

2   Q   That would be great.  I would love an overview

3       first.

4   A   So for -- for example, one -- one component --

5       one example component would be that Didacta

6       Conferences are required for the residents.  So I

7       would make sure that they're appropriately

8       provided Didacta Conferences for the right range

9       of topics and the right frequency for the

10      residents.  That's one example.

11  Q   Okay.  What else?

12          MS. SAUNDERS: Objection.

13          You can answer.

14  Q   What else do you do as the program director  I

15      don't know if you have a job description but if

16      there was a job description what would it say as

17      the program director for the Radiology Residency

18      Program at Saint Vincent's Hospital?  I'm really

19      not trying to be difficult.  I'm trying to narrow

20      it down.  I just want to know, what do you do

21      (laughed)?

22          MS. SAUNDERS: Objection.

23          MS. GOYAL: (Laughed.)

24          MS. SAUNDERS: Objection.

1           You can answer.

2     BY MS. GOYAL:

3     A     Well you're not trying to be difficult but you're

4           asking me to describe the job description is that

5           it is the responsibility of the program director

6           as defined by the ACGME and the RRC to ensure

7           adherence to all policies and protocols and

8           requirements of the ACGME as defined to maintain

9           and to meet accreditation requirements.  And the

10          list is extensive.  So on a daily basis I'm

11          constantly attending to every single aspect, and

12          some of it is very cyclical, some of it is daily,

13          some of it is weekly, some of it is monthly, some

14          of it is quarterly, some of it is annual.  We

15          make sure that we adhere to all elements of the

16          program related to the faculty, related to the

17          wellness of the residents, related to the

18          curriculum.  It's -- it's quite extensive and we

19          have a fully accredited Radiology Residency

20          Program without a single citation.  So that's

21          what I adhere to.

22    Q     Okay.  So what do you do on a daily basis as the

23          program director?

24    A     Again, I believe I've already answered it.  I --

1          I would attend to any and all elements of the

2          Residency Program to maintain accreditation.

3     Q    So what are those elements?

4          MS. SAUNDERS: Objection.

5          You can answer.

6     Q    What are the elements of the Residency Program

7          that you maintain on a daily basis?

8     A    I've mentioned some of them, would you like me to

9          mention as many as I can possibly think of?

10    Q    Yeah, that would be great.

11    A    On a daily basis I would look at -- I would make

12         sure that all the elements are being maintained

13         on time and in order.

14    Q    So what I asked you is what are those elements?

15         You've held this position for almost, I don't

16         know, 15 plus years and I'm just trying to

17         understand what as a program director you do?

18         Not what it says in the ACGME manual, but what --

19         tell me what you do?  If you are at a dinner

20         party right now and I asked you to tell me what

21         you do at work every day, what would you say?

22         MS. SAUNDERS: Objection.

23         You can answer.

24    A    I would say my responsibilities for running the

1        Radiology Residency Program are for oversight of

2        all the elements and all the faculty and all the

3        residents to makes sure that the program is

4        running properly on a daily basis.

5    Q   Okay.  And how do you ensure that it runs

6        properly on a daily basis?

7            MS. SAUNDERS: Objection.

8            You can answer.

9    Q   Again, I'm finding your questions extremely broad

10       given the scope of my responsibilities.

11   A   I understand you're very high up, Dr. Bader, and

12       I understand you have a lot of responsibilities,

13       okay.  I'm just trying to understand what some of

14       them are, other than the fact that they're --

15       that you are an oversight of this entire program?

16       That doesn't tell me what you do.

17           MS. SAUNDERS: Objection.  Counsel, --

18   Q   So --

19           MS. SAUNDERS: -- if you have specific

20       questions why don't you ask him --

21           MS. GOYAL: I'm asking --

22           MS. SAUNDERS: -- what he's doing?

23           MS. GOYAL: -- him what he does everyday --

24           MS. SAUNDERS: And you're getting --

1          MS. GOYAL: -- at work (laughed).

2          MS. SAUNDERS: -- frustrated and asking him

3      the same --

4   Q   What do you do -- okay.

5          MS. SAUNDERS: -- and now --

6          MS. GOYAL: So let's -- fine.

7          MS. SAUNDERS: -- we're just trying the same

8      tack over and over again and --

9          MS. GOYAL: So -- all right.  I'll try a

10     different way.

11         MS. SAUNDERS: If there are different things

12     that you want to know does he do this?  You can

13     say, well, as part of that do you do this?  As

14     part --

15         MS. GOYAL: Well I don't even have a general

16     list yet (laughed).

17         MS. SAUNDERS: Well you do because your

18     client was in the Radiology Residency --

19         MS. GOYAL: So --

20         MS. SAUNDERS: -- Program, so you have some

21     idea of what he does.  I mean, and what's

22     relevant to this case.

23  BY MS. GOYAL:

24  Q   What are your responsibilities towards resident

1              education and training?
2    A    Resident -- my responsibilities are to make sure
3         that the residents are appropriately educated and
4         trained in all required elements of diagnostic
5         radiology to meet board eligibility.
6    Q    And how are some of the ways that you make that
7         residents are properly trained and educated in
8         diagnostic radiology?
9    A    Make sure that they have the appropriate range
10        and scope of clinical experience and didactic
11        experience to help in their preparation.
12   Q    And how do you ensure residents are properly
13        trained and educated for board eligibility?
14   A    I make sure in working with my team that they
15        have a full and comprehensive didactic
16        curriculum, as one example.
17   Q    Who's on your team?
18   A    My team area all -- all of the faculty members,
19        number one.
20   Q    Oh, I'm sorry, all the faculty members?
21   A    Faculty members.  Faculty, teaching attendings.
22        I also have a program coordinator, which is an
23        ACGME requirement, that I work with on a daily
24        basis.  Coordinate the program activities.  I

1          activities.  They'll be elements that I would

2          delegate to an associate program director for

3          support to provide the time and input and work

4          with the residents and the faculty.

5     Q    So what are some of those resident activities?

6     A    Teaching, scheduling, review of curricula as some

7          examples.

8     Q    Are you also responsible for overseeing the

9          evaluation of residents?

10    A    What do you mean by overseeing?

11    Q    Are you responsible for -- are you responsible in

12         any way for the evaluation of residents?

13    A    Yes.

14    Q    Okay.  How so?

15    A    I evaluate residents as a -- as a faculty member

16         I evaluate residents as all faculty members do.

17         And then as the program director I review those

18         evaluations as part of evaluation process for

19         residents.

20    Q    When you say review those evaluations, you mean

21         review the evaluations of other faculty members?

22    A    Yes.

23    Q    And you also mentioned that -- I think you

24         mentioned that you're also -- you also oversee

1      residency well-being?

2   A   Well, --

3          MS. SAUNDERS: Objection.

4          You answer.

5   A   Oversee -- well resident well-being is an

6       inherent part of the residency program.

7   Q   Can you describe a little bit about what that

8       entails?

9   A   Yeah, I gave one example before.  So, for

10      example, adherence to the ACGME, you know, limit

11      on duty hours, for example, that's defined.  And

12      time off between shifts, things like that.

13      Making sure that that's all adhered to.

14  Q   Other than limit the duty hours and time off

15      between shifts, any other responsibilities that

16      you have with regards to resident well-being?

17         MS. SAUNDERS: Objection.

18         You can answer.

19  A   Responsibilities for -- it's part of our program

20      so we always check in with the residents as to

21      their well-being.

22  Q   When you say check in, do you have conversations

23      with them?

24  A   Uh-huh.  Yes.

1    Q    Are those typically in person?

2    A    Yes.

3    Q    Do you have any sort of schedule to check in with

4         residents or is it more ad hoc?

5    A    Both.

6    Q    You said -- I believe you testified that as a

7         faculty member you are responsible for evaluating

8         residents but you're also, as a program director,

9         responsible for reviewing the evaluations that

10        faculty members give of other residents, right?

11        Is that fair to say?

12   A    Yes.

13   Q    Okay.  And are those written evaluations --

14   A    Yes.

15   Q    -- in general?

16            And can you tell me what those written

17        evaluations are, like what are they -- what are

18        those -- I know there's a lot of different

19        evaluations so I want to get just a working list

20        of what evaluations are used by the program?

21   A    So the program uses a system called

22        MyEvaluations, which is one word, M-y,

23        Evaluations, which is used throughout the

24        country.  That's the system, it's and electronic

VOL I - Page 87 of 298

1    made a decision to interview.

2  Q  Do you recall what materials you reviewed before

3    interviewing Dr. Garg?

4  A  We typically would have seen his CV, his prior

5    experience, his prior training.

6  Q  And do you recall what Dr. Garg's prior training

7    was?

8  A  I recall that Dr. Garg had significant experience

9    as a surgeon and some orthopedic surgery, and

10   then was applying to us after completing two

11   years of training at University of Oklahoma.

12  Q  And did you at some point speak with the

13   University of Oklahoma about Dr. Garg?

14  A  Yes.

15  Q  Okay.  Do you recall when that was?

16  A  I don't recall exactly.  It would have been after

17   we reviewed the material and we're moving forward

18   on getting more information to make a final

19   decision of whether or not to offer Dr. Garg a

20   position.  We would have had his letters of

21   reference in order to even have that information

22   of who to contact.  So those would have been

23   reviewed.  And then I called the program director

24   who had sent a letter of reference.

1    Q    The program director at the University of

2         Oklahoma?

3    A    Yes.

4    Q    And was that Dr. Hiller?

5    A    Yes.

6    Q    Did you speak with Dr. Hiller over the phone?

7    A    Yes.

8    Q    And what did you discuss with him?

9    A    We discussed Dr. Garg's performance at University

10        of Oklahoma and his potential change of --

11        transition to a program in Massachusetts.

12   Q    What did you discuss about Dr. Garg's

13        performance?

14   A    We discuss -- I typically would have asked what

15        his area of strength -- strengths are.  His

16        opportunity for improvement.  Or why he was

17        leaving the program.  Try to get feedback on

18        assessing his ability to perform at the R-3 level

19        at Saint Vincent Hospital.

20   Q    And what did the program director, Dr. Hiller,

21        tell you about Dr. Garg's strengths?

22   A    He told me his strengths were his

23        professionalism.

24   Q    Anything else?

1    A    Specifically his strengths?

2    Q    Yes.

3    A    He highlighted his strengths in his -- and his

4         willingness to work with others and want to

5         improve.

6    Q    Anything else?

7    A    Not that I recall.

8    Q    Okay.  Strengths he -- Dr. Hiller told you about

9         Dr. Garg's professionalism and his willingness to

10        work with others and improve?

11   A    Yeah, his desire to improve.

12   Q    And did Dr. Hiller answer your question about

13        what his areas of improvement?

14   A    Yes.

15   Q    And what were those?

16   A    Well, he told me that he came with a -- I believe

17        he told he came -- a little bit about his

18        background that I had seen in his CV.  And then

19        he said he started out well in the program.  And

20        then he seemed to fall behind after his first

21        year and was unable to keep up with others.  And

22        he thought it might've been due to other

23        distractions.  He was talking about -- mentioned

24        there may have been a family issue in India or

1          something, but he said he was trying hard but he

2          couldn't seem to keep up and he didn't think it

3          had anything to do with his ability to learn.

4          And that a change of environment -- he thinks he

5          would do well with a change of environment if he

6          repeated his R-3 level.  He told me that he had

7          been there for three years and he felt he needed

8          -- he would do well coming to a different

9          environment at the R-3 level.  Those were some of

10         the highlights.

11    Q    So he -- Dr. Hiller told you that Dr. Garg had

12         been there for three years.

13    A    Yes.

14    Q    Did he tell you how many credits Dr. Garg was

15         receiving for his three years?

16    A    He told me he was there for three years and that

17         he was receiving two years of academic credit and

18         -- which is why he thought repeating the third

19         year would be perfect for him.  He didn't use the

20         word perfect, but he said that would be -- he was

21         answering my question as to how he would

22         transition and function at an R-3 level.

23    Q    Did you ask why he was receiving two years of

24         academic credit even though he had been in the

1          applicants?

2    A     We were happy with Dr. Garg.

3    Q     And you said you reviewed Dr. Garg's CV?

4    A     I would have reviewed his CV, yes.

5    Q     Were you aware that he was older than some of the

6          other residents already in the program?

7    A     Yes.

8    Q     Is that a concern for you?

9    A     No.

10   Q     Did you speak with Dr. Hiller about the fact that

11         he was older than other residents?

12   A     No.

13   Q     Did you speak with Dr. Hiller about any concerns

14         that Dr. Garg -- strike that.

15             Did you speak with Dr. Hiller about whether

16         Dr. Garg go along with faculty at the University

17         of Oklahoma?

18   A     It -- yes, indirectly.  He told me that he had

19         fallen behind his peers and there -- I can't

20         remember the specifics.  He was -- the -- he was

21         referring to a change of environment, he felt

22         that he would do -- he felt he could potentially

23         thrive in a different environment.  Something --

24         I don't know, there was a turnover in staff or

VOL I - Page 111 of 298

1          of Dr. Garg's participation in the Radiology

2          Residency Program, if you see the months?

3     A    Yeah, I'm looking at the months.  Yes, at the --

4          at the time of the -- at the time of his

5          portfolio review meeting.  The second portfolio

6          review meeting, yes, September and June.

7     Q    And is it fair to say that at the bottom of the

8          chart those are the averages of all of the scores

9          of the core competencies?

10    A    Yeah, can I just check one thing here.  Yes, that

11         final number on the bottom where it says mean?

12    Q    Yes.

13    A    Yes, that would be -- that would be an average of

14         those categories.

15    Q    And would you look at the averages or --?

16    A    Yes, I look at averages.  Yes.

17    Q    And looking at the averages what -- what score

18         did Dr. -- which core competency did Dr. Garg

19         receive the lowest score on?

20    A    It looks like practice-base learning improvement.

21         Practice-base -- practice-base learning and

22         improvement would be the lowest.

23    Q    What would be the second lowest?

24    A    Clinical judgment.

VOL I - Page 126 of 298

1           at the end for, you know, strengths, weaknesses,

2           opportunities for improvement, which are all

3           these pages of comments which are very helpful

4           and impactful in assessing the resident's

5           performance over and above a numerical value.

6      Q    The numerical values that are generated through

7           the drop down, is the drop down used by each

8           faculty member?

9      A    Yes.

10     Q    Okay.  And once the faculty member chooses a drop

11          down number or score, it's stuck?

12     A    Yeah.

13     Q    Okay.

14     A    Well, once they finalize the evaluation, --

15     Q    Right.

16     A    -- yes.

17     Q    And you said they also provide comments that you

18          also review that are very helpful?

19     A    More helpful, yes.

20     Q    More helpful.  Okay.

21               So do you look at the numerical scores at

22          all?

23     A    Yes, --

24     Q    Okay.

VOL I - Page 145 of 298

1    Q    Okay.  You also testified that you would've

2         looked at it for purposes of the -- you would

3         have looked at the most recent data that would've

4         been available at the time that you had the

5         meeting.  I believe you're talking about the term

6         -- is it correct that you're talking about the

7         termination meeting?

8              MS. SAUNDERS:  Objection.

9              You can answer.

10   A    I'm talking about his final portfolio review

11        meeting.

12   Q    All right.  Is the final portfolio review meeting

13        the same meeting in which you notified him --

14        notified Dr. Garg that he was being terminated

15        from the program?

16   A    Yes.

17             MS. SAUNDERS:  Objection.

18             You can answer.

19   Q    I'll represent to you that, that was on June 21st

20        of 2017, does that sound correct?

21             MS. SAUNDERS:  Objection.

22             You can answer.

23   A    It sounds -- it sounds correct, it would've been

24        towards the end of the academic year.

1    Performance Evaluation for all residents that

2    complete a program, they need a Summary

3    Performance Evaluation.  It's almost the same as

4    our final performance review which is the Summary

5    Portfolio Review and then there's a Summary

6    Performance Evaluation that goes into every

7    resident folder for a resident that has

8    successfully completed the program.  It has to

9    state that they can practice independently; they

10   completed an entire residency.  That is a summary

11   performance letter I believe is the term that the

12   ACGME uses.  The end of each academic year there

13   has to be a document in the file that shows your

14   performance at the end of the -- the conclusion

15   of that year and your ability to go onto the next

16   year, which is typically our final portfolio

17   review.  It's a little different for Dr. Garg

18   because he wasn't -- he wasn't leaving at the end

19   of that meeting.  He was being terminated in that

20   meeting; wasn't graduating from the program.

21   That's why he's -- he's not going to have a

22   summary -- he's going to have a summary

23   performance meeting, but not a summary

24   performance letter as defined by the ACGME.  But

VOL I - Page 194 of 298

1    Q    Sure, this one right here -- it's right here.

2    A    Okay.  Thank you.  Okay.

3              (Whereupon, Exhibit Number 9, so marked:

4         Letter dated April 26, 2017 - Bates Stamp

5         SVH 000001)

6              MS. GOYAL: Is this 9?

7              COURT REPORTER: Yes.

8    Q    I've provided you a document that's been marked

9         as deposition Exhibit 9, do you recognize this

10        document?

11   A    I do.

12   Q    What is it?

13   A    It's the letter -- it's a renewal letter of

14        intent given to Dr. Garg.

15   Q    Okay.  And is that your signature at the bottom?

16   A    Yes.

17   Q    What is it dated?

18   A    4-26-17.

19   Q    Is it fair to say that at the time that you

20        signed this you were prepared to continue Dr.

21        Garg's participation in the Radiology Residency

22        Program at Saint Vincent's Hospital?

23   A    That was the -- yes.

24   Q    Okay.  So as of April 26th you were prepared to

VOL I - Page 198 of 298

1    Q   Why did you have to sign it on April 26th, 2017?

2    A   It's, all program directors signs all renewal

3        letters.

4    Q   What does that mean?  They all sign them on that

5        date?

6            MS. SAUNDERS:  Objection.

7            You can answer.

8    A   I don't know what date they sign them.

9    Q   Okay, so why is it your understanding that you

10       had to sign this?

11   A   Because that's the timing of the GME process --

12   Q   Didn't you say time --

13   A   -- for renewal letters.

14   Q   Didn't you say the timing of the GME process is

15       four months prior to the end of the program year?

16   A   I don't know, it's whatever they -- if they're

17       running late, they're running late.  My

18       understanding is that it has to do with potential

19       Visa processing and all these issues, so they

20       have to start -- they start their process early.

21       So these letters, for clarification, are not

22       generated by me.  They're generated by the

23       graduate medical education office for -- so

24       unless there's a resident that's leaving the

VOL I - Page 200 of 298

1      A    This is the timing the GME requires to begin

2           their processing for the next academic year, so

3           the reminders are sent out to the programs and

4           the program directors.

