## United States District Court
## District of Massachusetts

```
_____
                               )
Ashu Garg,                     )
                               )
          Plaintiff,           )
                               )
     v.                        )    Civil Action No.
                               )    20-40060-NMG
VHS Acquisition Subsidiary     )
Number 7, d/b/a Saint Vincent  )
Hospital, David Bader, John    )
Mukai and Douglas Burd         )
                               )
          Defendants.          )
_____)
```

### MEMORANDUM & ORDER

**GORTON, J.**

This case arises out of alleged discriminatory and retaliatory actions taken against plaintiff Ashu Garg, M.D. ("Garg" or "plaintiff"), a former medical resident, by his former employers, VHS Acquisition Subsidiary No. 7, Inc. d/b/a Saint Vincent Hospital ("SVH" or "the Hospital"), David A. Bader, M.D. ("Bader"), John K. Mukai, M.D. ("Mukai") and Douglas A. Burd, M.D. ("Burd") (collectively "defendants").

Before the Court are defendants' motions for 1) summary judgment, 2) to exclude the report and testimony of plaintiff's expert, Jason N. Itri, M.D., Ph.D. and 3) to strike Itri's October 31, 2022 affidavit. For the reasons that follow, the

motion for summary judgment will be allowed, in part, and denied, in part.  The motions with respect to Dr. Itri will be denied.

I.  **Background**

A.  **The Parties**

SVH is a community hospital and tertiary care center in Worcester, Massachusetts.  Garg was a third-year resident in the SVH diagnostic radiology residency program ("the SVH program") in 2016 and 2017.

Bader is the President of Saint Vincent Radiological Associates, Inc., a medical group that contracts with the Hospital to provide radiology services.  He is the Chief of Radiology at SVH and has served as the Program Director of the SVH diagnostic radiology residency program for 16 years, including during 2016 and 2017 when Garg was employed at SVH.

Mukai and Burd are attending physicians and program faculty at SVH.  They provided teaching and supervision to the SVH program when Garg was a resident.  Both Mukai and Burd completed several evaluations of Garg on different rotations and assignments.  They are employed by Saint Vincent Radiological Associates, Inc., not by SVH directly.

**B.    The SVH Program**

The SVH program is fully accredited by the Accreditation
Council for Graduate Medical Education ("ACGME").  The ACGME is
an independent, § 501(c)(3), not-for-profit organization that
sets and monitors voluntary professional educational standards
for medical residents.

The SVH program trains doctors to become radiologists,
i.e., physicians who specialize in the interpretation of imaging
studies of the human body and image-guided interventional
procedures.  The program consists of clinical and didactic
experiences, education sessions, assigned and optional reading,
logs of diagnostic and interventional studies, education
portfolio reviews, scholarly research, observed one-on-one
reading of images such as x-rays, MRI and CT scans and directly
supervised and independent patient care.

The first year of residency before entering a diagnostic
radiology residency program is the "PGY1" year, i.e., post-
graduation year one.  Each successive year of training is then
referred to as PGY2, PGY3, etc.  A radiology residency continues
for four years after the PGY1 year and each year of diagnostic
radiology training is simultaneously referred to as R1, R2, etc.
Thus, Garg was an R3 resident and in his PGY4 year while he was
employed by SVH.

C.   **Employment History**

Plaintiff was hired by Bader to be an R3/PGY4 in the SVH program beginning in September, 2016.  Bader was aware prior to hiring Garg that he was over 40 years of age.  Plaintiff was a transfer from the University of Oklahoma Diagnostic Radiology Residency Program, which he attended from July, 2013 to June, 2016.

Garg received several negative faculty evaluations during his first few months in the program.  For example, Priyanka Prakash, M.D. ("Prakash") wrote that Garg had "more misses/incorrect diagnoses than what is expected for a third year resident" and Paulomi Kanzaria, M.D. ("Kanzaria"), the Associate Program Director wrote "Ashu is not at the expected level for an R3 resident," noting that he cannot "apply his knowledge or reliably see findings on both plain radiographs and cross sectional imaging."  In December, 2016, Kanzaria noted in an email to Bader that she had to make changes to almost all of Garg's plain films from his emergency room rotation and Mukai expressed concern that Garg did not have the "visual cognitive aptitude to do radiology."