5      Q    So you don't know the exact time of the renewal

6           of the contracts for the GME guidelines?

7                MS. SAUNDERS: Objection.

8                You can answer.

9      A    I do not know the exact timing.

10     Q    And your expectations or your understanding was

11          that if Dr. Garg met the expectations of the

12          program in May and June of 2017, that he would

13          have continued in the PGY-5 year?

14               MS. SAUNDERS:  Objection.

15               You can answer.

16     A    If Dr. Garg met the expectations of his Stage One

17          and Stage Two Warning letters.

18     Q    He would have continued in the program?

19     A    Yes, that was stipulated in the letter.

20     Q    Do you recall that earlier in the program you

21          agreed that Dr. Garg could complete the program

22          by June of 2018?

23     A    By June of 2018, what year are we talking about.

24          Yes.

1    Q    Why did you agree to that?

2    A    That was by request of Dr. Garg to accommodate

3         the schedule for him to complete on an academic

4         cycle.  He had an interest in pursuing fellowship

5         training.

6    Q    At the time that you agreed to allow him to

7         complete the program by June of 2018 would that

8         have been two months earlier than he would have

9         normally completed the program?

10             MS. SAUNDERS:  Objection.

11             You can answer.

12   A    No.

13   Q    Why not?

14   A    What do you mean by completing the program?

15   Q    Well, he began in September 2016, is that right?

16   A    It -- yes, that's correct.

17   Q    So he --

18   A    2016, is that what you said?

19   Q    Right.  And he was supposed to be in the program

20        for two years?

21   A    For two -- yes, correct.

22   Q    He would have had one year of PGY-4 year and then

23        completed his final year, his PGY-5, is that

24        right?

1    A    Correct.

2    Q    And when would he have completed his second year?

3    A    If it -- his second year, if there were no

4         accommodations made to the schedule then it

5         would've ben exactly two years from when he

6         started, but he wasn't -- he wasn't finishing

7         early.  He was finishing his requirements on

8         time, but the schedule was being accommodated to

9         allow for that.

10   Q    So how was the schedule accommodated?

11   A    I'd have to look exactly how it was accommodated,

12        but there's -- there's an ability to utilize some

13        available time, vacation time, and D-Os, and

14        working some additional weekends, for example,

15        while staying withing duty hour rules so that

16        your equivalent training time is the same as all

17        residents in the program, which is a requirement

18        of the program.  And it still meets ACGME

19        requirements for time spent.

20   Q    And you felt comfortable agreeing to accommodate

21        his request and accommodate his schedule so that

22        he could complete the program within -- in less

23        than two years?

24             MS. SAUNDERS:  Objection.

1      April.  I'm sure we have them here for review.  I

2      believe that was April or so.

3  Q   So you said that you wanted to support Dr. Garg

4      in his request to accommodate his schedule and

5      complete the academic year in less than two years

6      to pursue fellowships.  I mean, weren't you

7      concerned that had been on two written warnings,

8      why allow him to complete the program in less

9      than two years?

10         MS. SAUNDERS:  Objection.

11         You can answer.

12  A   He was not completing the program -- he was

13      completing all program requirements.  He was not

14      being relieved of any requirements of the program

15      --

16  Q   Right, in order for him to complete the

17      requirements in less than two years it required

18      him to essentially work more -- you know, not

19      work, but utilize his vacation time, days off,

20      perhaps work additional weekends.

21  A   Correct.

22  Q   Did you have any concern with agreeing to that

23      when this is someone that you put -- or issued

24      two written warnings to?

1            MS. SAUNDERS:  Objection.

2            You can answer.

3    A    I did have concerns.

4    Q    Why did you allow -- why did you agree to allow

5         him to complete the residency requirements in

6         less than two years when you also put him on two

7         written warnings?

8            MS. SAUNDERS:  Objection.

9            You can answer.

10   A    Dr. Garg initially in our -- even when I first

11        interviewed him said he had no interest in

12        fellowship training, that he was dedicated --

13        fully dedicated to the residency.  Once the

14        residency began, he initially that request, I

15        don't know what changed in his mind of why he

16        wanted to do that, and I met with him to suggest

17        that he concentrate on meeting his core

18        competency requirements rather than fellowship.

19        He felt it was important.  He was very

20        passionate, very professional about it.  Very

21        passionate that he would be dedicated to it and

22        he would fulfill all the responsibilities and

23        that was -- that was his responsibility to make,

24        you know, to have that opportunity.  We weren't

VOL I - Page 212 of 298

1    Q    Is it fair to say that he would assume -- that

2         Dr. Garg would assume he's continuing in the PGY-

3         5 program when he signed that renewal letter?

4              MS. SAUNDERS:  Objection.

5              You can answer.

6    A    I don't know.

7    Q    Okay.  When a resident signs the renewal letter

8         what is your -- what do you believe that resident

9         understands by signing that renewal letter?

10             MS. SAUNDERS: Objection --

11   Q    What is your belief?

12             MS. SAUNDERS: -- you can answer.  Objection.

13        You can answer.

14   A    My belief is that a resident that feels that they

15        are going to successfully complete the

16        requirements of the current academic year will

17        then continue in the next academic year.

18   Q    Right.  And if they've been offered an

19        opportunity to continue in their final year, that

20        it would be -- that they would understand that

21        mean that they, at least as of that date, met the

22        expectations to continue with the final year?

23             MS. SAUNDERS:  Objection.

24             You can answer.

1       is it based on?

2              MS. SAUNDERS:  Objection.

3              You can answer.

4   A   It's based on my -- on my understanding from

5       employees -- hospital employee, they take very

6       seriously, HR, any discrimination at a hospital.

7       They wouldn't tolerate that for any reason at

8       all, and I didn't review it as a resident --

9       residency specific issue.  I viewed it as an

10      employee issue so that any protections would be

11      in place for Dr. Garg, which is why I contacted

12      HR, which otherwise is not involved in residency

13      -- residency programs directly.

14  Q   What protections are -- did you want to afford to

15      Dr. Garg as an employee?

16  A   I had no idea, that's why I called HR.

17  Q   Did you talk to her about what protections Dr.

18      Garg was entitled to?

19  A   No, I just asked her what I'm supposed to do.

20  Q   And did Patty ask you to read the email?

21  A   I don't recall.

22  Q   Did she ask you whether you knew what this was

23      about?

24  A   I would have told her what it was about.

1   Q   What did you tell her it was about?

2   A   I would have told her about the email.

3   Q   Okay.  So what did you tell her about the email?

4          MS. SAUNDERS:  Objection.

5          You can answer.

6   Q   Did you read her the email?

7   A   I don't recall, but I certainly would have told

8       her that I have a resident who has raised a

9       concern of discrimination?

10  Q   What's your understanding of what discrimination

11      is?

12  A   Discrimination is improper treatment, in this

13      case of a resident based on something other than

14      objective review of these rereads.

15  Q   And you under -- do you understand that the

16      improper treatment of the resident based on the

17      objective review of the re-read being unlawful?

18         MS. SAUNDERS:  Objection.

19         You can answer.

20  A   So, yes, in the sense that to me it was a buzz

21      word.  I don't -- I didn't know what he was

22      referring to, but I knew that there were

23      potentially significant implications which is why

24      HR was immediately notified.

1        schedule a meeting with HR, did you speak with

2        him about the discrimination?

3             MS. SAUNDERS:  Objection.

4             You can answer.

5    A   I let him know I was concerned enough to contact

6        HR and set up a meeting and then he said that he

7        dropped the discrimination comment.  He said he

8        didn't want to pursue that.  He's not -- it

9        wasn't discrimination, it was the rereads that he

10       wanted to deal with, which we've been deal --

11       which we have been dealing with.

12   Q   You said that you tried to reach out to him

13       within an hour, you responded to him when he

14       used the word discrimination, why did you feel a

15       sense of urgency?

16   A   Because to me that's a -- a resident that uses

17       that word, there's significant implications of

18       inappropriate behavior and treatment that needs

19       to be addressed, and that's beyond the residents

20       -- as an employee of the hospital that's an H --

21       in my mind that's first and foremost an HR issue

22       to make sure appropriate steps are taken.  So I

23       looked to HR for guidance.

24   Q   And once Dr. Garg, you believe said, he wanted to

1        generates them through the GME office, your

2        Program Coordinator brings them to you and you

3        sign them?

4    A   Yes.

5    Q   Okay.  Do you have any other involvement other

6        than signing them when they're provided to you by

7        your Program Coordinator?

8    A   Yes.

9    Q   Okay.  What is that involvement?

10   A   The other involvement is if there's a Resident

11       that's not already determined to not be

12       continuing in the program then they would not be

13       receiving their renewal letter.

14   Q   And if you knew that -- once you learned that

15       some -- a resident may not be receiving a -- once

16       you learn that a resident may not be continuing,

17       would you notify the GME office?

18   A   Yes, of course.

19   Q   Okay.  Have you done that in the past?

20   A   What -- we have done that for if a resident is

21       transferring, for example, if they're not

22       continuing in the Saint Vincent Hospital for any

23       reason then the -- they wouldn't be generating

24       that renewal letter for them and beginning the

1          training.

2     Q    And you recall during a determination -- the

3          meeting in which you notified him he wasn't

4          continuing with the program or sometime during

5          the appeal process, do you recall telling him

6          that there was no opportunity for him to extend

7          his program?

8               MS. SAUNDERS:  Objection.

9               You can answer.

10    A    At Saint Vincent Hospital you're referring to?

11    Q    Yes.

12    A    Can you be more specific in the question, during

13         what portion of the appeal?

14    Q    I -- I think it -- let me just -- In June 21,

15         2017 Stage Two Warning follow-up Portfolio Review

16         Meeting you say --

17    A    Uh-huh.

18    Q    -- "There is no option to extend your training at

19         Saint Vincent Hospital as was done in your prior

20         program."

21    A    Uh-huh.

22    Q    Why was there no option to extend his training?

23    A    There was no option be -- I believe I stated this

24         before, because he was functioning at a level

VOL I - Page 257 of 298

1      significantly below the R3 level, which he had

2      already repeated that year now for a second time.

3      We were not going to continue him -- we could not

4      advance him and offer him another opportunity to

5      continue at another level, below the level for

6      which he should've been progressing.

7  Q  Could you have given him an opportunity to be at

8      some other level?

9      MS. SAUNDERS:  Objection.

10      You can answer.

11  A  No.

12  Q  Why not?

13  A  What specific level are you referring to?

14  Q  Well, I'm asking if he -- you said you couldn't

15      allow him to repeat a year that he already

16      repeated, is that right?

17  A  Correct, that was our decision.

18  Q  So was there any opportunity for him to continue

19      in the program at a lower level --

20      MS. SAUNDERS:  Objection.

21      You can answer.

22  Q  -- as a PGY-1 -- a PGY-2 or PGY-3 resident?

23  A  No.  If you're not only unable to be promoted,

24      but need to be demoted, that's not typically what

1              Are we done with this?

2              MS. GOYAL: I may have to go back to it.

3              MS. SAUNDERS: Okay.  I just want to --

4         because we're -- she still has it marked

5         confidential.

6              MS. GOYAL: From -- yeah, you can -- it's no

7         longer confidential --

8              MS. SAUNDERS: Okay.

9              MS. GOYAL: -- I'm going to move on to some

10        other documents -- other questions.

11             MS. SAUNDERS: Okay.  I just don't want to

12        burden the transcript with that.

13   BY MS. GOYAL:

14   Q    Who was Dr. Garg's employer?

15             MS. SAUNDERS:  Objection.

16             You can answer.

17   A    Saint Vincent Hospital.

18   Q    And you had the authority to hire Dr. Garg as a

19        resident in the Radiology Resident Program at

20        Saint Vincent's Hospital?

21   A    The authority, yes, I had -- that was my

22        responsibility.

23   Q    And you had the authority and the -- you had the

24        authority to terminate Dr. Garg from the

VOL I - Page 269 of 298

1          Radiology Residency Program at Saint Vincent's

2          Hospital, right?

3     A    I had the authority to recommend termination.

4     Q    Who did you recommend termination to?

5     A    The termination -- I make the decision for

6          termination and then on appeal then there's a

7          whole series of faculty members and regimental

8          education and administrators that have the

9          opportunity to review the decision, if that's the

10         resident's choice.

11    Q    So did you have the authority to make the

12         decision to terminate or did you have the

13         authority to recommend the termination?

14             MS. SAUNDERS:  Objection.

15             You can answer.

16    A    I have the authority to make the decision to

17         terminate.

18    Q    And did you consult with anyone at Saint

19         Vincent's Hospital when you made the decision to

20         terminate?

21             MS. SAUNDERS:  Objection.

22             You can answer.

23    A    Yes.

24    Q    Who did you consult with?

```
 1              together before we sat together to go over it
 2              with Dr. -- with Dr. Garg.  So she would've been
 3              the main person that I would've discussed this
 4              with.
 5    Q     What about conversations or how did you consult
 6              with Dr. Kanzaria -- I mean, sorry, Dr. Midkiff
 7              regarding the decision to terminate Dr. Garg from
 8              the program?
 9    A     Dr. Midkiff would've been aware from
10              conversations.
11    Q     What kind of conversations?
12    A     Being informed as an Associate Program Director
13              that that that's the decision that we were
14              making.
15    Q     So he wasn't consulted in terms of whether to
16              terminate?  He was consulted in terms of letting
17              him know?
18    A     Correct.
19    Q     And who's on the Clinical Competency Committee?
20    A     That would be Dr. Berberian -- I believe to the
21              best of my recollection, Dr. Berberian, Dr.
22              Kanzaria, Dr. Midkiff, --
23    Q     Okay.  And you said --
24    A     -- and my -- and myself.
```

1    Q    When did you decide that he couldn't meet the

2         expectations of the Stage One and Stage Two

3         Written Warning?

4              MS. SAUNDERS:  Objection.

5              You can answer.

6    A    It would have been at the end of the defined

7         period of the evaluation of that warning letter,

8         so he would have every opportunity.

9    Q    So you're saying that in the second written

10        warning there would have been a period of

11        evaluation.  You would've waited until the end of

12        that period of evaluation to make a decision?

13   A    Correct.  That's when we would have all the --

14        all the feedback.

15             Do I have that letter here somewhere?  It's

16        just the follow-up meeting.

17   Q    During the time between -- the time you issued

18        the second written warning and the time you made

19        the decision that he wasn't able to meet the

20        expectations of the Stage One and Stage Two

21        Written Warning, had you had any conversations

22        with Dr. Garg between those two periods of time?

23             MS. SAUNDERS:  Objection.

24             You can answer.

                C E R T I F I C A T E

COMMONWEALTH OF MASSACHUSETTS

COUNTY OF ESSEX, SS


        I, KAREN CASSOLA NORMAN, a Professional
Court Reporter and Notary Public in and for the
Commonwealth of Massachusetts, do hereby certify
that the foregoing Deposition of Dr. David A.
Bader, was taken before me on February 15, 2022.
The said witness was duly sworn before the
commencement of his testimony; that the said
testimony was taken audio graphically by myself
and then transcribed under my direction.  To the
best of my knowledge, the within transcript is a
complete, true and accurate record of said
Deposition.

        I am not connected by blood or marriage with
any of the said parties, nor interested directly
or indirectly in the matter in controversy.


        IN WITNESS WHEREOF, I have hereunto set my
hand and Notary Seal this 14th day of March,
2022.


_KAREN CASSOLA NORMAN, Notary Public


        My Commission Expires:
        March 17, 2028


PLEASE NOTE: THE FOREGOING CERTIFICATION OF THIS
TRANSCRIPT DOES NOT APPLY TO ANY REPRODUCTION OF THE
SAME BY ANY MEANS UNLESS UNDER THE DIRECT CONTROL
AND\OR DIRECTION OF THE CERTIFYING REPORTER.

# PLAINTIFF EXHIBIT 3

VOL I - Page 1 of 181

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

C.A. No. 4:20-cv-40060-DHH

DR. ASHU GARG,

                              Plaintiff,

          v.

VHS ACQUISITION SUBSIDIARY NO. 7 d/b/a

SAINT VINCENT HOSPITAL, DAVID BADER

JOHN MUKAI, and DOUGLAS BURD,

                              Defendants


          DEPOSITION OF DR. JOHN MUKAI, a

witness called on behalf of the Plaintiff, taken

pursuant to Notice under the applicable

provisions under the Federal Rules of Civil

Procedure, before Karen Cassola Norman, a CER

and Notary Public in and for the Commonwealth of

Massachusetts, at the Rosen Law Offices, P.C.,

204 Andover Street, Suite 402, Andover,

Massachusetts, on Wednesday, March 2, 2022,

commencing at 10:00 a.m.

J&K COURT REPORTING, 12 BUENA VISTA AVE, SALEM, MA 01970

KC    (978) 825-9171          FAX (978) 744-6476     KC

****************COMPUTER AIDED TRANSCRIPTION*************

1    APPEARANCES:

2

3         Kavita Goyal, Esq.

4         Matthew Perry, Esq. (Appearing remotely)

5         ROSEN LAW OFFICE

6         204 Andover Street, Suite 204

7         Andover, Massachusetts 01810

8              Counsel on behalf of the Plaintiff.

9

10        Olivia L. Vehslage, Esq.

11        OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.

12        One Boston Place, Suite 3500

13        Boston, Massachusetts 02108

14             Counsel on behalf of the Defendants.

15

16   Also Present:

17        Dr. Ashu Garg, (Appearing remotely)

18

19

20

21

22

23

24

1                    I-N-D-E-X

2    WITNESS                   DIRECT  CROSS  REDIRECT  RECROSS

3    Dr. John Mukai

4    (By Ms. Goyal)              6     ***     ***       ***

5    (By Ms. Saunders)          **     ***     ***       ***

6                            EXHIBITS

7    NUMBER                                            PAGE

8    1    Summary Report - Bates Stamped          61

9         SVH 000480-SVH 000482

10   2    Email Chain - Bates Stamped             84

11        SVH 000554--SVH000556

12   3    Email dated March 1, 2017 -  Bates Stamped   103

13        SVH 000557

14   4    Email dated May 17, 2017 - Bates Stamped    105

15        SVH 000592

16   5    Resident General Evaluation - Bates Stamped  134

17        SVH 003371-SVH 003393

18   6    Email dated May 24, 2017 - Bates Stamped    148

19        SVH 000605

20   7    Email dated June 8, 2017 - Bates Stamped    163

21        SVH 000625

22

23

24

1    A    Correct.

2    Q    And you carry all those responsibilities?

3    A    Correct.

4    Q    So what are some of those responsibilities?

5    A    The responsibilities at the hospital?

6    Q    Yes.

7    A    Well it's just to cover the department as

8        directed by my chief.  I have a very focused

9        role.  My areas of interest are information

10       technology and emergency radiology.  And it's

11       pretty much, that's what I do on the -- in the

12       teaching side, and then I cover all the major

13       specialties and the, you know -- well I'll let

14       you ask me specifically.