Plaintiff alleges that during the fall of 2016, he noticed that Burd "seemed to unfairly evaluate [his] radiology reports" and was "overly critical."  Garg complained to Bader about those

"unsound evaluation gradings" but did not suggest that they were discriminatory.

In February, 2017, Bader conducted a comprehensive evaluation known as a Portfolio Review of Garg's performance in the program.  On February 14, 2017, Garg, Bader and Kanzaria met to discuss his Portfolio Review and his performance in detail. One week later, Bader issued Garg a Stage One written warning, which Bader and Kanzaria discussed with Garg at a meeting. Bader noted that Garg's performance would be reassessed in May, 2017 after his next night float rotation.  Bader informed him at that time that they expected to see him meeting the performance expectations of an R3, specifically a decrease in the number and severity of missed findings, particularly on CT exams, and improved report quality and turnaround time.

Plaintiff alleges that in early April, 2017, during a conversation about radiology reports, Mukai asked Garg how old he was.  When he replied that he was over 40 years old, Mukai responded, "You are f***ing 40 years old and you are trying to learn radiology now?!"

On April 26, 2017, Bader signed Garg's renewal letter for the following residency year.

Bader issued Garg a Stage Two written warning for performance deficiency on May 3, 2017.  The warning letter

referred to several performance issues including a high number
of re-reads, unsatisfactory quality and clarity of reports,
delays in generating reports, low volume of cases during
rotation and low faculty evaluations, particularly on night
float.  It stated that the next formal re-evaluation of Garg's
warning status would be after his next night float rotation in
mid-June, 2017.

According to Garg, in May, 2017, he was concerned that Burd
continued to grade him unfairly and, given Mukai's comment about
his age, he wondered if Burd's grading was related to his age.
On May 12, 2017, Garg emailed Bader, stating that Burd's grading
was "an example of discrimination."  Bader responded to that
email that "given [plaintiff's] accusation of discrimination" he
would arrange for a meeting with Human Resources.  Garg
responded that he was "not accusing anyone" and he did not
"think that a formal meeting [was] necessary."

Garg received additional negative faculty evaluations in
May and June, 2017, several of which noted that Garg was still
not performing at the expected level for a third-year resident.
On June 21, 2017, Bader and Kanzaria met with Garg and provided
him with a written notice of dismissal from the diagnostic
radiology program for failure to meet performance expectations.

### D.   SVH Appeal Proceedings

Following his dismissal and while still employed by SVH, Garg appealed pursuant to the appeal process set forth in the Graduate Medical Education Manual.  Stage One of that process was for plaintiff to appeal to Bader as Chief of the Radiology Department.  Bader, however, recused himself given his dual role as Chief and Program Director.

At Stage Two, the appeal to a Faculty Review Committee, plaintiff had the opportunity to choose and approve each of the members of the committee, all of whom worked with him personally.  A hearing occurred on July 29, 2017, during which the Faculty Review Committee decided to uphold Garg's dismissal.

Garg then proceeded to Stage Three of the appeal process, in which the Director of Graduate Medical Education, Yuka-Marie Vinagre, M.D., Ph.D. ("Vinagre") reviewed Garg's educational portfolio and his personal statement on the appeal.  She also upheld Garg's dismissal from the SVH program.  Vinagre did, however, offer Garg the opportunity to repeat his R3 year.

Next, at Stage Four, Garg appealed to the CEO of SVH, Jeffrey Welch ("Welch").  Welch also upheld Garg's dismissal after reviewing his educational portfolio and personal statement.