15    Q    When you say cover all the major --

16    A    Right.  I kind of pride myself -- I mean I do see

17       CT PET imaging, I do -- which is you know, one

18       whole area of nuclear medicine.  I do all facets

19       of MRI largely.  I do some of the latest CT

20       imaging which is CT coronary and geography -- I'm

21       the only reader.   Things like that.

22    Q    And so I want to make sure I'm clear.  So you

23       have -- you said something about teaching side.

24       So there's a teaching portion of your job as well

1      as a clinical portion; is that what you're

2      saying?

3    A    Yes.  Yeah.

4    Q    Okay.  So when you were listing CT imaging, MRI,

5         the latest CT imaging, that's more of the

6         clinical side?

7    A    Yes.

8    Q    Okay.  And then you -- in conjunction with that

9         you also --

10   A    Well then -- actually it's the work product side

11        if you will, to use your terms.  I mean we make -

12        - we do reports on studies in those modalities.

13        So that's clinical.  Clinical means making those

14        things I suppose is what you would say whereas

15        the teaching is dealing with the residents.

16   Q    Yeah.  And how long have you been dealing with

17        the residents at Saint Vincent?

18   A    Well, since I was there.

19   Q    Okay.

20   A    However long that is.  Probably 2000-ish.

21   Q    And on the teaching side when you're dealing with

22        residents what are some of your responsibilities?

23   A    My area is very focused.  I make -- basically

24        because of my experience I have a lot of

1          experience in emergency radiology given that I

2          set up the department and ran it, the whole

3          thing.  So I -- pretty much my role is to prepare

4          the starting residents for emergency radiology

5          and taking call.

6     Q    So when you say starting residents, residents who

7          are in their first year of the program?

8     A    Correct.  Hm-mm.

9     Q    Other than the emergency radiology and preparing

10         the first year residents for taking call, what

11         other responsibilities do you have on the

12         teaching side?

13    A    That's it.  Actually I'm not a formal -- you know

14         there are people -- there's a -- oh, excuse me

15         for one second.

16    Q    Sure.

17    A    I am very -- I don't take part in the official

18         academic teaching responsibilities in the

19         department.  I teach the first-year residents

20         emergency radiology and that's it.  You know I

21         don't --

22    Q    Other than the first year residents, do you --

23         are you responsible for evaluating any of the

24         residents in their second year programs?

1    A    Yes.  We've got -- everybody evaluates.  It's

2         part of the process.

3    Q    So you're still interacting with residents after

4         their first year?

5    A    Yes.

6    Q    Okay.  In the medical malpractice lawsuit that we

7         spoke about some time before 1990 --

8    A    Right.

9    Q    -- who was it that sued?

10   A    I honestly don't remem -- I really don't

11        remember.

12   Q    Was it a patient?

13   A    Oh, yes.  Yeah.  Sure.

14   Q    It was the patient but you don't recall their

15        name?

16   A    No.

17   Q    Okay.  And you said it was regarding a lung

18        situation?

19   A    It was a lung biopsy, yes.

20   Q    That had a bad outcome?

21   A    Had a bad outcome.

22   Q    Did it result in --

23   A    Actually --

24   Q    -- as a fatality?

1    Q    Yeah.

2    A    I'm great with pictures in front of me.

3    Q    Yeah.

4    A    So -- yeah, something like that.

5    Q    Okay.  Okay.  And who would you say do you report

6         to?

7    A    Be more specific.  In terms of my duties in the

8         department?

9    Q    Yes.

10   A    The chief of the department.

11   Q    And that's --

12   A    Clearly.  Dr. Bader.

13   Q    Dr. Bader.

14   A    Yeah.

15   Q    Okay.  And how often do you interact with Dr.

16        Bader?

17   A    Oh, whenever -- you know it's a small department

18        and we see each other regularly.  We have a

19        common office area.  I can't give you specifics,

20        but we -- once a day when we're there, you know.

21        Something like that.  I could be way off again.

22        I mean, again, I --.

23   Q    Do you go to the hospital every day?

24   A    When I'm assigned at work -- if you're off --

1          yeah, we only cover the hospital.

2     Q    Right.

3     A    Right.

4     Q    Does Saint Vincent Radiology Associates also have

5          a separate office?

6     A    No.

7     Q    Okay.  So their office is in essence the

8          hospital?

9     A    Well, let me rephrase that.  We have an

10         administrative office outside --

11    Q    Outside of the --

12    A    -- and Dr. Bader takes care of that because he's

13         the president of the corporation too.

14    Q    And when you say administrative office outside,

15         do you mean outside the hospital, at a different

16         address?

17    A    Correct.  We have a separate office address, fax,

18         phone.

19    Q    Do you ever go to that administrative office?

20    A    No.

21    Q    Okay.  So when you go to work you're going to

22         Saint Vincent Hospital?

23    A    Correct.

24    Q    And do you -- in addition to serving as a back-

1          period of -- I assume --

2     A    To some extent.  It's relatively similar.  I mean

3          you fill out the same kind of things.  Maybe

4          there's a general statement about overall -- I

5          get the forms and I fill them out --

6     Q    Yes.

7     A    -- you know.  And I know it's happened before, I

8          get the form and that's about it.

9     Q    Yeah.  And what is your understanding of what

10         core competencies are?

11    A    You know, again lucky for me, I don't have to

12         understand this a great detail because it is --

13         well, it is -- it's not my area but there's a

14         whole layer of core competencies laid out by the

15         American College or the ABR of what residents are

16         supposed to know.  And how, you know -- I know

17         that, and I know my colleagues would know it very

18         well.

19    Q    When you are asked to complete evaluations, are

20         you asked to complete an evaluation of whether

21         they meet certain core competencies?

22    A    No.  I don't even -- I just -- I don't know

23         specifically to be honest with you.  It's just an

24         evaluation; they ask you questions and you fill

1          it out.  Again the core competencies -- those --

2          that's the expertise from my colleagues on the

3          Education Committee.

4     Q    And have you ever reviewed the core competencies?

5     A    Yes.  I think so.

6     Q    When was the last time you probably reviewed

7          them?

8     A    Oh geez, I don't know, maybe six months ago.  I

9          don't -- it's not something that's a major area

10         of updating.  They're pretty much standard, you

11         know, areas.  You need to know each modality, you

12         need to know each anatomic region, things like

13         that.

14    Q    And is it fair to say that based on your years of

15         doing this, you understand how to evaluate a

16         resident based on those core competencies?

17              MS. VEHSLAGE:  Objection.

18    A    Could you say again?

19    Q    Sure.  I know you said --

20    A    I don't understand.

21    Q    -- you don't really know the specifics and some

22         of the people on the Education Committee would,

23         but when you're evaluating someone on a form and

24         if the form asks about a core competency on a

1    Q    Do you understand what it is?

2    A    Yes.

3    Q    Okay.  What is it?

4    A    Well, it's a report read by him, and I assume it

5         must have been -- it must have been he was on a

6         call.  I think he did do a little of that.  And

7         I'd marked it an R3 so that's the sort of --

8         residents get R2s, R3s commonly.

9    Q    Okay.

10   A    But the 3 means that it was an obvious -- in my

11        mind a 3 is an obvious finding.  The R2s and 3s

12        mean that it's -- and again talk to the Education

13        Committee about giving you the specifics, but in

14        my mind an R2 or an R3 is a significant miss --

15        and I could be wrong on this -- where it changes

16        patient therapy if it's an R2 or 3.  And an R3 is

17        a big one and an R2 is a little one, but they're

18        both important because patient management is

19        changed.

20   Q    And looking at this document, how do you know

21        that you reviewed it?

22   A    Well, I don't, except it's signed by me, so I

23        must have.

24   Q    Okay.

1   A   And in fact I gave an R3, so I gave that.

2   Q   Okay.  So you assigned an R3 to this particular

3       read?

4   A   Correct.  That's correct.

5   Q   And do you see here on page -- in the middle of

6       the second page of the document where it says --

7       I'll read -- I'll just read it out loud,

8       "Critical finding of possibility of intermittent

9       small bowel volvulus and diffuse mesenteric

10      stranding were discussed by Dr. Garg of her

11      consultation with Dr. Kataoka with Lauren Dwyer,

12      ER service."

13  A   Yeah.

14  Q   Did I read that correctly?

15  A   I see that, yes.

16  Q   So do you see that Dr. Garg -- from that -- what

17      I just read to you, would that mean that Dr. Garg

18      consulted with Dr. Kataoka --

19          MS. VEHSLAGE:  Objection.

20  Q   -- regarding this read?

21  A   He put that there.  I can't say whether that

22      happened or not, but he put that down there.

23  Q   Okay.  Any reason to believe he would put that

24      down there when it wasn't true?

1               MS. VEHSLAGE:  Objection.

2        A    I have no idea.  I just can't say.

3        Q    And who is Dr. Kataoka?

4        A    She was with us -- she was a partner in our

5             group.

6        Q    Okay.  She's an attending?

7        A    Yeah.  I believe -- yes.  Oh yeah.

8        Q    Okay.  So her consulted -- according to this

9             document Dr. Garg consulted with an attending --

10       A    Yeah.

11       Q    -- regarding the read --

12       A    Right.

13       Q    -- and then identified what the read said?

14       A    Yeah.

15       Q    And you found that that was incorrect --

16       A    Yeah.

17       Q    -- and you assigned an R3 to Dr. Garg?

18       A    Yes.  Yes.

19               MS. VEHSLAGE:  Objection.

20       Q    Even though he consulted with an attending?

21               MS. VEHSLAGE:  Objection.

22       A    I'm sorry, say that again.

23       Q    So even though he consulted with an attending who

24            advised him as to what should be in this finding,

1        report.  And you know that's a summary.  Again

2        it's not my area of expertise but --

3    Q   So do you know what the core competencies are for

4        the ACGME guidelines?

5    A   I've reviewed them.  I don't -- I can't --

6        couldn't give it to you from memory.

7    Q   So you don't know the list of them?  For example,

8        medical knowledge is one of them?

9    A   Sure.  Yeah.

10   Q   Do you know what some of the other ones are?

11   A   You know I've been doing this for 30 years and so

12       regardless of what the labels are, you need --

13       it's really about them becoming competent,

14       functioning radiologists in a critical setting by

15       themselves, that's one item and the other item is

16       passing their boards.  Those are the two big

17       ones.

18   Q   Right.  Understood.  But you also understand that

19       they need to be evaluated in some way to

20       determine whether they can meet these criterias?

21   A   Yes.

22   Q   And ACGME, my understanding, outlines these core

23       competencies that they need to meet?

24   A   Yes.

1    Q    So if the educational committee is the one who

2         takes the feedback and then figures out how to

3         communicate that with the residents, do you know

4         why you're asked to complete these evaluations?

5              MS. VEHSLAGE:  Objection.

6    A    Can you say that again?

7    Q    Sure.  You're saying that you -- it's not your

8         area to give them feedback, you assign the rating

9         and then it goes to the Educational Committee.

10   A    No, it's not -- say that again.  It's not --

11   Q    I --

12   A    Just back up and say it again.

13   Q    Sure.  I think you testified that it's not your

14        area to give them feedback.

15   A    No, that's not --

16   Q    That's not correct?

17   A    No, that's not correct.

18   Q    Okay.  So it is your area to give them feedback?

19   A    We all have the responsibility to grade them on

20        their performance in whatever it is that they're

21        doing, yes.

22   Q    Right.  So part of your responsibility is to

23        evaluate these residents?

24   A    Yes.

1    Q    Okay.

2    A    Fill out the form and send it into Dr. Bader and

3         the committee.  Yes.

4    Q    Okay.  And what do you believe is the purpose of

5         filling out those forms for you?

6              MS. VEHSLAGE:  Objection.

7    A    I can't -- say that again.

8    Q    What do you --

9    A    What's the purpose?

10   Q    What is your understanding of the purpose of

11        filling out those forms?

12   A    Could you be more specific?

13   Q    Yeah.  Why do you believe you're asked to fill

14        out these forms?

15             MS. VEHSLAGE:  Objection.

16   A    Well, it's kind of like I said before, the whole

17        point of this is so they're successful in

18        completing the residency and are good

19        radiologists.  The reason we fill out this form

20        is so they understand where any deficiencies that

21        there are so they can improve.  And in fact

22        that's why it's even graded, because it has to be

23        broken down.  As I said before, and again I'm not

24        up on the exact definitions but what fascinates

1          THE WITNESS: Sure.  What I meant by that,

2      it's amazing.

3   A   Oh, okay.  I read this page.

4   Q   Let's start with the first page.

5   A   Okay.

6   Q   So looking at the first page of Deposition

7      Exhibit 2 --

8   A   Right.

9   Q   -- do you recognize this document?

10  A   Well now that you show it to me, yeah, and

11     clearly it's from me to Dr. Bader.

12  Q   Okay.  Do you recall writing this email to Dr.

13     Bader?

14  A   Not really but now that I see it, I -- it's

15     refreshing my memory, yes.

16  Q   Sure.  And when is it from?

17  A   February 28, 2017.

18  Q   And is it regarding Dr. Garg?

19  A   Yes.

20  Q   Okay.  I'm going to direct your attention to the

21     middle of the email --

22  A   Yeah.

23  Q   -- where it says, "You should find out the

24     details of why he was let go."

1    A    Yeah.

2    Q    Do you know why you wrote that?  How did you know

3         he was let go?

4    A    That was my sense of what happened because he

5         left his program.  I honestly -- it was

6         conjecture.  I don't know.

7    Q    So why did you say, I suspect -- "You should find

8         out the details of why he was let go and I

9         suspect it was because of this"?

10   A    Well, I'll tell you, my -- it was complete

11        conjecture on my part because he was doing so

12        poorly and I think I probably assumed he was let

13        go, but I don't know.

14   Q    So you just wrote that even though you weren't

15        sure?

16   A    Yeah.

17   Q    Just speculating?

18   A    I think so.  Yeah.  I mean, listen, I cared -- I

19        really did care about him.  I'm surprised that I

20        was -- I mean I remember now -- this refreshes my

21        memory.  I really cared for the man.  He was a

22        good person.  He just didn't seem to have certain

23        skills that were required, and he looked like --

24        I got a sense he was going to crash and burn.  I

1        had no privy to anything that was going on.  Dr.

2        Bader was very good at keeping everything

3        confidential because it just -- it creates

4        unnecessary bias in how everybody looks at

5        somebody, and he was excellent at that.  So I

6        mean I just -- I felt very bad for him and I was

7        hoping -- my sense of the -- because he kept

8        doing the same -- having the same problems -- he

9        had the same problems of not seeing something,

10       being shown how to see the thing, still not

11       seeing the thing and then not having any insight

12       that he missed the thing.  So given all that, my

13       own little tiny opinion unrelated -- just my

14       little tiny opinion -- and I've been around 30

15       years -- I have a feeling and I care deeply about

16       the residents -- that he wasn't going to make it.

17       And I felt bad that he was going to crash and

18       burn.  And that's -- ask me the question again

19       because I think I know why I'm saying this.  You

20       asked me a question?

21   Q   Yeah.  I just asked you why you wrote that he was

22       let go?

23   A   Right.  Because I was feeling bad and I thought

24       he was going to crash and burn and I was hoping

1          mistake, it's a big mistake.  The normal response

2          would be, oh geez, I made a mistake.  How can I

3          learn?  But it was like, oh yeah, yeah, and go

4          away.  He didn't seem to own the mistake.

5     Q    You also in this email -- take a look at

6          Deposition Exhibit 2 on page 1 -- you write here

7          that, "I realize there's a danger to get on the

8          bandwagon and see him as a failure as it's known

9          and talked about with the technologists and my

10         colleagues so there may be a huge bias here."

11         What did you mean by that?

12    A    Again, I don't have -- I did not have any privy

13         to any formal or even any major informal you know

14         assessments of him and again I don't remember

15         specifics.  It just seemed as though there -- it

16         just seems there -- you know, it just seems there

17         -- he seemed to be traveling with a cloud over

18         him.  There were always people who seemed to be

19         upset with him about one thing or another.  I

20         don't remember specifics and listen I'm cranking

21         out widgets in my thing here and then I pretty

22         much do that.  There was just a sense that he

23         must not be -- that he's struggling.  You know

24         you can see --

1          I wanted Dr. Bader to know that I thought there

2          was a serious problem with Dr. Garg being --

3          having the equipment to be a radiologist.  Having

4          said that, I didn't want to trash Dr. Garg and

5          ruin his chances of succeeding in any way as a

6          physician and so in fact I said, you know, maybe

7          he wants to do family practice, you know.

8     Q    So in your opinion based on this email, you

9          didn't believe he could be a radiologist?

10    A    First of all, my opinion is one little piece so

11         the decision for --

12    Q    I'm asking your opinion though.

13    A    Hmm?

14    Q    Your opinion.

15    A    In my opinion?

16    Q    Yes.

17              MS. VEHSLAGE:  Objection.

18    A    Just tell me again.

19    Q    In your opinion, based on this email --

20    A    Yeah.

21    Q    -- was it your concern that Dr. Garg could not be

22         a radiologist?

23    A    No.  No, I think I was concerned that he did not

24         have the cognitive skills to make it through.  I

VOL I - Page 136 of 181

1    Q    Which in this case would be the entire residency

2         year?

3    A    I can't tell.  Is that what it is?

4    Q    Well it says 07/01/2016 through June 30th, 2017.

5    A    Yes.  Yes.  Yes.

6    Q    And I'll direct your attention to the fourth page

7         in this packet.

8    A    Got it.

9    Q    Yeah.  It should be Bates stamped 3374.

10   A    Okay.

11   Q    If you look below it says, evaluation completed

12        May 22nd, 2017.  Evaluation period July 1st, 2016

13        through June 30th, 2017.  Did I read that

14        correctly?

15   A    Right.  It's the same amount of time, right.

16   Q    And the attending is Dr. Mukai?

17   A    Yes.

18   Q    Okay.  So is this -- is it fair to say that this

19        would be your evaluation of Dr. Garg for --

20   A    Yes.

21   Q    -- the evaluation period?

22   A    Yes.

23   Q    And this is a General Evaluation?

24   A    It would seem so from the date, yeah.

1    Q    And so looking at the scores that you assigned to

2         Dr. Garg -- and it continues on to the --

3    A    Right.

4    Q    -- next couple of pages -- you see that?

5    A    Yes.

6    Q    Okay.  Do you recall assigning Dr. Garg those

7         scores?

8    A    Not specifically, but it's apparently what I did,

9         yeah.

10   Q    And you believe it to be accurate?

11   A    Should be,  yeah.

12   Q    Okay.  And do you understand what a score of

13        number 4 is?