Upon Garg's termination, Bader informed the American Board of Radiology ("ABR") and New York University Medical Center ("NYU") that Garg was no longer a resident in SVH's diagnostic radiology residency program.  Garg intended to sit for the ABR's Core Exam, a requirement for certification in diagnostic radiology, in November, 2017.  Because Garg had not completed the required 36 months of diagnostic radiology residency training required to sit for the exam, his registration for it was cancelled.  Garg also had a Match Agreement with NYU for a fellowship in their Vascular and Interventional Radiology Program after the completion of his residency.  Plaintiff was required to finish PGY5 and graduate in order to be eligible for that fellowship.

### E.   ACGME Appeal

In July, 2018, Garg submitted a complaint to the ACGME alleging that the SVH program violated a plethora of ACGME Program Requirements and failed to adhere to them with respect to Garg's participation in the SVH program.  In particular, Garg complained about his performance evaluations, contending that the SVH program improperly evaluated his performance.

The ACGME investigated Garg's complaints and conducted a site visit in March, 2019 at SVH as part of the investigation.

In May, 2019, the ACGME advised SVH that it had reviewed the complaint and determined that "no further action" was required.

**F.   Procedural History**

Plaintiff filed a complaint of age discrimination with the Massachusetts Commission Against Discrimination ("MCAD") in January, 2018.  According to plaintiff, his former attorney requested dismissal of that administrative complaint without his knowledge and then filed a complaint for age discrimination against defendants in the Massachusetts Superior Court, also without his knowledge and consent.  Garg alleges that when he discovered what his attorney had done, he requested the MCAD complaint be reinstated and the Superior Court complaint be dismissed and he subsequently discharged his attorney in September, 2019.

In May, 2020, Garg filed a complaint in this Court asserting six counts against defendants: 1) violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 et seq., 2) violation of the Massachusetts Fair Employment Practices Act, M.G.L. c. 151B, 3) breach of contract, 4) breach of the implied covenant of good faith and fair dealing, 5) tortious interference with contractual relations with the American Board of Radiology and 6) tortious interference with contractual relations with New York University Medical Center.

Defendants promptly moved to dismiss the case and to compel arbitration.  That motion was denied in March, 2021.

Defendants moved for summary judgment and to exclude the testimony and report of Garg's expert witness, Jason N. Itri, M.D. in October, 2022.  Defendants also moved to strike Dr. Itri's affidavit in November, 2022.  Those motions are pending before the Court.

## II.  <u>Motion for Summary Judgment</u>

### A.    Legal Standard

The role of summary judgment is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." <u>Mesnick</u> v. <u>Gen. Elec. Co.</u>, 950 F.2d 816, 822 (1st Cir. 1991) (quoting <u>Garside</u> v. <u>Osco Drug, Inc.</u>, 895 F.2d 46, 50 (1st Cir. 1990)).  The burden is on the moving party to show, through the pleadings, discovery and affidavits, "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

A fact is material if it "might affect the outcome of the suit under the governing law . . . ." <u>Anderson</u> v. <u>Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  A genuine issue of material fact exists where the evidence with respect to the material fact

in dispute "is such that a reasonable jury could return a verdict for the nonmoving party." Id.

If the moving party satisfies its burden, the burden shifts to the non-moving party to set forth specific facts showing that there is a genuine, triable issue. Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). The Court must view the entire record in the light most favorable to the non-moving party and make all reasonable inferences in that party's favor. O'Connor v. Steeves, 994 F.2d 905, 907 (1st Cir. 1993). Summary judgment is warranted if, after viewing the record in the non-moving party's favor, the Court determines that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law.

**B.   Analysis**

**1.   Age Discrimination (Counts I and II)**

As a preliminary matter, plaintiff's age discrimination claims extend into two separate counts. Nonetheless, the allegations in each count require the same legal analysis and the parties treat the claims as interrelated. See Adamson v. Walgreens Co., 750 F.3d 73, 83 (1st Cir. 2014). Accordingly, this Court will address both age discrimination claims together and then the retaliation claims.