14   A    Yes.

15   Q    What is it?

16   A    Well, as it says here, very good.

17   Q    Okay.  And a score of number 3?

18   A    Yes.

19   Q    And did you assign Dr. Garg a score of 3

20        anywhere?

21   A    Yes.

22   Q    Okay.  And 3 is a score of what?

23   A    Is passing.

24   Q    Okay.  So overall your general evaluation of Dr.

1        I'd have to look at it in more detail.

2    Q   Spend the time that you need because I want you

3        to be able to testify about --

4    A   Right.

5    Q   -- and answer the question.

6    A   I just -- I would have trouble doing anything on

7        here that might ruin the chances of a resident

8        moving forward even if they were bad.  So I

9        suspect that these scores are pretty good here

10       and probably I was too -- a little kinder to him

11       than I should have been but --

12   Q   Are you suggesting that these are not accurate

13       scores?

14         MS. VEHSLAGE:  Objection.

15   A   No.

16   Q   Then?

17   A   I'm suggesting that if it was close to a 2 or a 3

18       I might have given him a 3, and it's very

19       subjective anyway.  And it's simply answering

20       each category, sending it to the Education

21       Committee and then they deal with it.  And it was

22       not -- I'm not passing him or failing him.

23   Q   I understand.

24   A   Yeah.

1    Q    What is your understanding of what the Education

2         Committee does with this information?

3              MS. VEHSLAGE:  Objection.

4    A    I have no idea.  No idea.  It's not my purview.

5         I don't go to meetings.  I'm not anywhere near

6         that.

7    Q    Is it fair to say that the Education Committee is

8         expecting you to be truthful and accurate in this

9         evaluation?

10             MS. VEHSLAGE:  Objection.

11   A    Yeah.  Yeah.

12   Q    So when you gave him a 4 or a 3, that was what

13        you believed his evaluation to be, correct?

14             MS. VEHSLAGE:  Objection.

15   A    Within -- say that again.

16   Q    When you assigned him a value of -- whatever

17        numerical value you assigned to him -- you

18        believed that to be an accurate representation of

19        your evaluation of his performance?

20             MS. VEHSLAGE:  Objection.

21   A    I don't think accuracy is an effective term

22        because it's very subjective and somewhat

23        relative.  No I don't think accuracy applies to a

24        math number being correct.  This is a subjective

VOL I - Page 142 of 181

1       assessment of him.

2   Q   Your subjective assessment?

3   A   Yeah.  Hm-mm.

4   Q   Okay.  And you're objectively assessing him as

5       satisfactory performing under medical knowledge

6       under these specific categories?

7   A   I think -- that's what I did, yeah.  It says

8       satisfactory, correct.

9   Q   And you understand that this then goes to the

10      Education Committee, and though you don't know

11      what they do with it, you understand that they

12      may look at this and --

13  A   Yes.  Correct.

14  Q   -- for some purpose?

15  A   Right.

16  Q   But you have no idea what that purpose is?

17  A   I know they're going to evaluate his overall

18      performance, yeah.

19  Q   So they're looking at how you evaluate him?

20  A   No.  They're looking at how he is performing.

21      They're not looking at how I evaluate him.

22  Q   Fair enough.  But they are looking at how he is

23      performing and you're saying he's performing

24      satisfactory when it comes to medical knowledge?

VOL I - Page 143 of 181

1              MS. VEHSLAGE:  Objection.

2    A    That was my overall conclusion at the end of the

3         year, feeling bad for him, yes.

4    Q    Why do you say feeling bad for him?  Are you

5         saying he didn't --

6    A    Because he was horrible.  He couldn't see

7         anything and it was very, very painful for me to

8         see him not be able to succeed, and I think I'm a

9         fairly kind grader.  In fact I'm surprised that

10        there's -- that there are even 2s here because I

11        don't like -- at the end of the year I don't want

12        to hurt anybody.  It was just like my other thing

13        to Bader saying you know I don't think he can see

14        things but please don't -- like keep it in mind,

15        but don't hurt him.  And I don't want to hurt the

16        man.  So it's never -- these go into a huge, a

17        mass of data that is one small piece of how he's

18        evaluated.  This is one small piece and I'm a

19        tiny piece of that piece.  The overall grade of

20        how he does has to do with a bazillion things

21        that -- God bless Dr. Bader and the Education

22        Committee -- I don't have to deal with his

23        scores, many other things.  I don't even know

24        what they are.

VOL I - Page 144 of 181

1    Q    I appreciate that --

2    A    So--.

3    Q    -- but I'm asking about you.

4    A    Yeah.

5    Q    I'm not asking about the Education Committee.

6         I'm not asking about what other physicians

7         evaluate.  I'm asking about you.

8    A    Right.  Okay.

9    Q    You completed this evaluation.

10   A    Yes.

11   Q    And you assigned him a four on several categories

12        and a three on several other categories.

13   A    Yes.

14            MS. VEHSLAGE:  Objection.

15   Q    And I --

16   A    Yes I apparently did.

17   Q    Okay.  And that was accurate?

18            MS. VEHSLAGE:  Objection.

19   A    Accuracy is a funny term.  Accuracy means that

20        one plus one is two.  This was my subjective

21        evaluation of him.

22   Q    Do you believe your subjective evaluation to be

23        accurate of your understanding of his

24        performance?

1          MS. VEHSLAGE:  Objection.

2     A    Again, I can't answer -- accuracy is not a term I

3          can respond to.

4     Q    Okay.

5     A    Like is it accurate that you're beautiful?  Is

6          that accurate?  Is that an accurate comment?

7          It's a subjective comment.

8     Q    And I'm asking you when you assigned it a 3 or a

9          4, were you accurately assigning it a 3 or a 4?

10         MS. VEHSLAGE:  Objection.

11    A    I would say that I knew that I was putting down a

12         3 and I knew that I was putting down a 4, yeah.

13    Q    Okay.  And when you knew you were putting that

14         down, what did you understand that to mean?

15         MS. VEHSLAGE:  Objection.

16    A    It was a 3 or a 4.

17    Q    Okay.  And is this your comment here below -- at

18         the end of your scoring on 375 -- 3375?

19    A    Hold on.

20    Q    Evaluation comments --  I'll read it.  "Very

21         receptive to feedback.  Not sure, sometimes

22         issues discussed remain issues.  But there is

23         progress.  A for effort."

24    A    That's --

VOL I - Page 180 of 181

C E R T I F I C A T E

COMMONWEALTH OF MASSACHUSETTS

COUNTY OF ESSEX, SS

     I, KAREN CASSOLA NORMAN, a Professional
Court Reporter and Notary Public in and for the
Commonwealth of Massachusetts, do hereby certify
that the foregoing Deposition of Dr. John Mukai,
was taken before me on March 2, 2022.  The said
witness was duly sworn before the commencement of
his testimony; that the said testimony was taken
audio graphically by myself and then transcribed
under my direction.  To the best of my knowledge,
the within transcript is a complete, true and
accurate record of said Deposition.

     I am not connected by blood or marriage with
any of the said parties, nor interested directly
or indirectly in the matter in controversy.

     IN WITNESS WHEREOF, I have hereunto set my
hand and Notary Seal this 20th day of March,
2022.

KAREN CASSOLA NORMAN, Notary Public

My Commission Expires:
March 17, 2028

PLEASE NOTE: THE FOREGOING CERTIFICATION OF THIS
TRANSCRIPT DOES NOT APPLY TO ANY REPRODUCTION OF THE
SAME BY ANY MEANS UNLESS UNDER THE DIRECT CONTROL
AND\OR DIRECTION OF THE CERTIFYING REPORTER.

# PLAINTIFF EXHIBIT 4

Pages:   1-105
Exhibits:     16

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO.: 4:20-cv-40060-DHH

* * * * * * * * * * * * * * *

DR. ASHU GARG,
          Plaintiff

vs.

VHS ACQUISITION SUBSIDIARY
NO. 7 d/b/a SAINT VINCENT
HOSPITAL, DAVID BADER, JOHN
MUKAI, and DOUGLAS BURD,
          Defendants

* * * * * * * * * * * * * * *

DEPOSITION of **DOUGLAS BURD**, a witness

called on behalf of the Plaintiff, taken pursuant to

the applicable provisions of the Federal Rules of

Civil Procedure, before Maria C. Puglisi, Professional

Court Reporter and Notary Public in and for the

Commonwealth of Massachusetts, at Rosen & Goyal, P.C.,

204 Andover Street, Andover, Massachusetts 01810, on

Wednesday, March 9, 2022, commencing at 9:00 a.m.

---

**J&K COURT REPORTING**
12 Buena Vista Avenue
Salem, Massachusetts 01970
(978) 825-9171

2

<u>APPEARANCES</u>:


KAVITA M. GOYAL, ESQ.
Rosen & Goyal, P.C.
204 Andover Street, Suite 402
Andover, Massachusetts 01810
(978) 474-0100
kgoyal@rosengoyal.com
     Representing the Plaintiff


OLIVIA I. VEHSLAGE, ESQ.
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
One Boston Place, Suite 3500
Boston, Massachusetts 02108
(617) 994-5722
olivia.vehslage@ogletree.com
     Representing the Defendant


<u>ALSO PRESENT</u>

Dr. Ashu Garg (attended via Zoom)

3

I N D E X

DEPOSITION OF:                DIRECT    CROSS    REDIRECT    RECROSS

**DOUGLAS BURD**

  (By Ms. Goyal)              5


E X H I B I T S

| No. | Description | Evid |
|---|---|---|
| 1 | Email from Brian Midkiff dated 11/02/16 | 30 |
| 2 | Individual Resident Evaluation of Ashu Garg completed 01/02/17 | 32 |
| 3 | CT Exam Report dated 10/29/16 | 45 |
| 4 | CT Exam Report dated 11/03/16 | 47 |
| 5 | Radiology Exam Report dated 10/29/16 | 49 |
| 6 | CT Exam Report dated 10/30/16 | 51 |
| 7 | CT Exam Report dated 11/03/16 | 54 |
| 8 | CT Exam Report dated 10/31/16 | 58 |
| 9 | Individual Resident Evaluation of Ashu Garg completed 12/08/16 | 64 |
| 10 | Email from David Bader dated 01/03/17 | 71 |
| 11 | Email from Ashu Garg dated 03/02/17 | 73 |
| 12 | Individual Resident Evaluation of Ashu Garg completed 04/26/17 | 76 |
| 13 | Individual Resident Evaluation of Ashu Garg completed 05/04/17 | 84 |
| 14 | Individual Resident Evaluation of Ashu Garg completed 06/14/17 | 87 |
| 15 | Resident Comments - All Evaluations dated 06/28/17 | 97 |
| 16 | Individual Resident Evaluation of Ashu Garg completed 08/07/17 | 98 |

16

```
 1    A    Approximately two years.

 2    Q    And prior to that?

 3    A    Prior to that, I was at Leominster Hospital.

 4    Q    And do you recall how many years you were at

 5         Leominster Hospital?

 6    A    I believe it was just under one year.

 7    Q    And when you first began your employment at Saint

 8         Vincent's Radiological Associates, what was your

 9         position?

10    A    Staff radiologist.

11    Q    Do you still hold that position?

12    A    I do.

13    Q    Has your position changed at all since the initial

14         time?

15    A    No.

16    Q    Have you ever been terminated from a job?

17    A    No.

18    Q    And as a staff radiologist, who do you report to?

19    A    Dr. Bader, who's the chief of the department.

20    Q    And when you say "department," you mean the radiology

21         department?

22    A    Yes.

23    Q    And as a staff radiologist, what are your

24         responsibilities?
```

17

1    A    I'm responsible for reading various radiologic cases,

2         overseeing residents, teaching residents.

3    Q    And how long have you been overseeing and teaching

4         residents?

5    A    Since the beginning.

6    Q    So, the past 14 years?

7    A    (No audible reply.)

8    Q    So, you said you've been overseeing and teaching

9         residents since the beginning.  Is there any

10        particular area or specialty that you teach

11        residents?

12   A    My particular area of interest is neuroradiology and

13        MRI, but I am a general radiologist.  So, I teach

14        general radiology, which is most every modality.

15   Q    And would you consider yourself part of the education

16        committee of the radiology residency program at Saint

17        Vincent's Hospital?

18   A    I don't know what that is.

19   Q    and you said you report to Dr. Bader?

20   A    Correct.

21   Q    How often do you speak with Dr. Bader?

22             MS. VEHSLAGE:  Objection.  You can answer.

23   A    Several times a week.

24   Q    Is that generally in person?

19

1    A    Some are.  I actually don't know their specific ages.

2    Q    And as part of overseeing and teaching residents, do

3         you evaluate residents, as well?

4    A    Yes.

5    Q    And how are they evaluated by you?

6    A    We have routine forms that are given to us, assigned

7         to us by the residency coordinator to evaluate a

8         resident that we may have seen for a certain period

9         of time in a certain rotation.  For example, someone

10        who was doing MRI for the week of "X" or "Y" and they

11        may want my input of my perception of what they were

12        like for that time frame.

13   Q    And is that because you would have been part of doing

14        the MRIs for that week in particular?

15   A    Correct.  So, I would have been assigned to MRI

16        coverage at some point within that time frame.  So, I

17        would have knowledge and the ability to answer the

18        evaluation.

19   Q    And you said there's forms to evaluate the residents.

20        How do you know when it's time for you to complete a

21        form?

22   A    We get emails.  Well, they're standardized types of

23        evaluations.

24   Q    And who do those emails come from?

22

1        evaluation, but it's simply over the course of the

2        time frame.

3    Q   So, I just want to make sure I understand that.

4              When you say it's not specific, you're not

5        scheduling a meeting to have an evaluation meeting

6        with the resident.  It's more in the course of

7        practicing medicine?

8    A   Correct.

9    Q   And are you involved with the process of any sort of

10       performance improvement plan of the resident?

11   A   I am not.

12   Q   Do you know who is?

13   A   I believe it's Dr. Bader.

14   Q   Are you part of the clinical competency committee?

15   A   No.

16   Q   Do you know what that is?

17   A   No.

18   Q   But you know you're not part of it.  Do you know who

19       is part of the clinical competency committee at Saint

20       Vincent's Hospital?

21   A   No.

22   Q   And as part of the evaluations that you complete, the

23       written evaluations or the electronic evaluations

24       complete, do you evaluate a resident's ability to

 1         meet core competencies?

 2    A    I believe it's implied within the evaluation, how

 3         they're proceeding according to their specific age of

 4         residency that they're in, the level of residency

 5         that they're in.

 6    Q    Do you know what the core competencies are?

 7    A    Not specifically.  It's more of a feeling of where

 8         they should be given their time frame.

 9    Q    When you say "given their time frame," you mean which

10         year of residency they're in?

11    A    During their level of experience.  For example, it

12         might be common for a beginning first-year to miss a

13         pneumonia on a chest X-ray, but an ending fourth-year

14         should virtually never miss an obvious pneumonia on a

15         chest X-ray, just for a matter of perspective.

16    Q    Using that same example, would it be fair to say the

17         difference between a first-year and a fourth-year is

18         that -- well, let me ask you.

19              What is the difference between a first-year

20         and a fourth-year that you would expect a first-year

21         to perhaps miss it but rarely to expect a fourth-year

22         to miss it?

23              MS. VEHSLAGE:  Objection.  You can answer.

24    A    It's really one of experience.  So, you know, a

24

1       first-year may have only seen a few pneumonias in his

2       or her experience, you know, beginning the residency.

3       But as time goes on, one starts to see more and more

4       pathology; one starts to see more and more different

5       types of the appearances of different pathologies,

6       but the appearances of similar pathologies in

7       multiple different forms so that as they gain

8       experience, their ability to detect and to understand

9       what they're looking at is always increasing.  So,

10      from one year to the next year to the next year,

11      their ability to detect pathology is improving

12      continuously.

13  Q   So, I believe you testified when I asked you about

14      the core competencies that it's a feeling of where a

15      resident should be, given their time frame?

16  A   Correct.

17  Q   Have you heard the term, though, "core competencies"?

18  A   I think it's something that Dr. Bader uses for his

19      evaluation.  I don't know the specifics of what they

20      are or how many there are or even how he uses them,

21      you know, in his evaluation.

22  Q   I understand you may not know the specifics or the

23      number or how he uses them.  Do you know any of them?

24  A   I mean, I have a feeling for what they should be --

25

1          you know, medical knowledge, ability to detect -- you

2          know, to visualize things on images -- but I don't

3          know what they specifically are.

4     Q    So, when you're completing an evaluation, you're

5          answering the questions that they ask in --

6     A    Yes.

7     Q    -- evaluating the resident?

8               Are you familiar with the ACGME guidelines?

9     A    I am not.

10    Q    Not?  Do you know what they are, generally?

11    A    I do not.  I do not know.  Dr. Bader would be the

12         person to answer those questions.

13    Q    And do you know the plaintiff in this case, Dr. Ashu

14         Garg?

15    A    Yes.

16    Q    How do you know him?

17    A    Through the residency.

18    Q    And when did you first hear about Dr. Ashu Garg?

19    A    I don't remember the exact time.  I remember hearing

20         that he was coming over as a third-year resident from

21         another program.  So, it would have been a short time

22         before he arrived.

23    Q    Do you remember who told you that he was coming over

24         as a third-year in the program?

26

1    A    I believe it was Dr. Bader.

2    Q    Did Dr. Bader tell you anything else other than

3         Dr. Garg was coming in as a third-year in the

4         program?

5    A    Nothing; no.

6    Q    Did you ask Dr. Garg about -- strike that.

7              Did you ask Dr. Bader about Dr. Garg's

8         prior residency?

9    A    No.

10   Q    Was it unusual for a resident to enter the program in

11        their third year?

12   A    In our experience, we don't get many mid-range

13        entries because we have, for the most part, a fairly

14        stable resident staffing.

15   Q    Do you know why in that particular year there was a

16        vacancy for a mid-entry resident?

17   A    I believe someone had left that would have been, at

18        that point, a third-year.  In other words, there was

19        a gap that needed to be filled.

20   Q    Were you involved with the hiring of Dr. Garg?

21   A    No.

22   Q    And you said other than learning from Dr. Bader that

23        Dr. Garg was coming in as a third-year in the

24        program, you were not told anything else about

38

1      reading a CT.  You know, reading X-rays and

2      ultrasounds or what have you, whether or not it's

3      during the night or during the day, it's still

4      reading those cases.

5              So, as a third-year, having completed his

6      third year at another institution, meaning that he

7      has done three years of radiology under his belt,

8      that the mistakes that were being made were not

9      consistent with that level of education.

10  Q   Is it fair to say, though, that when a resident is

11      completing night float, that there's an added level

12      of pressure?