Massachusetts law provides that it is unlawful

> [f]or an employer in the private sector, . . . because
> of the age of any individual, . . . to discharge from
> employment such individual, or to discriminate against
> such individual in compensation or in terms,
> conditions or privileges of employment, unless based
> upon a bona fide occupational qualification.

M.G.L. c. 151B § 4(1B).  When direct evidence of age

discrimination is unavailable, Massachusetts courts apply the

burden-shifting framework outlined in McDonnell Douglas Corp. v.

Green, 411 U.S. 792 (1973).  Under that framework, the plaintiff

must first establish a prima facie case of discrimination by

demonstrating that he or she

> (1) was a member of the class protected by G.L. c.
> 151B (that is, over forty years of age); (2) had
> performed [his or] her job at an acceptable level; (3)
> was terminated; and (4) was replaced by a similarly or
> less qualified younger person.

Knight v. Avon Prod., Inc., 780 N.E.2d 1255, 1262 (Mass. 2003).

Once a prima facie case has been stated, the burden shifts

to the defendants to rebut the presumption of discrimination by

offering a legitimate, nondiscriminatory reason for its

employment action. See Blare v. Husky Injection Molding Sys.

Boston, 646 N.E.2d 111, 115 (Mass. 1995).  If the defendants do

so, the plaintiff must produce evidence demonstrating that the

defendant's stated reason was pretext. Id. at 116-17.

Viewing the record in the light most favorable to plaintiff, the Court finds there is no genuine issue of material fact in dispute.  Although the parties pay little attention to whether Garg can establish a prima facie case at the first step, leaving that dispute to the footnotes, the Court finds that plaintiff has failed to demonstrate that he performed his job at an acceptable level and thus cannot establish a prima facie case of age discrimination. See Knight, 780 N.E.2d at 1262.

Garg received two written formal warnings from Bader in February and May, 2017 with respect to his performance.  The Stage Two written warning, for example, indicated that Garg continued to misread CT scans, the quality and timeliness of his reports were unsatisfactory and he failed to maintain or update his procedure log.  In sum, the warning stated "you are not meeting performance expectations for your PGY level."  Faculty evaluations revealed similar problems, stating that Garg was

> unfortunately still not at the expected level of a
> [third year] resident [and he did] not meet minimum
> standards for PG3.

Although Garg disputes the objectivity of the metrics used to assess his re-reads and case volume, he fails to provide evidence rebutting the essential accuracy of the written warnings and faculty evaluations.  Considering those undisputed facts, this Court finds that plaintiff did not perform his job

at an acceptable level. See Hillstrom v. Best Western TLC Hotel, 265 F. Supp. 2d 117, 124 (D. Mass. 2003) (finding no prima facie case of discrimination when plaintiff "offer[ed] no evidence rebutting the essential accuracy of [employer's] dissatisfaction of his job performance").

Without any evidence of a prima facie case, plaintiff's claim of age discrimination in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621 and the Massachusetts Fair Employment Practices Act, M.G.L. c. 151B fails and the Court will allow defendants' motion for summary judgment as to age discrimination on Counts I and II.

Furthermore, even if plaintiff had made out a prima facie case, defendants have shown a legitimate, nondiscriminatory reason for his termination.  Garg was given two formal warnings as well as multiple evaluations in which he was informed that he was not at the expected level of a third-year resident. Termination based on "substandard performance . . . described by the uncontested evidence put forward by the defendant" is a credible, nondiscriminatory reason that justifies allowing summary judgment. See Rios-Jimenez v. Principi, 520 F.3d 31, 42-43 (1st Cir. 2008).

Finally, plaintiff proffers no evidence to show that the decision to terminate his employment was pretextual.  Both

parties agree that pretext is the "crux" of Garg's age discrimination complaint. Garg points to the incident in April, 2017, when he asserts that when he told Mukai how old he was, Mukai responded, "You are f***ing 40 years old and you are trying to learn radiology now?!" Garg suggests that after that event, Mukai made negative comments in Garg's evaluations to influence Bader to terminate Garg.