13  A   Absolutely.

14  Q   Why is that?

15  A   They're acting as an independent individual.  They're

16      essentially acting as a radiologist, a fully

17      functioning radiologist.  Of course, all residents

18      have backup at any point.  They can call the

19      attending who's covering at any point, but the point

20      being that when a resident takes night float, they

21      are alone in the hospital and they are fielding

22      questions from various sources, whether they be the

23      emergency room or in-house patients, residents,

24      attendings, technologists; for example, which

39

1          examination to perform or how to perform it, various

2          issues that arise during the course of general

3          practice.

4      Q   So, it's fair if a resident hasn't ever completed a

5          night float, then they may not have acted as a fully

6          functional radiologist alone in a hospital?

7                    MS. VEHSLAGE:   Objection.

8      Q   Is that fair to say?

9      A   I'm not aware of what he did in his previous program.

10     Q   Did you ask him?

11     A   I did not.

12     Q   So, even though you had these concerns, you didn't

13         have a conversation with him about it?

14     A   No.

15     Q   Why not?

16     A   He was a third-year and he was taking night float.

17         Third-years should have a large font of knowledge of

18         radiology under their belts.  They should have the

19         ability to function in an independent fashion.  And I

20         don't know that it matters whether or not they have

21         or had not, they should still have the ability to do

22         so.  They need to have knowledge; they need to see

23         findings on cases; they need to make clinical

24         decisions as to the importance of those findings and

40

1        to relate those findings to the appropriate

2        personnel.  So, from my perspective, as a third-year,

3        he was not where he should have been in terms of his

4        ability to function.

5    Q   You said it shouldn't matter whether they have or

6        have not had this sort of experience.  But you didn't

7        even know that, whether he did or not, right?

8                MS. VEHSLAGE:  Objection.

9    A   I don't understand the relevance.

10   Q   You don't understand the relevance --

11   A   I don't understand what you're -- I'm not sure what

12       you're asking.

13   Q   Sure.  You said that what experience level they had

14       shouldn't matter.

15   A   I don't believe I said that.

16   Q   Let me clarify.  The question I asked you is why not

17       have a conversation with him about the fact that you

18       didn't think he was able to independently function as

19       a third-year.

20   A   I sent in my evaluation.  And I would add that every

21       case that we review that a resident does has an

22       evaluation associated with a level of agreement.  Let

23       me rephrase that.

24                Every case that we read from a resident is

41

1   evaluated by the attending.  If we agree, we simply

2   sign off the case as agreeing.  If we don't agree,

3   there are levels of disagreement, as you may be

4   aware, that we have sort of gradations of the miss,

5   if the resident makes a miss, for example.  We call

6   them R1, R2, R3, R4.  And the resident is encouraged

7   by Dr. Bader to seek out the attending for any

8   significant miss that they have or any questions that

9   they have.  And Dr. Garg has never spoken to me about

10  any single miss, although he's had far away more

11  misses than any resident in my experience.

12 Q  So, I understand your position is Dr. Garg never

13     spoke to you about these misses --

14 A  Correct.

15 Q  -- that you found.

16            Did you speak to him about them?

17 A  I didn't.  I did not --

18 Q  Why not?

19 A  -- specifically.  In the course of the busy day we --

20     let me rephrase that.  During the night float, I

21     don't think I sought him out to discuss specific

22     misses.  But during the course of the day when we

23     review cases I, of course, go over misses that he had

24     on cases that we're reading out together.  That's

42

1       part of my job, to go over the cases that he's

2       reading and to evaluate him and to tell him what I

3       think of what the findings are and what they mean and

4       what needs to be done, et cetera.

5   Q   And what do you recall about those conversations?

6       What do you recall about what Dr. Garg's response

7       was?

8   A   My general perception is that there was a very large

9       number of significant pathologies that were missed,

10      and there were some cases where there were some

11      pathologies that were caught.  But there were some --

12      a large number of cases that were missed that were of

13      the range of expectation for that level of training

14      such that my concern was that there was a

15      considerable danger in letting him be an independent

16      functioning resident during the course of the

17      evening.

18   Q   And so, what I asked you was, what was Dr. Garg's

19      response when you had these conversation with him?

20   A   I don't recall his specific response.  I don't recall

21      the specific conversations, to be honest.

22   Q   So, you believe you had these conversations but you

23      have no recollection of what Dr. Garg said in

24      response?

45

1    Q    And when you review the cases each day, you said, do

2         you assign a rating -- R1, R2, R3 or R4 -- if there

3         is any disagreement?

4    A    I do.

5    Q    And were you aware that Dr. Garg had other attendings

6         review some of your review of his cases?

7    A    No.

8    Q    Would you be surprised to learn that several

9         attendings disagree with some of the ratings that you

10        issued to Dr. Garg?

11             MS. VEHSLAGE:  Objection.

12   A    Yes.

13   Q    You'd be surprised?

14   A    Yes.  Well, there are disagreements and there are

15        disagreements.  So, there are large findings and

16        small findings.  Some people may disagree a little

17        bit with maybe a minor finding, but I would be very

18        surprised of any significant changes.

19                            (Exhibit 3 marked; CT Exam Report

20                             dated 10/29/16)

21   Q    I'm going to show you a document that's been marked

22        as Deposition Exhibit 3.  When you've had a chance to

23        look at it, let me know.

24             MS. VEHSLAGE:  Take your time.

46

1    A    (Witness reviewing exhibit.)  Okay.

2    Q    Do you know what this document is that has been

3         marked as Deposition Exhibit 3?

4    A    This is a report that I have signed off on from

5         Dr. Garg.

6    Q    And do you recall when that was?

7    A    I don't recall the report but looking at the date,

8         the date of service was 10/29/16.

9    Q    And do you see what rating you issued to Dr. Garg?

10   A    I do; R3.

11   Q    And is it your handwriting here on the front page?

12   A    No.

13   Q    The 11/14?

14   A    No.

15   Q    What about in the top right-hand corner?

16   A    Top right-hand corner?  Dr. Candia?

17   Q    That's not your handwriting?

18   A    No.

19   Q    Would you be surprised to learn that Dr. Candia

20        reviewed this finding and issued an R2 rating?

21             MS. VEHSLAGE:  Objection.

22   A    Yes.

23   Q    You would be surprised?

24   A    Yes.

47

1   Q    Why would you be surprised?

2   A    Because it looks like from what I'm saying here, from

3        my number 3, "There is enhancement noted about the

4        common duct.  This can be seen with cholangitis."

5        And it's not clear to me -- I mean, R2 is a little

6        bit less worrisome than an R3, but it looks to me

7        like based on what I'm writing, that a concern for

8        cholangitis, which is possibly a significant clinical

9        scenario, would be something that I would give an R3

10       for.  So, yes.

11            Now, it may very well be that some of the

12       attendings didn't have full understandings of the

13       differences between R2 and R3.  Certainly they would

14       have had -- I've seen that in the past, but certainly

15       they would have no problem distinguishing R1 from R4

16       or, you know, that type of thing.  But sometimes the

17       R2 and R3 tends to be a little bit different.

18            But nonetheless, based on what I've written

19       here, particularly "There is enhancement about the

20       common duct.  This can be seen with cholangitis,"

21       that's a potential significant clinical finding.

22                          (Exhibit 4 marked; CT Exam Report

23                          dated 11/03/16

24   Q    I'm going to show what been marked as Deposition

48

1   Exhibit 4.

2 A Okay.

3 Q When you've had a chance to look at it, let me know.

4     MS. VEHSLAGE:  Take your time.

5 A (Witness reviewing exhibit.)  Okay.  Let's see.

6 Q Do you know what this document is that's been marked

7   as Deposition Exhibit 4?

8 A Yes.  This is a cervical spine CT examination that I

9   have overread from Dr. Garg's preliminary report.

10 Q And do you recall the time frame in which this case

11   was reviewed?

12 A I don't recall the specific case but looking at the

13   date, it's 11/3/16.

14 Q And did you issue a rating to Dr. Garg?

15 A Yes.  That was an R3.

16 Q And the handwriting that's on Deposition Exhibit 4,

17   is any of that handwriting yours?

18 Q Deposition Exhibit 4.  Is any of that handwriting

19   yours?

20 A I do not believe so; no.

21 Q Would you be surprised to learn that Dr. Kanzaria

22   reviewed your finding and issued an R2 rating?

23     MS. VEHSLAGE:  Objection.

24 A Yes.  I'm reading what Dr. -- if this is

49

1              Dr. Kanzaria's writing, she said "periapical lucency,

2              may be abscess" and I wrote in my thing, "Periapical

3              abscesses are seen about the right posterior

4              mandible."  So, she's saying "may be abscess" and I'm

5              saying that it is an abscess.

6       Q     So, you have a disagreement and as a result she

7              assigned a lower --

8       A     Right.

9       Q     -- a little less concern with the miss?

10      A     From my point of view, if something may be an abscess

11             -- even if I had said it may be an abscess, you know,

12             that's a significant clinical finding.  Something

13             that may be an abscess, even deferring to the lower

14             finding, is a significant clinical finding.  I don't

15             know the specifics of the case.  I don't remember the

16             case, but I would say that something that may be an

17             abscess would be significant and that the ordering

18             physician or clinician would want to know that.

19                             (Exhibit 5 marked; Radiology Exam

20                             Report dated 10/29/16)

21      Q     I'm showing you a document that's been marked as

22             Deposition Exhibit 5. Let me know when you've had a

23             chance to look at it.

24      A     (Witness reviewing exhibit.)  Okay.  So, this is

50

1     something that I gave an R3 to and the reviewer gave

2     an R2 to.

3   Q   Is it your handwriting that's on SVH 491 or 492?

4   A   No.

5   Q   And would you be surprised to learn that Dr. Kanzaria

6     assigned an R2 rating for this?

7         MS. VEHSLAGE:  Objection.

8   A   Yes.  As I read this, she's commenting on my sentence

9     that says, "There may be a left-sided pneumothorax

10    although this may be artifactual."  And then there's

11    an arrow that points to an R2 which says, "As he

12    said" -- it says, "R2 -- as he said may be

13    artifactual, reviewed with Ashu."

14         So, what I'm saying is that there may be a

15    left-sided pneumothorax or it may be artifactual, and

16    that's, again, a clinically significant finding.  So,

17    I believe that the difference here is one of

18    interpretation of what R2 and R3 means, not of the

19    finding.

20  Q   Is it fair to say you're a little bit more harsh

21    than --

22  A   I'm probably a little bit more -- I'm more aware than

23    Dr. Kanzaria was as to the true definitions and

24    distinctions.  In my experience, a lot of the

51

1    attendings have some difficulty with the differences

2    between R2 and R3.

3                                  (Exhibit 6 marked; CT Exam Report

4                                  dated 10/30/16

5    Q    I'm showing you a document that's been marked as

6         Deposition Exhibit 6.

7    A    (Witness reviewing exhibit.)   Okay.

8    Q    Do you know what this document is that's been marked

9         as Deposition Exhibit 6?

10   A    It's a CT of the brain that's dated 10/30/16.

11   Q    And was this one of the cases that you reviewed?

12   A    Yes.

13   Q    For Dr. Garg?

14   A    Yeah.

15   Q    And do you recall looking at the dates what time

16        frame?

17   A    Well, it was done 10/30/16 and it was reviewed 10/31.

18        So, I imagine that it was done over the evening

19        before midnight and then reviewed the next morning.

20   Q    And this was during Dr. Garg's first night float?

21   A    If you say so.

22   Q    And is it your handwriting that's on the first or

23        second page of Deposition Exhibit 6?

24   A    I don't see -- no; it's not, as far as I know.

52

1   Q   And you assigned an R4 rating to Dr. Garg?

2   A   Yeah.

3   Q   Would you be surprised to learn that Dr. Prakash

4       assigned an R2/R3 rating for this finding?

5               MS. VEHSLAGE:  Objection.

6   A   Yes.  I don't even know what an R2/R3 means.  It's

7       either one or the other.

8   Q   Again, you issued a harsher rating than the attending

9       that reviewed this finding?

10              MS. VEHSLAGE:  Objection.

11  A   It would appear so.

12  Q   Dr. Burd, how is a "may be" -- not looking at that

13      particular deposition exhibit, but I think there are

14      a couple of deposition exhibits that we've talked

15      about where you said you had found that there was --

16      "may be a finding."  How is a "may be a finding"

17      significant?

18  A   Let's say, for example, that a patient may have a

19      pneumothorax but I can't be 100 percent sure looking

20      at a chest X-ray.  So, a pneumothorax is a collapse

21      of the lung.  Now, if it's an older patient, for

22      example, that may cause difficulty breathing; that

23      may cause hypoxia; they could end up with a heart

24      attack or worse, death, if it should get worse and go

56

1    wasn't mentioned.  These are significant -- and for a

2    third-year to have missed this finding -- in my

3    experience, that's not something that a third-year

4    should miss.

5    Q   And so, you assigned an R4 rating to this --

6    A   I did.

7    Q   -- you were very concerned about it?

8    A   I was very concerned that this could have had

9        clinical significance.

10   Q   But the reviewer disagreed?

11   A   The reviewer disagreed.

12   Q   I'm going to show you a document that's been marked

13       as Deposition Exhibit 7.  I believe you testified

14       that, you know, R2, R3, maybe there's not as much of

15       a difference.  But looking at Deposition Exhibit 7 --

16       let me know when you're ready.

17   A   Okay.

18   Q   Do you recognize this document?

19   A   I recognize this document as being a combination CT

20       brain and facial bone done on 11/03 and overread by

21       me.

22   Q   And you have assigned a rating of an R3 to Dr. Garg?

23   A   I did.

24   Q   And would you be surprised to learn that Dr. Prakash

57

```
 1        assigned in a grading of R1?
 2                    MS. VEHSLAGE:  Objection.
 3   A    Yes.
 4   Q    That's a significant difference, R3 and R1?
 5   A    It's a difference; yes.
 6   Q    Again, you assigned a harsher rating to Dr. Garg than
 7        Dr. Prakash?
 8                    MS. VEHSLAGE:  Objection.
 9   A    (Witness reviewing exhibit.)  Okay, yes.  So, what's
10        going on here is that Dr. Garg mentioned some of the
11        findings in the body of the report but didn't mention
12        them specifically in the impression.  For example --
13   Q    I think there's a question.  I asked a question of
14        whether --
15   A    No; you didn't ask a question.
16   Q    Yes.  I said you assigned a harsher rating to
17        Dr. Garg --
18   A    That's not a question.  That's a statement.
19   Q    I'm asking you.  Did you assign a harsher rating to
20        Dr. Garg than Dr. Prakash?
21                    MS. VEHSLAGE:  Objection.
22   A    This is by Dr. Prakash?  Yes.
23   Q    You did?
24   A    Yes.
```

58

1    Q    And it was significantly harsher, because you

2         assigned an R3 and Dr. Prakash assigned -- or the

3         reviewer assigned an R1?

4              MS. VEHSLAGE:  Objection.

5    A    It is harsher.

6              MS. GOYAL:  I'm going to just take a short

7         five-minute break.

8              MS. VEHSLAGE:  Yes.  That will be great.

9         Thank you.

10             (Break taken from 10:17 to 10:25 a.m.)

11                  (Exhibit 8 marked, CT Exam Report

12                  dated 10/31/16

13   Q    I'm going to show you a document that's been marked

14        as Deposition Exhibit 8.  Let me know when you've had

15        a chance to look at it.

16   A    Okay.

17             MS. VEHSLAGE:  Is there a copy for me?

18             MS. GOYAL:  Oh, yes.  I'm sorry.

19   A    (Witness reviewing exhibit.)  Okay.

20   Q    Do you know what the document that's been marked as

21        Deposition Exhibit 8 is?

22   A    Yes.  This is a CT of the brain dated 10/31/16.

23   Q    And is this one of the cases that you have reviewed

24        for Dr. Garg?

61

1                    MS. VEHSLAGE:  Objection.

2    A   So, as I explained, sometimes the distinction between

3        R2 and R3 is not very obvious to the larger attending

4        staff.  But to answer your question, I assigned what

5        I felt was in the correct light of the true R3

6        meaning.

7    Q   And other attendings disagreed?

8    A   And the other attendings for this last one said R2/R3

9        and some -- so, it's really -- yeah.  So, there's

10       some slight disagreements with other attendings.

11   Q   Would you agree that that could be confusing to a

12       resident –

13                   MS. VEHSLAGE:  Objection.

14   Q   -- for attendings to assign different ratings to

15       their cases?

16   A   I really don't know.

17   Q   It could be, though?

18   A   I really don't know.

19   Q   And did you hear that Dr. Garg complained about

20       you --

21                   MS. VEHSLAGE:  Objection.

22   Q   -- in regards to this matter?

23   A   I did hear about it.  I don't remember when I heard

24       about it, though.  I don't recall, because I don't

62

1          think I heard about it until well after it happened.

2     Q    Some time later that year or --

3     A    I don't recall.

4     Q    And how did you hear about this?

5     A    I think Dr. Bader may have mentioned it to me.

6     Q    Do you recall what Dr. Bader mentioned to you?

7     A    I don't, specifically.

8     Q    Generally?

9     A    That he was complaining about my readings or he's --

10         I don't remember specifically what was said.

11    Q    Generally, what else do you remember other than

12         Dr. Garg was complaining about his readings?

13    A    That's all I remember.

14    Q    And what did you say in response?

15    A    I stand by my readings.  So, I don't remember any

16         specific conversation, nor was there any issues that

17         were presented to me.

18    Q    What do you mean issues?

19    A    Like "you're being too excessively -- you're being

20         excessively harsh.  You're being excessively --

21         you're coming down too hard on Dr. Garg."  None of

22         that was ever presented to me.

23    Q    That was not presented to you?

24    A    Correct.

63

1    Q    But you recall Dr. Bader telling you that Dr. Garg –

2    A    I vaguely recall that Dr. Bader told me that Dr. Garg

3         was disagreeing.

4    Q    Was disagreeing with what?

5    A    With some of my readings.

6    Q    Did he tell you why he was disagreeing with some of

7         your readings?

8    A    No; he did not, to the best of my recollection.

9    Q    Do you recall whether Dr. Bader or anyone else told

10        you that Dr. Garg was disagreeing with you because

11        some of the other attendings disagreed?

12   A    I don't recall that at all; no.

13   Q    You don't recall, but it's possible?

14   A    I don't recall at all.

15   Q    So, you just don't recall?

16   A    I can speculate what's possible and not possible, but

17        I don't recall.

18   Q    Do you know if there's any definitions for what an R2

19        rating is versus an R3?

20   A    I think that from time to time we've had some emails

21        regarding what the definitions are.

22   Q    Who would you receive those emails from?

23   A    Dr. Bader.

24   Q    Do you recall in this instance whether you received

93

1   A   No.

2   Q   When did you first learn that Dr. Garg was being

3       terminated from the program?