The plaintiff's substandard performance had, however, been recorded in evaluations since the beginning of his residency at SVH, months before the conversation with Mukai. Thus, the timing of Mukai's insult is insufficient to demonstrate that the decision to terminate Garg was pretext for age-based animus. Rather, the uncontested facts demonstrate that Garg's performance evaluations were negative from the beginning of his residency, as confirmed by his faculty evaluators who agreed that he failed to meet the expectations for a third-year radiology resident.

### 2. Retaliation (Counts I and II)

Garg also asserts that he was the victim of retaliation in violation of the ADEA and Chapter 151B. To establish a prima facie claim of retaliation, Garg must demonstrate that: 1) he engaged in protected conduct, 2) he suffered an adverse employment action and 3) the two were causally related. Ponte v.

Steelcase Inc., 741 F.3d 310, 321 (1st Cir. 2014).  Once a prima
facie case is articulated, a standard that has been described as
requiring only a "small showing," the McDonnell Douglas burden-
shifting framework applies.  Kosereis v. Rhode Island, 331 F.3d
207, 213 (1st Cir. 2003).  Such a claim may succeed even if the
underlying claim of discrimination fails, provided that the
plaintiff can

> prove that [he] reasonably and in good faith believed
> that the employer was engaged in wrongful
> discrimination.

Psy-Ed Corp. v. Klein, 947 N.E.2d 520, 529-30 (Mass. 2011).

As an initial matter, defendants dispute whether Garg
engaged in protected conduct by complaining via email on May 12,
2017 to Bader that Burd's grading was "an example of
discrimination."  Bader responded to that email that "given
[plaintiff's] accusation of discrimination" he would arrange for
a meeting with Human Resources.

> Protected activity includes not only the filing of
> formal charges of discrimination but also informal
> protests of discriminatory employment practices,
> including making complaints to management.

Jacquet v. City of Somerville, No. CV 18-10167, 2020 WL 3545535,
at *4 (D. Mass. June 30, 2020) (quoting Fantini v. Salem State
Coll., 557 F.3d 22, 32 (1st Cir. 2009)).  Viewing the record in
the light most favorable to plaintiff, under that standard,

Garg's email to Bader may so qualify but the following day Garg responded that he was "not accusing anyone" and declined the meeting with Human Resources.  Therefore, whether he intended to complain of age discrimination remains a genuine dispute of material fact.

With respect to the necessary "causal nexus," between Garg's protected conduct and his termination, Ponte, 741 F.3d at 322, there are also genuine disputes of material fact.  Bader signed most resident renewal letters for their final year of residency on April 12, 2017 but signed Garg's letter, as well as the letter of another resident who was issued prior warnings, two weeks later, on April 26, 2017.  Plaintiff alleges the delay was because Bader was deliberating as to whether Garg would succeed and the fact that Bader signed the renewal letter is evidence that he ultimately concluded that Garg would succeed. Defendants describe the signing of Garg's renewal letter as "nothing more than an administrative formality."

Garg emailed Bader complaining of discrimination on May 12, 2017.  About two weeks later, on or about May 24, 2017, the Clinical Competency Committee completed Garg's Milestone Evaluation for his overall performance that year.  The parties dispute Garg's allegation that for other residents, Milestone Evaluations are typically completed in mid-to-late June.

Despite signing Garg's residency renewal letter on April 26, 2017, Bader informed Garg of his decision to terminate him from the program just two months later on June 21, 2017. "Chronological proximity" between the protected conduct and the adverse action may give rise to an inference of causation. Wright v. CompUSA, Inc., 352 F.3d 472, 478 (1st Cir. 2003).

The disputed evidence presented with respect to whether Garg's email constituted protected conduct and the timeline leading up to Garg's termination creates triable issues of material fact as to whether his termination was, in fact, due to his allegedly substandard performance or was retaliation for his complaint of discrimination.