4           MS. VEHSLAGE:  Objection.

5   A   I'm trying to recall.  I remember being told by

6       Dr. Bader that they were going through some type of

7       process of -- but it was towards the end of his year,

8       so I don't recall when that was.  I'm sorry.

9   Q   At some point, did you realize that Dr. Garg was no

10      longer in the program?

11  A   Yes.

12  Q   And do you recall when that was?

13  A   When he no longer showed up.  I do remember that

14      there was a question as to whether or not he was

15      going to be continuing as a repeat third-year.  And

16      so, I didn't know what that status was or where that

17      -- you know, where the decision -- where they were in

18      the decision process.  So, I did know that that issue

19      did exist.

20  Q   And how did you learn about that issue?

21  A   I believe from Dr. Bader, as well.

22  Q   Do you recall saying anything to Dr. Bader about

23      that?

24  A   I remember thinking and possibly saying that it was a

94

1      generous offer to allow him to repeat the third year,

2      because I felt that he was below a third-year in

3      functionality.

4  Q   You believe you expressed that to Dr. Bader?

5           MS. VEHSLAGE:  Objection.

6  A   I believe I do, although I can't recall the specific

7      conversation.

8  Q   But generally --

9  A   But my general impression is yes.

10 Q   And do you recall if Dr. Bader responded to that

11     general impression?

12 A   I think that's when he was saying that he was going

13     through this process of, you know -- I think it also

14     involved the CEO at some point.  I don't know the

15     specifics behind it, only that, you know, they were

16     trying to do the right thing and in terms of making

17     sure that they -- how do I put this -- trying to do

18     the right thing by making sure that they were doing

19     the best thing they could for Dr. Garg as well as for

20     the residency.

21 Q   When your impression was that it was a generous

22     offer, did you ask them why?  Did you ask Dr. Bader

23     why?

24 A   No.

96

1    was that it was a generous offer that Saint Vincent's

2    Hospital was allowing or offering Dr. Garg the

3    opportunity to repeat his third year.  Is that a fair

4    assessment of your testimony, a fair representation

5    of your testimony?

6  A    Yes.

7  Q    And do you know why Dr. Garg said no to that, what

8    you believed to be a generous offer?

9  A    I do not.

10  Q    You had no conversations with Dr. Garg about this?

11  A    Correct.

12  Q    Did you have any conversations with Dr. Bader about

13    why Dr. Garg said no?

14  A    I don't recall specifically.  I think he was -- he

15    mentioned it to me and I think we talked about it,

16    but I don't remember what we said and I can't

17    remember any of the specifics.

18  Q    During your 14 years in the program, do you recall

19    any residents entering the program and in their fifth

20    year, or final year, I should say?

21  A    I do not recall.  I don't --

22  Q    Nobody?

23  A    -- believe so.  I don't believe so.

24  Q    Would it be fair to say that it would be difficult

97

1       for a resident to find a new program in their final

2       year?

3                   MS. VEHSLAGE:  Objection.

4    A  I don't have any knowledge of that.

5                              (Exhibit 15 marked; Resident

6                              Comments - All Evaluations dated

7                              6/28/17)

8    Q  I'm going to show you a document that's been marked

9       as Deposition Exhibit 15.  And I'm going to direct

10      your attention to the Bates stamp number at the

11      bottom right-hand corner, 3422.  Let me know when

12      you're ready.

13   A  Okay.  I'm on that page.

14   Q  Do you recognize the document that's been marked as

15      Deposition Exhibit 15?  Do you know what it is?

16   A  It looks like it's a summary of comments from various

17      attendings with regards to the -- what I just looked

18      at, which was the full-year general evaluation.

19   Q  Thank you.

20                  And looking at SVH 3422, which is the page

21      that I directed your attention to --

22   A  Yes.

23   Q  -- do you see where it says "Evaluation Comments" and

24      your name, "Dr. Douglas Burd"?

COMMONWEALTH OF MASSACHUSETTS

       I, Maria C. Puglisi, Professional Court Reporter and Notary Public in and for the Commonwealth of Massachusetts, do hereby certify that the foregoing deposition of **DOUGLAS BURD** was taken before me on Wednesday, March 9, 2022.  The said testimony is a true and accurate transcript of my system tapes to the best of my knowledge, skill and ability.

       I am not connected by blood or marriage with any of the said parties, nor interested directly or indirectly in the matter in controversy.

       IN WITNESS WHEREOF, I have hereunto set my hand and Notary Seal this _30th_ day of March, 2022.

*Maria C. Puglisi*
_____
MARIA C. PUGLISI, Notary Public
My commission expires: 01/30/2026


**PLEASE NOTE: THE FOREGOING CERTIFICATION OF THIS TRANSCRIPT DOES NOT APPLY TO ANY REPRODUCTION OF THE SAME BY ANY MEANS UNLESS UNDER THE DIRECT CONTROL AND/OR DIRECTION OF THE CERTIFYING REPORTER.**

# PLAINTIFF EXHIBIT 5

IN THE DISTRICT COURT OF CLEVELAND COUNTY

STATE OF OKLAHOMA

ASHA GARG,                          )
                                    )
                Plaintiff,          )
                                    )  Case Number
vs.                                 )  CJ-2018-628
                                    )
STATE OF OKLAHOMA, ex rel.          )
BOARD OF REGENTS of the             )
UNIVERSITY OF OKLAHOMA,             )
                                    )
                Defendant.          )


*   *   *   *

DEPOSITION OF ASHA GARG, M.D.

Taken on behalf of the Defendant

on the 7th day of June, 2019

in Norman, Oklahoma.

*   *   *   *


REPORTED BY:  BRENDA PLUMBTREE, C.S.R.

Page 106

1    A.   Worst.  R1 is like just few typographical
2  mistake.  R2 is like slightly -- you missed little
3  bit.  You should be little bit more better.  R3, is
4  yeah, that is -- that can affect something.  R4 is
5  something that is critical.  You cannot miss it.
6    Q.   And that's what Dr. Burd was accusing you
7  of?
8    A.   Yeah, he basically -- he give me R4 for --
9  for the studies he was not sure of.
10    Q.   Do you think anybody else at Saint
11  Vincent's discriminated against you?
12    A.   Yes, Badar, Dr. Burd and Mukai.
13    Q.   Anyone else?
14    A.   Anyone else, no.  These are the main
15  person, because they were living together.  But
16  they -- they basically -- I don't know whether this
17  is a discrimination or it's a preplanned setup that
18  was basically coming from somewhere else or
19  something.  Because I Midkiff, I met Dr. Midkiff,
20  Brian Midkiff, and he told me that this was all set
21  up like this.  Your -- I ask for resignation, can I
22  resign.  He said, no, this was all set up like this.
23    So I don't understand what he mean by all set up
24  and why he was saying.  It is unusual for -- to say
25  a radiology resident or any student, this was all

Page 107

1  set up like.  This very unusual.
2    Q.   But you don't know what he meant?
3    A.   It means basically it was setup.  It was
4  all planned.
5    Q.   What was planned?
6    A.   My failure, it was planned.
7    Q.   It was planned by who?
8    A.   It was planned by Massachusetts program.  I
9  don't know.  Based upon what feedback they have
10  received.  I don't know.
11    Q.   Feedback they received from whom?
12    A.   I don't know whom.
13    Q.   So they just brought you in to fail?
14    A.   It seems like, yeah.  And they have not put
15  any efforts, because they directed me my focus for
16  board preparation.  I was doing board preparations.
17  They admitted my attendance in board -- all the
18  board reviews.  Though my examination was not
19  supposed -- I was not eligible for June exam,
20  because I joined late.
21    I was supposed to take that examination in
22  number 2017.  But they directed my all focus, energy
23  and everything.  And they -- they didn't told me
24  that you're so critical.  Then why am I going to the
25  board exams?  No, I first focus -- if I am so

Page 108

1  serious, I'm not able to read simple things, then I
2  should not be going to boards.  And this is the
3  program director is responsibility to present who's
4  weak or something.  Instead of directing their focus
5  to board exam or interventional radiology fellowship
6  interviews.  They have directed -- they should have
7  directed my energy to basic deficiency.  So that's
8  why on these basis I'm saying this, it was all
9  planned.
10    Q.   So, you -- are you saying you weren't the
11  one that was looking in to fellowships?
12    A.   Correct, yeah.  I was doing intervention
13  radiology -- so, I -- when I got confirmation from
14  Massachusetts program that I will be graduating on
15  cycle, that is on June 30th, 2018.  Then I further
16  ask one of the chief resident, oh, it's better.
17  Since I am graduating on time, let me apply for
18  fellowship, also.
19    Because previously I joined and I was supposed
20  to finish on September.  But when they approved it,
21  then I said that I would like to apply for
22  intervention radiology fellowship.  And ask for
23  their recommendation letters.  And the
24  recommendation letters they gave me on -- based
25  on -- those were confidential letters, I didn't ask

Page 109

1  them to give me favorable recommendation letters or
2  anything.  They sent those confidential to the
3  programs.  And based on my credentials, my scores
4  and everything, I got good amount of interview,
5  though I applied very late in the -- than usual, the
6  applicant apply.  Almost two months later.
7    But I got seven or eight interviews.  And I was
8  doing interviews.  I was doing board -- attending
9  the internal board reviews.  I was going to physics
10  board review course.  I was going to Duke board
11  review course, because I was supposed to take the
12  boards.
13    So if I'm deficiency -- if, for example, if a
14  patient is on ventilator, he cannot breathe by his
15  own.  And I will ask them, oh, run, go to the
16  100-meter marathon.  Can I do that?
17    Q.   So, before we move on, three doctors
18  discriminated against you at Saint Vincent?
19    A.   Yeah, because of their behaviors.  Yes.
20    Q.   And you were brought in by Saint Vincent,
21  and you believe set up to fail by Saint Vincent?
22    A.   Yeah, that was -- basically that was
23  something planned.  That's why they were kind of
24  like mean in their behavior or something.
25    Q.   They brought you in, paid you and hoped you

Garg vs OU Board of Regents
Asha Garg, M.D. 06/07/2019

Pages 194..197

Page 194

1 a PGY-5 position, not being able to continue for
2 PGY-5 at Saint Vincent's?
3     A.    Yes.  In their letter they said that he has
4 to resign from his current PGY-5 position.  Then he
5 is repeat his PGY-4 position.  And then we cannot --
6 we are not going to give PGY-5 position.
7     Even they -- then they said that we can do this.
8 They said that we are not going to help to find
9 another place to repeat the PGY -- to do the -- to
10 do the PGY-5.
11    And the rarity of those PGY-5 position is well
12 known to SVH or any program.  It's really rare,
13 because all of the radiology residents are set in
14 PGY-5, nobody -- nobody leaves the program.
15        MR. TABOR:  I have no further questions.
16        MR. MARTIN:  No further questions.
17        MR. TABOR:  And Dr. Garg will read and
18 sign.
19    (Deposition concluded/witness excused)
20
21
22
23
24
25

Page 195

1            JURAT
2     I, ASHA GARG, M.D., do hereby state under oath
3 that I have read the above and foregoing transcript
4 in its entirety, and that the same is a full, true,
5 and correct transcription of my testimony so given
6 at said time and place, except for the corrections
7 noted.
8
9            _____
            ASHA GARG, M.D.
10
11    SUBSCRIBED AND SWORN TO BEFORE ME, the
12 undersigned Notary Public in and for the State of
13 _____ on this, the _____ day of
14 _____, 2019.
15
16            _____
            Notary Public
17
My Commission Expires: _____
18
19    REPORTED BY:  BRENDA PLUMBTREE, CSR
20
21
22
23
24
25

Page 196

1            CERTIFICATE
2 STATE OF OKLAHOMA    )
                     )  SS:
3 OKLAHOMA COUNTY      )
4     I, Brenda Plumbtree, Certified Shorthand
5 Reporter within and for the State of Oklahoma, do
6 hereby certify that the above-named ASHA GARG, M.D.
7 was by me first duly sworn to testify to the truth,
8 the whole truth, and nothing but the truth in the
9 case aforesaid; that the above and foregoing
10 deposition was by me taken in shorthand and
11 thereafter transcribed; that the same is true and
12 correct; and that it was taken on the 7th day of
13 June, 2019 at the time of 10:00 A.M. in the City of
14 Norman, County of Cleveland, State of Oklahoma under
15 the stipulations hereinbefore set out, and that I am
16 not attorney for or relative of any of said parties
17 or otherwise interested in the event of said action.
18    IN WITNESS WHEREOF, I have hereunto set my hand
19 and official seal this 17th day of June, 2019.
20
21
22
23
            Brenda Plumbtree
24            Oklahoma Certified Shorthand Reporter
            Certificate No. 01434
25            Expires: December 31, 2019

Page 197

1            ERRATA SHEET
2     WITNESS: ASHA GARG, M.D.
3     DATE:  June 7th, 2019
4     REPORTER:  Brenda Plumbtree, CSR
5 NO CORRECTIONS ARE NECESSARY _____
6 PAGE  LINE  CORRECTION
7 ____  ____  _____
8 ____  ____  _____
9 ____  ____  _____
10 ____  ____  _____
11 ____  ____  _____
12 ____  ____  _____
13 ____  ____  _____
14 ____  ____  _____
15 ____  ____  _____
16 ____  ____  _____
17 ____  ____  _____
18 ____  ____  _____
19 ____  ____  _____
20 ____  ____  _____
21 ____  ____  _____
22 ____  ____  _____
23 ____  ____  _____
24 ____  ____  _____
25 ____  ____  _____

# PLAINTIFF EXHIBIT 6

```
 1            UNITED STATES DISTRICT COURT

 2         FOR THE DISTRICT OF MASSACHUSETTS

 3   Civil Action No. 4:20-cv-40060-DHH

 4   - - - - - - - - - - - - - - - - - - - -x

 5   DR. ASHU GARG,

 6                   Plaintiff,

 7        v.

 8   VHS ACQUISITION SUBSIDIARY NO. 7

 9   d/b/a SAINT VINCENT HOSPITAL, DAVID

10   BADER, JOHN MUKAI, and DOUGLAS BURD,

11                   Defendants.

12   - - - - - - - - - - - - - - - - - - - -x

13

14      DEPOSITION OF JASON ITRI, M.D., Ph.D.

15           Conducted Remotely Via Zoom

16              1582 Kendra Street

17            Charlottesville, Virginia

18               August 29, 2022

19            10:05 a.m. to 5:08 p.m.

20

21   Daria L. Romano, RPR, CRR, and Notary Public

22

23

24
```

```
 1      APPEARANCES VIA ZOOM:

 2

 3      ROSEN & GOYAL, P.C.

 4      (by Kavita Goyal, Esq.

 5      Matthew Perry, Esq.)

 6      204 Andover Street

 7      Andover, Massachusetts 01810

 8      (978) 474-0100

 9      kgoyal@rosengoyal.com

10      mperry@rosengoyal.com

11      Counsel for the Plaintiff.

12

13      OGLETREE, DEAKINS, NASH, SMOAK & STEWART,

14      P.C.

15      (by Diane M. Saunders, Esq.)

16      One Boston Place

17      Boston, Massachusetts 02108

18      (617) 994-5700

19      diane.saunders@ogletree.com

20      Counsel for the Defendants.

21

22      ALSO PRESENT VIA ZOOM:

23      David Bader

24      Ashu Garg
```

Dr. Ashu Garg vs                                              Jason Itri, M.D., Ph.D.
VHS Acquisition Subsidiary No. 7, et al.                          August 29, 2022

3

1                        I N D E X

2    Deposition of:                              Page

3     JASON ITRI, M.D., Ph.D.

4      Ms. Saunders                                6

5      Ms. Goyal                                 254

6

7

8                      E X H I B I T S

9    No.                                         Page

10   Exhibit 1      Report of Jason N. Itri,       8

11                  MD, PhD of Itri

12                  Consulting Group, LLC

13   Exhibit 2      E-mail, May 29, 2019          44

14   Exhibit 3      Frequently Asked              67

15                  Questions:  Milestones

16   Exhibit 4      The Diagnostic Radiology      72

17                  Milestone Project, July

18                  2015

19   Exhibit 5      Article, May 2020, Use        94

20                  of Individual Milestones

21                  Data by External

22                  Entities for High Stakes

23                  Decisions - A Function

24                  for Which they Are not

Dr. Ashu Garg vs
VHS Acquisition Subsidiary No. 7, et al.

Jason Itri, M.D., Ph.D.
August 29, 2022

4

1                        Designed or Intended
2     Exhibit 6          Diagnostic Radiology          102
3                        Milestones
4     Exhibit 7          The Milestones Guidebook,     110
5                        Version 2020
6     Exhibit 8          Radiologic Resident           125
7                        Education; ACGME
8                        Diagnostic Radiology
9                        Milestones 2.0:  The Time
10                       is Now; (2022) 29 ACARAD
11                       S18-S26
12    Exhibit 9          Document Bates-stamped SVH     155
13                       3323
14    Exhibit 10         Saint Vincent Hospital        173
15                       Resident Educational
16                       Portfolio Review, July 1,
17                       2016 to January 31, 2017
18    Exhibit 11         Saint Vincent Hospital        173
19                       Resident Educational
20                       Portfolio Review
21                       February 1, 2017 to
22                       June 30, 2017
23    Exhibit 12         Letter, August 30, 2017       216
24    Exhibit 13         Expert witness report of      244
25                       Tara M. Catanzano, MD,

Dr. Ashu Garg vs
VHS Acquisition Subsidiary No. 7, et al.

Jason Itri, M.D., Ph.D.
August 29, 2022

5

1                    July 5, 2022

2   Exhibit 14      Article How to Choose an          257

3                    Effective Expert Witness

4                    in Lawyer Monthly

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

93

 1   of SVH 1172.  It's under "Practice-based
 2   Learning and Improvement."
 3        A.    Yes.
 4        Q.    They have to consider, under
 5   "Systems-based Practice," a learning
 6   activity, so the resident is expected to have
 7   a learning activity, and the ACGME programs
 8   are required to evaluate that as part of
 9   their assessment, correct?
10        A.    Yes.
11        Q.    And they're supposed to have some
12   scholarly activity, correct?
13        A.    Yes.
14        Q.    And in terms of assessing the
15   residents for advancement, isn't it true that
16   the responsibility for determining whether or
17   not a resident advances through each year and
18   ultimately graduates rests with the program
19   director?
20        A.    Yes.
21        Q.    And isn't it true that the program
22   director's judgment in that regard supersedes
23   all interim assessments, including the
24   milestone readings?