Defendants' motion for summary judgment as to retaliation on Counts I and II will be denied.

### 3.   Breach of Contract (Count III)

To prove a breach of contract claim under Massachusetts law, a plaintiff must demonstrate that an enforceable contract existed, the defendant breached that contract and the plaintiff suffered damages. See Valle v. Powertech Indus. Co., Ltd., 381 F. Supp. 3d 151, 160 (D. Mass. 2019).

Garg argues that defendants terminated his residency early and without just cause.  The Resident Agreement, however,

defines the term of the agreement as June 27, 2016 until June 30, 2017 and gives SVH sole discretion to renew the agreement for an additional term of 12 months.  Garg was in fact terminated on June 21, 2017, a mere nine days before the scheduled end of the agreement.  Moreover, defendants contend that plaintiff cannot sustain his breach of contract claim because the Resident Agreement provided for termination at any time if the Program Director determined that the Resident Physician had failed to fulfill any obligation under the Agreement.

It is well established that "an unambiguous contract must be enforced according to its terms." Senior v. NSTAR Elec. & Gas Corp., 449 F.3d 206, 219 (1st Cir. 2006).  Given the explicitly defined term of the subject agreement, as well as the language permitting for cause termination, the Court finds no genuine dispute of material fact as to Garg's breach of contract claim.

Thus, defendants' motion for summary judgment as to Count III will be allowed.

### 4. Breach of the Implied Covenant of Good Faith and Fair Dealing (Count IV)

In Massachusetts, the covenant of good faith and fair dealing between parties is implied in all agreements. Guldseth

v. Fam. Med. Assocs. LLC, 45 F.4th 526, 537 (1st Cir. 2022).

The purpose of the covenant

> is to ensure that neither party interferes with the
> ability of the other to enjoy the fruits of the
> contract, and that, when performing the obligations of
> the contract, the parties remain faithful to the
> intended and agreed expectations of the contract.

Eigerman v. Putnam Invs., Inc., 877 N.E.2d 1258, 1264 (Mass.
2007).  The covenant cannot create rights or duties that are not
already present in the existing contractual relationship.
Guldseth, 45 F.4th at 538.  To prove a breach of the implied
covenant of good faith and fair dealing, plaintiff must prove
that defendants violated his "reasonable expectations . . .
concerning the obligations of the contract." 477 Harrison Ave.,
LLC v. JACE Bos., LLC, 134 N.E.3d 91, 101 (Mass. 2019).

Garg alleges that the appeal proceedings at SVH were a
"sham," thus violating his reasonable expectation that he would
receive an impartial and independent appeal decision.  At the
summary judgment stage, however, plaintiff must "affirmatively
point to specific facts that demonstrate the existence of an
authentic dispute," which Garg fails to do on this claim. Kenney
v. Floyd, 700 F.3d 604, 608 (1st Cir. 2012).  Instead, Garg
points to his own recollection of the appeal proceedings and
fails to identify any specific facts in dispute as to the
fairness or impartiality thereof.

Accordingly, defendants' motion for summary judgment will, with respect to Count IV, be allowed.

### 5.   Tortious Interference (Counts V and VI)

Finally, defendants contend that plaintiff's tortious interference claims as to his contracts with the American Board of Radiology and New York University Medical Center "rise and fall with his age discrimination and retaliation claims."

To prove tortious interference with contractual relations in Massachusetts, plaintiff must prove that:

> (1) he had a contract with a third party; (2) the defendant knowingly interfered with that contract; (3) the defendant's interference, in addition to being intentional, was improper in motive or means; and (4) the plaintiff was harmed by the defendant's actions.

O'Donnell v. Boggs, 611 F.3d 50, 54 (1st Cir. 2010) (quoting Harrison v. NetCentric Corp., 744 N.E.2d 622, 632 (Mass. 2001)).