94

1      A.   Well, it should include everything.
2    I don't know that I would use the word
3    "supersede," but it should include all the
4    other evaluations, all the other material
5    that they have.
6      Q.   So if you look at the zip file that
7    I sent you -- give me one moment to find
8    this.
9            (Pause)
10   BY MS. SAUNDERS:
11     Q.   If you look at Exhibit 9 of that zip
12   file that I sent.
13           THE STENOGRAPHER:  So this is
14   Exhibit 5?
15           MS. SAUNDERS:  Yes.
16           (Exhibit 5 marked
17           for identification)
18   BY MS. SAUNDERS:
19     Q.   So it's a May 2022 article from the
20   ACGME, and it says, "Use of Individual
21   Milestones Data."
22          Did you find that document?
23     A.   Yes.
24           MS. GOYAL:  This is the one that

97

1    ask, if I'm going be to be asked questions

2    about this article, if I could take five

3    minutes to read it.

4        Q.   Sure.

5        A.   And then may I include a five-minute

6    bathroom break with that?

7             Oh, you asked a question so, no, let

8    me wait.

9             (Pause)

10            (Recess taken 12:30 to 12:32)

11            (Record read)

12       A.   Yes.

13       Q.   And how about the statement "There

14   is currently no 'expected' or established

15   rate of resident or fellow progression in

16   Milestones achievement"?

17       A.   Yes, I agree with that.

18       Q.   So if you look further on page 4 of

19   the PDF, it says, at the very top of the

20   page, "In the Milestones framework,

21   everything else prior to the program

22   director's final judgment of readiness or

23   non-readiness for unsupervised practice is

24   interim; the responsibility for the final

98

1    judgment rests with the program director and

2    supersedes all interim assessments, including

3    Milestones ratings."

4              Do you see that?

5        A.    Yes.

6        Q.    Were you aware that that was the

7    ACGME's position?

8        A.    I was aware that it was ultimately

9    the program director's decision on promoting

10   residents, not these specific words, but

11   overall I'm aware of the same concept.

12       Q.    Well, how about the statement that

13   the program director's judgment "supersedes

14   all interim assessments, including Milestone

15   ratings"?

16       A.    I think what they're saying is that

17   the program director ultimately decides who

18   progresses and who graduates, and that takes

19   precedent over things like milestone scores.

20       Q.    And the program, meaning that the

21   program director can graduate somebody even

22   if on the milestone ratings they're a 1

23   across the board and they're in their fifth

24   year of residency, correct?

99

 1      A.   That's my problem with the word

 2    "supersedes" is that you're creating a

 3    scenario that's highly unlikely to happen.

 4          So the milestones define

 5    competencies for residents that we expect,

 6    and when you look at those milestones, we

 7    expect residents to have those when they

 8    graduate.

 9          So it's not really consistent in

10    practice that a program director would

11    graduate a resident who could only meet the

12    Level 1 on all the milestones.

13      Q.   But we just read the sentence on the

14    prior page, on page 3, that says, "There is

15    currently no 'expected' or established rate

16    of resident or fellow progression in

17    Milestones achievement"?

18      A.   That's correct.

19      Q.   But that completely conflicts with

20    what you just said.

21      A.   No, it doesn't.

22      Q.   You're saying that the ACGME expects

23    that residents graduating, if I understand

24    it, are going to reach a Level 5 if they're

143

1   communication skills, professionalism and

2   systems-based practice based on the specialty

3   specific Milestones."

4       Q.   Okay.  But that's not referring to

5   faculty evaluations, is it?  It talks about,

6   right up above, under V.A.2.a, it says, "The

7   faculty must evaluate resident performance in

8   a timely manner," and "document this

9   evaluation at completion of the assignment."

10          There's no -- there's no specific

11  statement in there about the -- about the

12  ACGME requiring that those evaluations be of

13  the resident's performance on the milestones.

14      A.   I disagree with your interpretation.

15  I think that whole section is about the

16  evaluations that the faculty provide.

17      Q.   And so your testimony is that you

18  believe that the ACGME requires that faculty

19  evaluations in a diagnostic radiology

20  residency program mirror the milestones?

21      A.   I didn't say that.  I didn't say

22  requires that it mirrors it.  It should

23  include the milestones.  It should include

24  competency-based assessment using the

161

1    the milestones.  And so my question to you

2    is, you know, why didn't you look at the

3    other elements of the overall comprehensive

4    assessment of residents that was conducted by

5    the Saint Vincent Hospital residency program?

6        A.    Which elements are you referring to?

7        Q.    Well, there were, like, a whole

8    bunch of other elements and it's those

9    elements that we've looked at now -- like,

10   this will be the third time, if I have to

11   call them back up again -- in the program

12   requirements.  The in-service exam, the 360s,

13   all the other elements, the rereads, the

14   whole data that they gained from their reread

15   process that they did where they scored

16   rereads, and all the other elements of --

17   that the ACGME requires diagnostic residency

18   programs include in their overall

19   comprehensive assessment of residents.

20       A.    So what's problematic for me is that

21   everything they seem to rely on was

22   subjective, when there were opportunities to

23   be more objective.  And I'll give you some

24   examples.

162

1        So in terms of volume, for example,

2   that's a good one, it's very easy to derive

3   volume reports and turnaround time reports to

4   substantiate that a resident is slower than

5   average or slower than expected.  It's also

6   pretty important for defining what the goal

7   is.

8        So if you're going to say a resident

9   is not reading the volume you would expect

10  them to read, you should be able to produce

11  data and say, "This is how many CTs we expect

12  them to read on this rotation.  This is what

13  we expect the turnaround time to be.  It

14  should be less than 60 minutes for 90 percent

15  of the exams."  And nowhere in any of the

16  documentation did I see any objective data

17  provided.  So that's one example.

18        Another problematic area is in the

19  rereads.  I don't know anything about how

20  rereads are scored, and there's no

21  comparative data that I can see.  And when

22  you have a process like that and you're

23  trying to map it out to quality, I -- I need

24  to know what defines a reread.

163

1              Is it that they're changing one word
2    in the report?  Is it that they're making
3    incidental findings in the report that don't
4    impact patient care?  Or is 50 percent of the
5    report text getting changed because it's not
6    grammatically correct and there's
7    typographical errors?
8              So it's hard to interpret what a
9    50 percent reread means if I don't know what
10   those changes are.
11             When it comes to diagnostic errors,
12   again, you know, we have no normalized data.
13   We have no objective data.  All we have is
14   anecdotal reports.  And, frankly, I didn't
15   see a single comment on an error that
16   impacted patient care.
17             So I think there's opportunities for
18   the Saint Vincent program to provide
19   objective data, and I haven't seen any of
20   that objective data.
21      Q.   You didn't see it before you
22   prepared your report?
23      A.   I have not seen it based on anything
24   I've seen so far.

177

1   testified to this and so did Dr. Bader, you

2   said you reviewed these depositions -- to do

3   the semiannual review of his performance.  So

4   this was the educational portfolio review

5   meeting, and this is the form that was used.

6          So my question to you is, like, why

7   didn't you look at all of these different

8   metrics that are on this form, many of which,

9   maybe not all, but many of which were

10  mandated by the ACGME?  Why didn't you do

11  that when you prepared your report?

12      A.   I reviewed these documents, but when

13  you look at the reasons why Dr. Garg was

14  terminated from the program, I think those

15  reasons primarily relied on the faculty

16  evaluations and the semiannual milestone

17  reviews, so I believe I reviewed the material

18  that was important for that decision.

19      Q.   And you're basing that on your

20  interpretation of Dr. Garg's termination

21  letter?

22      A.   On all the information that was

23  provided, including the termination letters,

24  yes.

178

1      Q.   But what was your source of

2   information for the reasons why the Saint

3   Vincent Hospital terminated Dr. Garg?

4      A.   The warning letters.

5      Q.   And you don't remember that in those

6   warning letters there's a reference to the

7   portfolio review and all the different

8   components that went into that?

9      A.   I'm sorry.  I don't remember that

10  they talked -- I remember the deficiencies

11  they talked about in the warning letters.

12     Q.   And your memory is it was focused

13  only on faculty reviews?

14     A.   No, it wasn't just focused on that.

15     Q.   It mentioned other things, right?

16     A.   Yeah.  And, again, I'll go back to

17  the opportunity to provide objective data

18  wasn't there.  So he was deficient in his

19  case volume, but I didn't see any objective

20  data to make a decision about that.  He was

21  dinged about turnaround times.  I didn't see

22  any objective data, so I don't have any way

23  to make that decision.  So, you know, they --

24     Q.   So because you weren't provided with

179

1  the objective data, you decided that the

2  Saint Vincent program didn't have it,

3  correct?

4       A.   Well, when I inquired about where

5  that data is, Dr. Garg and my attorney said

6  that they weren't provided that information.

7       Q.   Okay.  What about the fact that

8  Dr. Garg's percentage rank on the in-training

9  exam was 16 percent?  Wasn't that objective

10  evidence of his poor performance?

11       A.   Well, I think that depends on his

12  preparation for the exam.  So, you know,

13  what's problematic about these in-service

14  exams is that there are some programs who

15  want to score well, they want the residents

16  to score well, they get the prior in-service

17  exams with the answers and they provide them

18  to the residents.  They can go through

19  several years of prior questions.  Often

20  there's overlap in those questions.  And

21  sometimes programs will provide some study

22  time and tell the residents, "We want you to

23  brush up and do well on this in-service

24  exam."  Some programs don't do that.

180

1          So, you know, I think that's a
2   factor to consider on his score, you know, is
3   it a program that provides them the prior
4   in-service scores that they can study and do
5   well, or are they just taking it right off
6   the bat.
7          And he's a little different in that
8   he comes from a different program, and he's
9   being ranked according to other R3s.  So I'm
10  not sure I can make a whole lot out of that
11  in-service exam except to say that there
12  were, I think, four categories where he was
13  at or above average.
14          So I think the potential for his
15  knowledge base to be adequate was there.  He
16  just wasn't where you would expect for an
17  R3-level resident.
18      Q.   How about the fact that Dr. Garg had
19  not filled out the procedure log that was
20  required by the ACGME or -- and hadn't even
21  started the required scholarly project?
22  Isn't that objective?  The ACGME requires it,
23  he didn't do it?
24      A.   Well, he didn't finish residency.

181

1   So, many programs don't require you to do the

2   scholarly project until your fourth year.

3   You know, I don't -- I don't know why the

4   procedure log wasn't kept.  I think he only

5   did one month of procedures.  Those are not

6   reasons to terminate a resident after nine

7   months.  So if you're contending that those

8   facts -- those observations were used to

9   terminate him, I would say that's

10  unreasonable.

11      Q.   Isn't he expected to start the

12  scholarly project in his fourth year of

13  residency?

14          MS. GOYAL:  Objection.

15      A.   I would want them to start by the

16  beginning of their fourth year to have enough

17  time to do it.

18      Q.   And he was in his fourth year,

19  right?

20      A.   He's R3.

21      Q.   He's an R3, but that's a PGY4,

22  correct?

23      A.   That's fourth-year residency.

24      Q.   You're a saying a PGY5 year he's

182

 1    expected to do it?

 2         A.    Yes.

 3         Q.    Okay.  So how about on page 12 of

 4    your report, you're taking issue with report

 5    quality being used as a metric for a

 6    resident's improvement.  You said, "As for

 7    the other criteria (report quality), which

 8    Dr. Bader has incorrectly described as

 9    influencing competencies within Medical

10    Knowledge, Interpersonal and Communication

11    Skills, and Clinical Judgment, this criteria

12    is inappropriate to use as a metric for a

13    resident's improvement."

14         A.    I'm sorry, you have to clarify.  The

15    page of the document or the page at the

16    bottom of the document?

17         Q.    I'm talking about your report, page

18    12 of your report.  So --

19         A.    That's the PDF page or the bottom

20    page.

21         Q.    It's page 12 at the bottom of the

22    report, not the PDF.

23         A.    Thank you.

24         Q.    Sorry.  I printed your report, so

183

1   I'm using the printed version, not the

2   exhibit.

3       A.   I have the paragraph in front of me.

4   Can you repeat your question?

5       Q.   Okay.

6              MS. SAUNDERS:  Can you read back

7   the question, please.

8              (Record read)

9   BY MS. SAUNDERS:

10      Q.   Do you see that in your report?

11      A.   Yes.

12      Q.   So it's your testimony that report

13  quality is not an appropriate metric to use

14  for evaluating a resident?

15      A.   I think there's two components to

16  that.  I think without knowing more details

17  about the process, I don't know what to do

18  with the numbers that are provided.  I think

19  the second part of that is -- really, what I

20  was trying to get at is it shouldn't be used

21  as a determinant for termination.

22            Report quality obviously should be

23  part of performance improvement and

24  residents' improvement and that's an

200

1   program, that within, like, two months of his

2   joining, that the faculty became concerned

3   with his ability to take call and then took

4   him off the call schedule?  Were you aware of

5   that?

6        A.   Yes.

7        Q.   And he's expected to take call as

8   a -- in his R3 year, correct?

9        A.   Yes.

10       Q.   And isn't it true that all radiology

11  residency programs around the country expect

12  their second- and third- and fourth-year

13  residents to take call?

14       A.   I don't know what all residency

15  programs expect.

16       Q.   Well, at ACGME-accredited ones, it's

17  expected by the ACGME, correct?

18       A.   It says it should occur.

19       Q.   Okay.

20       A.   ACGME is a little tricky.  There are

21  certain words that they use and that -- the

22  "should" means they kind of expect this in

23  most cases, but accepting the fact that there

24  may be exceptions.

212

1      A.    That's correct.

2      Q.    So you have a section in your report

3   where you say that Dr. Bader graded Dr. Garg

4   more harshly than other faculty, but because

5   you didn't look at how Dr. Bader evaluated

6   other residents, you can't say one way or

7   another whether Dr. Bader evaluates all

8   residents more harshly, can you?

9      A.    No, I can't.

10     Q.    And Dr. Bader, as the program

11  director, he would have more experience with

12  Dr. Garg than the other faculty, correct,

13  based on his position as the program

14  director?

15     A.    No, I don't think that's correct.

16     Q.    So the fact that Dr. Bader is the

17  one who designed the remediation program and

18  had meetings with Dr. Garg about the

19  remediation program, that wouldn't give him

20  any greater insight and information about

21  Dr. Garg's performance?

22     A.    Well, he's using feedback from all

23  the faculty who worked with him to do that,

24  so it's not -- it's very likely that he had

213

1    less one-on-one contact with Dr. Garg than

2    some of these other faculty, but he

3    incorporated that information in his

4    decisions on the warning letters for

5    remediation.

6         Q.   And what are you basing your

7    statement that you think he would have less

8    one-on-one interaction with Dr. Garg?  Based

9    on what are you saying that?

10        A.   Because he's is not working in every

11   single rotation every single month.

12        Q.   Well, neither are any of those

13   faculty members working in every single

14   rotation in every single month.

15        A.   Okay.  So -- so when you're on a

16   month of CT, you're working with the same

17   faculty members for that whole month, and

18   Dr. Bader may not even be on that rotation,

19   may not see him for the whole month.  So

20   there's some faculty that may see him every

21   day for 20 days whereas he doesn't have

22   direct one-on-one contact with him.

23        Q.   For those 20 days.  But then when

24   Dr. Bader is supervising him for 20 days,

214

1    none of the other faculty have direct contact

2    with him for those 20 days either, correct?

3        A.    He's not working 20 days.

4              MS. GOYAL:   Objection.

5    BY MS. SAUNDERS:

6        Q.    Excuse me?

7        A.    The program director doesn't work

8    clinical five days a week.  They have

9    protected time to be program director.

10             I -- I personally don't know what

11   Dr. Bader's role is.  I don't know what

12   rotations he's on.

13             But typically, in my experience,

14   when residents are evaluated, they have more

15   one-on-one time with the individual faculty

16   and less so with the residency program

17   director.

18             So in my example, my program

19   director was a neuroradiologist.  I would

20   work with her one day a week on the month I

21   was on neuro and then never again for the

22   rest of the year.

23             So it would be highly unlikely for

24   the program director to spend more one-on-one

215

1    time with the resident than some of the other

2    faculty members.

3        Q.   So in your report on page 17, if you

4    want to reference that or not, but on page 17

5    of your report you make the statement that

6    "My understanding is that Dr. Garg was

7    provided no credits for his performance in

8    the program."

9            What is your basis for that?

10       A.   I believe it's in one of the

11   documents I was provided.

12       Q.   Isn't it true that he was provided

13   academic credit?

14           MS. GOYAL:   Objection.

15       A.   My understanding at this point was

16   that he was not provided any credit for those

17   nine months.

18       Q.   By Saint Vincent Hospital?

19       A.   Correct.

20       Q.   So -- and your source of information

21   from that is what?

22       A.   I don't recall which document.

23       Q.   So if you look at Exhibit 11 in the

24   zip file?

227

1    Q.   He wanted to do interventional

2  radiology?

3    A.   Yes, that's correct.

4    Q.   Okay.  So shouldn't a program

5  support a resident who wants to do a

6  fellowship even though at that moment they

7  may be struggling?

8         MS. GOYAL:  Objection.

9    A.   Well, I think a program needs to be

10 honest about the resident.  I mean, the

11 program that's accepting the prospective

12 fellow is depending on the residency program

13 to be honest about their capabilities,

14 otherwise they're in big trouble.

15        Those fellowship programs are highly

16 dependent on those fellows.  So I think, yes,

17 the program does want to support the

18 resident, but at the same time they need to

19 be honest about his performance.

20    Q.   And do you believe that the Saint

21 Vincent program should have withheld letters

22 of reference for Dr. Garg because he was

23 struggling?

24    A.   My personal opinion is yes.

228

1      Q.   Wouldn't that have been the
2   equivalent of not giving him any chance to
3   improve at all?
4      A.   No, not at all.
5      Q.   Isn't it possible that Dr. Garg
6   could have improved and then graduated from
7   the program?
8      A.   Yeah, I mean, that's one of the
9   points I'm trying to make in my report is
10  that if he was given more time he could have
11  graduated.
12     Q.   Isn't it true that the fellowships,
13  they're on a schedule where you have to apply
14  so far ahead that if the Saint Vincent
15  program had not given him those letters of
16  reference, he wouldn't have been able to get
17  a fellowship, correct?
18     A.   He would have had to apply the
19  following year.
20     Q.   But then it's on a different cycle,
21  correct?
22     A.   No, it just means he's out of a job
23  for nine months, nine to 12 months, depending
24  on -- he just has to wait until the next

236

1      A.   I think it's incredibly problematic

2   that you've got a renewal letter or renewal

3   contract promoting him to PGY5, and a month

4   later you tell him he's terminated.

5           So, yeah, I think you can't put

6   yourself in that position.  If you have

7   significant concerns that result in

8   termination a month later, I think that

9   contract renewal should have been delayed.  I

10  mean, it's hard to believe that they couldn't

11  have executed that later.