Here, the parties dispute whether SVH's interference was accomplished through improper motive or means.  The improper motive element of this claim can be satisfied with "evidence of retaliation or ill will toward the plaintiff." Armstrong v. White Winston Select Asset Funds, LLC, No. CV 16-10666, 2022 WL 17981392, at *13 (D. Mass. Dec. 27, 2022) (citing Hamann v. Carpenter, 937 F.3d 86, 90 (1st Cir.

2019)).  Because there is a genuine dispute of material
fact with respect to Garg's retaliation claim, discussed
above, there is necessarily a dispute as to his tortious
interference claim as well.

Accordingly, defendants' motion for summary judgment
as to Counts V and VII will be denied.

### III. __Motion to Exclude__

#### A.   __Legal Standard__

The admission of expert testimony is governed by Fed. R.
Evid. 702, which codified the Supreme Court's holding in Daubert
v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993) and its
progeny. See United States v. Diaz, 300 F.3d 66, 73 (1st Cir.
2002).  Rule 702 charges a district court with determining
whether: 1) "scientific, technical, or other specialized
knowledge will assist the trier of fact," 2) the expert is
qualified "by knowledge, skill, experience, training, or
education" to testify on that subject and 3) the expert's
proposed testimony a) is based upon "sufficient facts or data,"
b) is the product of "reliable principles and methods" and c)
"applies the principles and methods reliably to the facts of the
case."

The Court must be vigilant in exercising its gatekeeper role because an expert's testimony may be given substantial weight by the jury due to the expert's status, see Daubert, 509 U.S. at 595, but the Court must keep in mind that

> [v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.

Id. at 596.  If an expert's testimony is within "the range where experts might reasonably differ," the jury, not the trial court, should be the one to decide among the conflicting views of different experts. Kumho Tire Co. v. Carmichael, 526 U.S. 137, 153 (1999).

### B.  Parties' Arguments

Defendants claim that the report and testimony of Jason N. Itri, M.D., Ph.D. should be excluded because they are unreliable, do not otherwise meet the requirements of admissible testimony under Daubert, 509 U.S. 579 and would not assist the jury in determining any fact at issue.  More specifically, defendants contend that 1) Itri lacks relevant experience because he has never been a program director of a diagnostic radiology residency program, 2) his conclusion that the SVH program violated ACGME standards is belied by ACGME's determination otherwise in response to Garg's complaint and 3)

Itri intentionally ignores critical information that a program director would not have ignored.

Garg opposes the motion to exclude his expert witness, arguing that 1) Itri's opinions will assist the trier of fact to identify and understand the inconsistences among Garg's performance evaluations, 2) Itri is highly qualified by knowledge, experience, training and education and 3) Itri's opinions are based on sufficient facts and data, specifically Garg's performance evaluations that SVH relied upon to terminate him from the program.  Moreover, Garg avers that defendants are free to attack Itri's opinions on cross examination at trial but the wholesale exclusion of his report and testimony is unwarranted.

### C.  Analysis

The Court concludes that Itri should be permitted to testify as an expert.  He is qualified as an expert based on his experience as a board-certified radiologist involved in multiple ACGME committees concerning the evaluation and assessment standard for radiology students, as well as his eight years spent training and assessing radiology students at five academic institutions.

With respect to the substance of the purported expert testimony, the Court finds that defendants' objections to Itri's

methodologies, opinions and conclusions go to his credibility and to the weight to be afforded to his testimony.  Such matters are appropriately left to the jury to resolve. <u>Crowe</u> v. <u>Marchand</u>, 506 F.3d 13, 18 (1st Cir. 2007); <u>Payton</u> v. <u>Abbott Labs</u>, 780 F.2d 147, 156 (1st Cir. 1985) ("[I]t is a matter for the jury to resolve any inconsistencies in expert testimony.").