12     Q.   But you have no information to base

13  that on, that they could have executed that

14  later?

15     A.   I don't see why they couldn't have

16  executed it on June 29th.

17     Q.   You testified you had no experience

18  with contract renewals for diagnostic

19  radiology residents?

20     A.   No, but other contracts I have

21  experience with.

22     Q.   Wouldn't not giving Dr. Garg a

23  renewal letter have been the equivalent of

24  not giving him any chance to improve at all?

237

1        A.   No, it's just saying, "We need to

2   evaluate you further before we commit to

3   another year."  I mean, what happened was

4   they gave him the letter and then they

5   terminated him, so.

6        Q.   Take a look at your report, and I

7   just want to have you look at Dr. Bader's

8   reference letter, if I can find it here.

9        A.   It looks like it's Exhibit 9 in my

10  report.

11       Q.   Yes, Exhibit 9.  That's it.

12            Have you ever seen a letter from a

13  program director like that before?

14              MS. GOYAL:  Objection.

15       A.   Yes.

16       Q.   And you view this as a

17  recommendation for the resident?

18       A.   Yes.

19       Q.   He doesn't say anywhere in here that

20  he recommends Dr. Garg, does he?

21       A.   No.

22       Q.   Don't they usually say that?

23       A.   Well, I think it's implied.  I mean,

24  whether it's a reference or recommendation,

238

1   you're basically supporting his matriculation

2   into fellowship.

3       Q.   Regardless of the content of the

4   letter?  So you're basing that testimony on

5   just the fact that a letter was written; is

6   that right?

7       A.   Well, it's part of the process to

8   applying for a fellowship.  You want to have

9   letters from certain people.  One is a

10  director, one is someone in the specialty

11  you're applying to, that support your

12  application for the fellowship.

13      Q.   But your testimony is that you think

14  that the fact that the program director wrote

15  a letter, even though they don't say that

16  they recommend the resident, that you view

17  that as a recommendation simply because they

18  did write a letter?

19          MS. GOYAL:  Objection.

20      A.   And because it's part of the process

21  of him applying for a fellowship.

22      Q.   But even though the letter itself

23  doesn't -- doesn't -- doesn't say, "I

24  recommend him"?

239

 1        A.   What I would ask is what is the
 2   purpose of the letter if it's not to
 3   recommend him?
 4        Q.   Well, it's basically documenting
 5   that he's participating in the program.  It's
 6   documenting his participation in the program,
 7   right?
 8        A.   As a fellowship program director, I
 9   don't -- that's not what I want for letters.
10   I want letters of recommendation.  So I don't
11   agree.
12        Q.   And this you think is a letter of
13   recommendation?
14            MS. GOYAL:  Objection.
15        A.   It only talks about the positives,
16   so it sure reads like a letter of
17   recommendation.
18            (Pause)
19   BY MS. SAUNDERS:
20        Q.   So in your report, you have this
21   discussion of Dr. Garg's e-mail to Dr. Bader
22   where he expresses concerns about Dr. Burd.
23        A.   Are you talking about page 14 or --
24        Q.   I'm trying to find it.  Yeah, it

Dr. Ashu Garg vs                                                    Jason Itri, M.D., Ph.D.
VHS Acquisition Subsidiary No. 7, et al.                            August 29, 2022

264

1   COMMONWEALTH OF MASSACHUSETTS)

2   SUFFOLK, SS.                    )

3

4        I, Daria L. Romano, RPR, CRR and Notary

5   Public in and for the Commonwealth of

6   Massachusetts, do hereby certify that there

7   came before me remotely on the 29th day of

8   August, 2022, at 10:05 a.m., the person

9   hereinbefore named, who was duly sworn by me,

10  and that such deposition is a true record of

11  the testimony given by the witness.

12       I further certify that I am neither

13  related to nor employed by any of the parties

14  or counsel to this action, nor am I

15  financially interested in the outcome of this

16  action.

17       In witness whereof, I have hereunto set

18  my hand and seal this 2nd day of September,

19  2022.

20                      _Daria Romano_

21       _____

22                      Notary Public

23                      My Commission Expires

24                      February 5, 2027

# PLAINTIFF EXHIBIT 7

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

C.A. No.4:20-cv-40060-DHH


DR. ASHU GARG,

Plaintiff

v.

VHS ACQUISITION SUBSIDIARY NO. 7 d/b/a
SAINT VINCENT HOSPITAL, DAVID BADER
JOHN MUKAI, and DOUGLAS BURD,

Defendants


DEPOSITION OF DR. TARA CATANZANO,

APPEARING REMOTELY FROM

SUFFIELD, CONNECTICUT

September 23, 2022



Reported by:

Karen Cassola Norman, CER

*** Appearing Remotely from Essex County, Massachusetts


_____

J&K COURT REPORTING

12 Buena Vista Avenue

Salem, MA  01970

tel: 978-825-9171 fax: 978-955-7417

**REMOTE APPEARANCES:**

Kavita Goyal, Esq.

Matthew Perry, Esq.

ROSEN LAW OFFICE

204 Andover Street, Suite 204

Andover, Massachusetts 01810

Counsel on behalf of the Plaintiff.

Dianne M. Saunders, Esq.

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.

One Boston Place, Suite 3500

Boston, Massachusetts 02108

Counsel on behalf of the Defendants.

Also Present:

Dr. Ashu Garg

I-N-D-E-X

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Dr. Tara Catanzano | | | | |
| (By Ms. Goyal) | 4 | ** | 164 | |
| (By Ms. Saunders) | ** | 154 | *** | |

E-X-H-I-B-I-T-S

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| | Exhibit Premarked | |
| 1 | Curriculum Vitae of Dr. Tara Marie Catanzano - 44 pages | 17 |
| 2 | Report of Jason N. Itri, MD, PhD of Itri Consulting Group, LLC - 171 pages | 28 |
| 3 | Expert Witness Report Prepared by Tara Catanzano - 15 pages | 32 |
| 4 | Exhibit A to Defendant's Supplement - three pages | 34 |
| 5 | Summative Performance Evaluation - one page | 37 |
| 6 | Summary Performance Evaluations (April 2021) - eight pages | 39 |
| 7 | Summary Performance Evaluation July 2018 - with missing page 2 - 14 pages | 42 |
| 8 | Resident Milestone Evaluation: Year-End 2016-2017 - four pages | 50 |
| 9 | Bates SVH 3394-3398 - five pages | 78 |
| 10 | Bates SVH 000733-000735 - three pages | 102 |
| 11 | Termination Letter dated June 21, 2017 - four pages | 102 |
| 12 | Article entitled, *Improving the Accuracy of Mammography: Volume and Outcome Relationships* - seven pages | 112 |
| 13 | Bates SVH 001468 - one page | 136 |
| 14 | Bates SVH790-791 - two pages | 153 |

**(Provided electronically to the reporter)**

1    Q    Are you, based on your review of the documents you

2         reviewed in preparing this report, are you aware of

3         any laterality errors discovered for Dr. Garg?

4    A    No.

5    Q    Were there mention of any laterality errors in the

6         termination letter?

7    A    No.

8    Q    What about the written warnings that were issued to

9         Dr. Garg?

10   A    No.

11   Q    Based on your review of the documents throughout Dr.

12        Garg's residency program at Saint Vincent's Hospital,

13        would you say it was safe to put him on night float?

14             MS. SAUNDERS: Objection.

15   A    At which time point?

16   Q    At anytime point, even towards the end --  well,

17        okay.  In your report, you talk about the reread

18        rates, which we'll get to in a moment, during his

19        last night float in early June of 2017, which is the

20        near of his -- the end of the third year, or the end

21        of the time that he was -- right before he was

22        terminated.  Would you agree that it was safe to put

23        him on night float at that time given his performance

24        deficiencies that Saint Vincent Hospital alleges?

1          MS. SAUNDERS: Objection.

2

3     A    I think I would have personal concern about doing so.

4     Q    What about professional concerns?

5     A    Yes.

6     Q    So why do you think that Saint Vincent's Hospital

7          continued to put Dr. Garg on night float?

8     A    I have no knowledge of why.  You know, it may have

9          been a staffing issue.  It may have been for him to

10         try to improve his performance or to demonstrate

11         improvement in his performance.

12    Q    Even though it could impact patient safety --

13         MS. SAUNDERS: Objection.

14    Q    -- according to your report?

15         MS. SAUNDERS: Objection.

16         You can answer.

17    A    Yes.

18    Q    So --

19    A    That's a programmatic decision.

20    Q    I'm sorry.

21    A    That's a programmatic decision.

22    Q    Okay. And you would have disagreed with the program's

23         decision to allow him to be assigned in night float

24         based on your review of the reports?

1           MS. SAUNDERS: Objection.

2           You can answer.

3    A    Yes.

4    Q    So that's a little strange, right?

5           MS. SAUNDERS: Objection.

6           You can answer.

7    A    What is little strange?

8    Q    The fact that they assigned him night float as late

9         as June 10th of 2017 when they allegedly have these

10        concerns about his performance?

11          MS. SAUNDERS: Objection.

12          You can answer.

13   A    I'm not clear why he would have been put on at that

14        point.

15   Q    What is the difference between, if there is any,

16        reread reports and report revisions?

17   A    Reread -- did you say reread reports and report

18        revisions?

19   Q    Yes. If you agree that there is a difference.

20   A    From -- I assume reread is discrepancy rate. So

21        whether there's agreement or disagreement in the

22        interpretation that was provided as a preliminary

23        report, and revisions are the final over-signed

24        report.

1    candidate who they otherwise didn't believe was

2    performing at the expected level.

3         MS. SAUNDERS: Objection.

4         You can answer.

5  A    Yes.

6  Q    Would you have written a letter of recommendation for

7       Dr. Garg based on your review of the documents that

8       you looked at?

9         MS. SAUNDERS: Objection.

10        You can answer.

11  A    No.

12  Q    Why not?

13  A    I don't believe based on the review that I could have

14      been forthcoming with anything positive other than

15      dates of matriculation.

16  Q    Would you be surprised to learn that Dr. Garg

17      interviewed with seven fellowship programs?

18        MS. SAUNDERS: Objection?

19  A    Not necessarily.

20  Q    But you said in your report that you thought these

21      letters of recommendations had red flags and that

22      they would have required the fellowship to either ask

23      for details, or even choose not to interview the

24      resident, that's how poor you thought these letters

1    Q    Would you be surprised to learn that in fact, Dr.

2         Garg received an offer for an interventional

3         radiology fellowship at NYU?

4              MS. SAUNDERS: Objection.

5              You can answer?

6    A    Yes.

7    Q    And why does that surprise you?

8    A    It is an institution with a very good reputation as

9         one of the premier programs or departments.

10   Q    So if this premiere program at NYU is looking at Dr.

11        Garg's CV, Dr. Garg's personal statement and Dr.

12        Garg's letters of recommendation, would it be fair to

13        say that those letters of recommendation probably

14        played a role in Dr. Garg receiving the fellowship?

15             MS. SAUNDERS: Objection.

16             You can answer.

17   A    Not necessarily.  There's also an interview process

18        as part of this.

19   Q    Would you be surprised to learn that Dr. Garg

20        interviewed with UMass Medical?

21             MS. SAUNDERS: Objection.

22             You can answer.

23   A    No.

24   Q    Why not?

1    A    Generally most programs in the region will interview

2         local trainees.

3    Q    So even though your report says that these letters of

4         recommendation provided sparse information and they

5         contain glaring flags, you're not surprised that

6         UMass Medical interview Dr. Garg for a radiology

7         fellowship program?

8              MS. SAUNDERS: Objection.

9    A    No.

10   Q    How's that?

11   A    He was a resident at a local program. And as I

12        mentioned, programs in the regions tend to interview

13        local trainees.

14   Q    Even if they provide sparse information on a letter

15        of recommendation?

16             MS. SAUNDERS: Objection.

17             You can answer.

18   A    Yes.

19   Q    Would you have allowed Dr. Garg to complete his

20        residency training in an expedited fashion if he

21        wasn't performing at the level of his -- if he wasn't

22        performing at his expected level?

23             MS. SAUNDERS: Objection.

24             You can answer.

1    A    No.

2    Q    Why not?

3    A    Because it is required that all rotations be

4         completed successfully in order to graduate.

5    Q    Okay, so it wouldn't make sense that if a resident is

6         not performing at their expected level, that you

7         would then expedite their training, right?

8              MS. SAUNDERS: Objection.

9              You can answer.

10   A    Correct.

11   Q    I'm going to ask you to pull up in the Bates stamp

12        document's folder, it's Bates SVH 1468.

13   A    Yes.

14   Q    Do you recognize this document?

15   A    Yes.

16   Q    What is it?

17   A    It is a letter from the program director to the ABR

18        outlining a desire of the resident to complete their

19        training on time as opposed to in a delayed fashion

20        or off-cycle.

21   Q    And this program director is Dr. Bader?

22   A    Yes.

23   Q    And the resident is Dr. Garg?

24   A    Correct.

1        attempted to give Dr. Garg every opportunity to

2        improve his performance with the hopes that he could

3        meet expected levels during the course of his time

4        with them. And in being supportive of him, I think

5        that is why the letter was written, so that if he was

6        able to remediate before any final steps, that he

7        could graduate on time.

8    Q   But you said you wouldn't have done that?

9    A   No.

10   Q   And why not?

11   A   I have a different philosophy.

12   Q   And what philosophy is that?

13   A   I believe in fully supporting the residents, and

14       remediating them, giving them, you know, learning

15       plans and corrective action plans and giving them

16       every opportunity to correct, but I don't think I

17       would have gone as far as asking the ABR to give

18       additional -- to allow graduating on time. I will

19       certainly do that for a resident who is performing

20       well, and I have one in my program now.

21   Q   Because your philosophy would be if a resident is not

22       performing at their expected level that they need

23       more time, not less, is that fair to say?

24           MS. SAUNDERS: Objection.

1              You can answer.

2    A    Yes.

3              MS. GOYAL: Can we mark this document, Karen, as

4         Exhibit 13?

5              MS. SAUNDERS:  This document meaning that ABR

6         letter?

7              MS. GOYAL: SVH 1468, correct.

8              MS. SAUNDERS: Okay.

9              (Whereupon, Exhibit Number 13, so marked: Bates

10        SVH 001468 - one page)

11   Q    Why do you think Dr. Bader agreed to expedite Dr.

12        Garg's training?

13             MS. SAUNDERS: Objection.

14             You can answer.

15   A    It was Dr. Garg's desire to be able to graduate on

16        time so that he would be on-cycle for fellowships.

17        And Dr. Bader was, in my opinion, attempting to be

18        very supportive of him, so that should he be able to

19        remediate, he would be able to do as he desired.

20   Q    Would it be fair to say that Dr. Bader was -- that

21        Dr. Bader wrote this letter because he expected that

22        Dr. Garg would be able to improve and successfully

23        complete his rotations?

24             MS. SAUNDERS: Objection.

1           MS. SAUNDERS: Objection.

2    A    No.

3    Q    Would it be fair for you to comment on whether or not

4         he was discriminated against on the basis of age?

5           MS. SAUNDERS: Objection.

6           You can answer.

7    A    I do not see evidence in my review.

8    Q    Again, though, were you retained as an expert to

9         determine whether or not he was discriminated on the

10        basis of his age?

11          MS. SAUNDERS: Objection.

12          You can answer.

13   A    No.

14   Q    This resident that you terminated, did you terminate

15        them before the completion of their residency year?

16   A    No, we did not renew their contract for the following

17        year.

18   Q    I believe you wrote in your report, that in your

19        program you tend to provide renewal letters to

20        residents by January of their program year, is that

21        right?

22   A    That is correct.

23   Q    So in the case of the resident that was terminated,

24        did you provide them a renewal of their contract in

```
 1            January of that year?
 2   A    We did not.
 3   Q    Okay. Why didn't you provide them a renewal of their
 4        contract in January of that year?
 5   A    The resident was either on a corrective action plan
 6        or probation. I can't remember which exactly at that
 7        point. And we were not sure that they were going to
 8        be continuing in the program.
 9   Q    Was the corrective action plan and/or the probation
10        based on performance concerns?
11   A    Yes.
12   Q    And had that resident improved sufficiently by the
13        end of that residency year, would you have renewed
14        their contract at that time?
15   A    If they had performed -- yes, if they had
16        substantially improved, we would have likely.
17   Q    Have you had -- in your program have you had any
18        other resident who you did not provide a renewal
19        letter in January of their program year?
20   A    There have been a couple of years where it has been a
21        little bit delayed because the letters are all
22        provided to residents in every program around the
23        same time, and there had been delays in the GME
24        office, but not any one specific individual.
```

1    Q    But your position is that for Dr. Garg you still

2         would have provided the renewal letter?

3    A    Yes. And I've actually had prior residents under

4         corrective action plans, who did not receive their

5         renewal with the remainder of their class, and did

6         subsequently received their renewal letters and

7         continued in the program.

8    Q    And they received their renewal letter later--

9    A    Yes.

10   Q    -- that same program year?

11            So you have that option?

12            MS. SAUNDERS: Objection.

13            You can answer.

14   A    If they are on a corrective action plan, and it is

15        agreed upon with the GME office, but only to a

16        certain time period because they need their

17        provisional licenses renewed.

18   Q    Other than what we've discussed today is there

19        anything in Dr. Itri's report that you saw in which

20        you disagree with?

21            MS. SAUNDERS: Objection.

22   Q    And you can pull it up if you'd like.

23   A    I responded in my letter to things I had concerns in

24        his report about.

C E R T I F I C A T E

COMMONWEALTH OF MASSACHUSETTS

COUNTY OF ESSEX, SS

     I, KAREN CASSOLA NORMAN, a Professional Court
Reporter and Notary Public in and for the
Commonwealth of Massachusetts, do hereby certify that
the foregoing Deposition of Dr. Tara Catanzano, was
taken before me on September 23, 2022.  The said
witness was duly sworn before the commencement of her
testimony; that the said testimony was taken audio
graphically by myself and then transcribed under my
direction.  To the best of my knowledge, the within
transcript is a complete, true and accurate record of
said Deposition.

     I am not connected by blood or marriage with any
of the said parties, nor interested directly or
indirectly in the matter in controversy.

     IN WITNESS WHEREOF, I have hereunto set my hand
and Notary Seal this 3rd day of October, 2022.

_____

_____
KAREN CASSOLA NORMAN, Notary Public

     My Commission Expires:
     March 17, 2028

PLEASE NOTE: THE FOREGOING CERTIFICATION OF THIS
TRANSCRIPT DOES NOT APPLY TO ANY REPRODUCTION OF THE SAME
BY ANY MEANS UNLESS UNDER THE DIRECT CONTROL AND\OR
DIRECTION OF THE CERTIFYING REPORTER.