Any issue as to the reliability of Itri's methods and analysis is not so fundamental as to render his testimony inadmissible and his conduct can be vigorously challenged on cross examination. <u>Compare</u> <u>WBIP, LLC</u> v. <u>Kohler Co.</u>, 965 F. Supp. 2d 170, 173 (D. Mass. 2013), <u>with</u> <u>United States</u> v. <u>Candelario-Santana</u>, 916 F. Supp. 2d 191, 204-05 (D.P.R. 2013).

Because defendants' concerns with Itri's testimony are more appropriately addressed by vigorous cross-examination during trial, the Court will deny their motion to exclude his expert report and testimony.

IV. **<u>Motion to Strike</u>**

A.   **Legal Standard**

Fed. R. Civ. P. 26(a)(2) governs the disclosure of expert testimony.  Parties must disclose the identity of any expert witnesses it intends to call at trial and provide a written report containing "a complete statement of all opinions the

witness will express and the basis and reasons for them." Fed.
R. Civ. P. 26(a)(2)(A)-(B).

Fed. R. Civ. P. 26(a)(2)(D) requires that disclosure of
expert testimony must be made "at the times and in the sequence
that the court orders."  If a party fails to abide by the
requirements of Rule 26(a), it shall be precluded from using

> that information or witness to supply evidence on a
> motion, at a hearing, or at a trial, unless the
> failure was substantially justified or is harmless.

Fed. R. Civ. P. 37(c)(1).  Notably, "preclusion is not
automatic" and a failure to disclose may be excused if a court
determines that a different remedy is more appropriate under the
circumstances. See Genereux v. Raytheon Co., 754 F.3d 51, 59
(1st Cir. 2014); Fed. R. Civ. P. 37(c)(1)(C).

### B.  Analysis

Defendants complain that Itri's affidavit filed in support
of Garg's opposition to defendants' Daubert motion is untimely
and "severely" prejudicial.

Garg responds that Itri's affidavit in conjunction with his
opposition brief is merely a clarification of his original
report in response to the Daubert motion.  He contends there
should be no question about its admission which is justified
because it elaborates on Itri's previously disclosed experiences

to rebut defendants' argument that he is unqualified to be an expert witness.  He suggests that it is harmless because the affidavit merely supplements his previously disclosed and timely opinions.

Here, the Court agrees with Garg that Itri's affidavit should not be stricken.

> In the court's view, a "late" expert declaration submitted in response to criticisms of the expert's opinion or methodology contained in a <u>Daubert</u> motion or motion for summary judgment is permissible as long as it is consistent with the overall opinion or methodology in the original report and merely provides additional subsidiary details, support, or elaboration.

<u>Massachusetts Mut. Life Ins. Co.</u> v. <u>DB Structured Prod., Inc.</u>, No. CV 11-30039, 2015 WL 12990692, at *4 (D. Mass. Mar. 31, 2015) (citing <u>Curet-Velazquez</u> v. <u>Acemla De Puerto Rico, Inc.</u>, 656 F.3d 47, 56 (1st Cir. 2011)).  Itri's affidavit does not offer new opinions outside the scope of his original expert report but rather elaborates on his opinions in an effort to respond to defendants' <u>Daubert</u> motion.

Accordingly, the Court will deny defendants' motion to strike Itri's October 31, 2022 affidavit.

**ORDER**

For the forgoing reasons,

1)   Defendants' motion for summary judgment (Docket No. 73) is:

   a)   as to Counts I and II (age discrimination), **ALLOWED**;

   b)   as to Counts III and IV, **ALLOWED**, but

   c)   as to Counts I and II (retaliation), **DENIED**, and

   d)   as to Counts V and VI, **DENIED**.

2)   Defendants' motion to exclude the report and testimony of Jason N. Itri, M.D., Ph.D. (Docket No. 82) is **DENIED**.

3)   Defendants' motion to strike the October 31, 2022 affidavit of Jason N. Itri, M.D., Ph.D. (Docket No. 91) is **DENIED**.


**So ordered.**

                              /s/ Nathaniel M. Gorton
                              Nathaniel M. Gorton
                              United States District Judge


Dated May 8, 2023

- 28 -